**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| OFF LEASE ONLY LLC, *et al.*,[1] | Case No. 23-11388 (CTG) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF LELAND WILSON IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Leland Wilson, hereby declare under penalty of perjury:

1.      Prior to the Petition Date (as defined below) I served as Chief Executive Officer of Off Lease Only LLC (together with its debtor affiliates Off Lease Only Parent LLC and Colo Real Estate Holdings LLC, the "Debtors" or the "Company").  I now serve as an independent contractor of the Company and, pursuant to the written consent approved by the Debtors' board of managers and attached to each Debtor's chapter 11 petition, I am authorized to submit this declaration (this "Declaration") on behalf of the Debtors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

2.      I have extensive experience holding leadership positions in the automotive and financial services industries.  I served as the Debtors' CEO from 2019 until immediately prior to the Petition Date.  Prior to serving as the Debtors' CEO, I was the CEO of CorePointe Group and was an executive at multiple Cerberus Capital Management portfolio companies, holding various interim Chief Financial Officer and Chief Administrative Officer roles.  Prior to joining CorePointe, I served as Vice Chairman and Chief Financial Officer of Chrysler Financial.  I have

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Off Lease Only LLC (7345), Off Lease Only Parent LLC (2753), and Colo Real Estate Holdings LLC (7453). The location of the Debtors' service address in these chapter 11 cases is 1200 S. Congress Ave., Palm Springs, FL, 33406.

also held senior finance and operating roles at First Marblehead, Vanguard Car Rental, and AutoNation.  I hold a bachelor of arts degree in economics from the University of Connecticut, a master's degree in business administration from Boston University, and a master's of science degree in finance from Boston College.

3.      As a result of my role and experience with the Company, my review of relevant documents, and discussions with the Company's management team, I am familiar with the Company's business, financial condition, day-to-day operations, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein.  Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' senior management, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial condition.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my supervision, at my direction, and for my use in preparing this Declaration. References to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters are based on my understanding of such in reliance on the advice of counsel.

4.      On the date hereof (the "Petition Date"), the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions (the "Petitions") for relief in the United States Bankruptcy Court for the District of Delaware (the "Court") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors will continue to operate their businesses and manage their properties as debtors-in-possession.

5.      I submit this Declaration to assist the Court and parties in interest in understanding the Debtors' prepetition business operations, the circumstances compelling the commencement of

these Chapter 11 Cases, and the Debtors' intentions for these Chapter 11 Cases, and in support of (i) the Petitions and (ii) the "first day" pleadings being filed concurrently herewith (collectively, the "First Day Pleadings").  The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on the wind-down of their businesses.  I have reviewed the First Day Pleadings, and I believe the relief sought therein is essential to ensure the Debtors' ability to wind-down their business and to ensure a smooth transition into chapter 11.  I believe that the Debtors would suffer immediate and irreparable harm that would jeopardize their ability to maximize the value of their estates, absent the relief requested in the First Day Pleadings.

6.      This Declaration is divided into three (3) parts.  **Part I** provides background information regarding the Debtors, their corporate and capital structures, and their prepetition business operations.  **Part II** describes the circumstances leading to the commencement of the Chapter 11 Cases and the Debtors' intentions for these Chapter 11 Cases.  **Part III** sets forth the relevant facts in support of each of the Debtors' First Day Pleadings.

## PART I

### Overview of the Debtors

7.      Prior to the Petition Date, the Debtors were a leading regional used car retailer, operating dealerships in the States of Florida and Texas.  The Company was founded in 2004 with just two cars and grew to become one of the largest volume used car dealers in Florida, with over 300,000 cars sold since it was founded.  The Company operated five (5) used car dealerships in Florida and one (1) in Texas.  However, the Company sold cars to customers throughout the United States.  As is explained below, the Company ceased operations shortly before the Petition Date,

and intends to wind down its business and allow its floorplan lender to collect the vehicles securing its loan during these Chapter 11 Cases.

**A. The Debtors' Corporate Structure**

8.      Debtor Off Lease Only Parent LLC ("Parent"), a Delaware limited liability company, is the direct parent of Debtor Off Lease Only LLC ("OLO"), a Florida limited liability company, and OLO is the direct parent of Debtor Colo Real Estate Holdings LLC ("Colo"), a Delaware limited liability company.  A chart illustrating the Debtors' organizational structure is set forth below:



9.      In November 2019, Cerberus Off Lease Only LLC ("Cerberus"), an affiliate of Cerberus Capital Management, acquired the Company.  Cerberus owns eighty percent (80%) of the equity of Parent.  The remaining twenty percent (20%) is held by M&E OLO Holdings, Inc., an entity owned by the Company's founders.

**B. Prepetition Capital Structure**

10.     The Debtors' capital structure consists of outstanding funded debt obligations in the aggregate principal amount of approximately $138,654,548, comprised of (i) approximately $67,368,932 outstanding pursuant to the Floorplan Agreement; (ii) $5,000,000 in principal outstanding pursuant to the Spirit Note; (iii) $13,450,000 in principal outstanding pursuant to the Katy Loan Agreement; and (iv) $52,835,616 in principal and paid-in-kind interest outstanding pursuant to the Cerberus Note (each as defined below).

### 1.  The Floorplan Agreement

11.     OLO, as borrower, Parent, as Guarantor, and Ally Bank and Ally Financial (collectively, Ally") are party to that certain Master Wholesale Agreement, dated as of October 11, 2010 (as amended, supplemented, or modified from time to time, the "Floorplan Agreement"). At the beginning of 2023, the Debtors' line of credit pursuant to the Floorplan Agreement (the "Floorplan Line") was $200 million.  However, on February 6, 2023, Ally reduced the Floorplan Line to $180 million.

12.     Pursuant to the Floorplan Agreement, Ally financed the Debtors' acquisition of the majority of their inventory.  Prior to the Petition Date, the Debtors acquired the bulk of their inventory at auction, as described in detail below.  Ally has a relationship with the majority of the Debtors' auction partners, and when the Debtors' acquired a vehicle at auction from one of those partners, Ally remitted payment directly to the auction partner and the vehicle was automatically added to Ally's floorplan (the "Floorplan").  When the Debtors acquired a vehicle from an auction partner not connected to Ally, the Debtors determined whether such vehicle should be manually added to the Floorplan, in which case, Ally would fund the Debtors 90 percent of the purchase price.  The Debtors also acquired inventory through trade-ins and the We Buy Your Car program, each described in detail below, and determined whether to manually add them to the Floorplan.

The Debtors did not add vehicles that they intended to sell wholesale rather than to retail customers, or vehicles outside Floorplan parameters based on age and mileage.  For all vehicles manually added to the Floorplan, the Debtors were required to obtain title to the vehicle and provide proof of title to Ally before such vehicles would be added to the Floorplan.  However, Ally provided a Floorplan advance accommodation whereby if the Debtors paid off the vehicle lien of a trade-in or We Buy Your Car purchase, the vehicle was placed on the Floorplan without title as long as title was received within a thirty (30) day period.  If a vehicle was not sold within one hundred fifty (150) days of acquisition, the Company repaid Ally ten percent (10%) of the original balance under the Floorplan Line related to such vehicle every thirty (30) days following the initial one hundred fifty (150) days, up to fifty percent (50%) of the lower of original vehicle Floorplan balance or clean wholesale value (such payments, "Curtailment Payments").

13.     The Floorplan Line is secured by a lien on (i) all of the Debtors' vehicles, including but not limited to vehicles for which Ally provides financing, and regardless of whether such vehicles are inventory or equipment, and (ii) all funds provided to or held by Ally, regardless of whether such funds are considered accounts, general intangibles, or otherwise.  Pursuant to the Floorplan Agreement, Ally also holds $10 million of the Debtors cash as restricted cash (the "Restricted Cash").

**2. The Spirit Loans**

14.     The Debtors are party to two loan agreements with Spirit Realty, L.P. ("Spirit"), their largest landlord.

15.     OLO, as borrower, Parent, as guarantor, and Spirit, as lender are party to that certain Loan Agreement, dated as of March 25, 2022 (as amended, supplemented, or modified from time to time (the "Katy Loan Agreement"), pursuant to which Spirit provided a construction loan for

use in constructing a new dealership in Katy, Texas (the "Katy Loan").  The original principal amount of the Katy Loan was $12.7 million, which was increased to $13.45 million pursuant to a January 31, 2023 amendment.  The Katy Loan is secured by, among other things, (i) land, improvements, fixtures, easements, and equipment related to the Katy property, and (ii) property and rights of OLO that may be subject to the Uniform Commercial Code, regardless of whether such assets are related to the Katy property.

16.     OLO, as maker, Parent, as guarantor, and Spirit, as holder, are also party to that certain Promissory Note, dated as of May 17, 2023 (as amended, supplemented, or modified from time to time, the "Spirit Note")' pursuant to which OLO issued a $5 million promissory note to Spirit.  The obligations pursuant to the Spirit Note are unsecured.

### 3.  The Cerberus Note

17.     Parent, as maker, OLO and Colo, as guarantors, and Cerberus, as holder, are party to that certain Promissory Note, dated as of August 5, 2022 (as amended, supplemented, or modified from time, the "Cerberus Note").  The original principal amount of the Cerberus Note was $26.7 million.  Pursuant to a February 15, 2023 amendment, the principal was increased to $46.7 million. The current outstanding balance of the Cerberus Note with paid-in-kind interest is $52,835,616.20.  The Cerberus note is secured by substantially all of the Debtors' assets, excluding Ally's collateral.

### C.  Overview of the Debtors' Prepetition Operations

18.     Prior to the Petition Date, the Debtors were a leading local used car dealer.  The Debtors' business operations revolved around the purchase and sale of used cars, however the Debtors also earned revenue by facilitating the financing of customers' vehicle purchases, and by selling F&I Products (as defined below).

### 1. Acquisition of Vehicles

19.     The Company acquired vehicles in three ways.  First, the majority of the Company's inventory was purchased at auction.  As explained above, when Ally had a relationship with the auction partner, Ally paid the purchase price directly to the auction partner for the vehicles acquired by the Company.  When Ally did not have a relationship with the auction partner, Ally funded the Debtors ninety percent (90%) of the purchase price and the vehicle was added to the Floorplan.  When vehicles were purchased at auction, the Company contracted with vendors to transport the vehicles to the appropriate location.  Upon receiving the inventory, the Company inspected vehicles to ensure they were in the same condition as they were at auction.  Any disputes regarding the condition of a vehicle were submitted to the auction partner's arbitration agent, and such disputes generally resulted in an adjustment to the purchase price or the return of the vehicle.  Vehicles not subject to arbitration were then reconditioned to repair any cosmetic or mechanical issues, and placed on the Company's website for sale.

20.     The Company also acquired vehicles through customer trade-ins, in which customers exchanged their existing vehicle for a new vehicle.  When the Company received a car to be traded in, the Company first produced an appraisal report using information on the customer's car.  The appraisal report was then reviewed by an appraiser, who would inspect the vehicle to verify the report's accuracy and determine the value of the vehicle based on market prices.  Once the customer agreed to the value of the vehicle, either (i) the Company issued a voucher to apply against the purchase of a vehicle on the same day, or (ii) a customer could seek to retain a portion any equity over-and-above the required minimum by a lender to satisfy the new finance contract.

21.     Additionally, the Company acquired vehicles through the "We Buy Your Car" program.  The Company inspected, appraised, and valued vehicles that individuals were seeking

to sell in the same manner that the Company valued trade-in vehicles. The Company then made an offer to the seller, and issued a check to the seller if the seller accepted the offer.

### 2. Sale of Vehicles and Financing of Customer Purchases

22.     The Company presented vehicles to retail customers at its six (6) dealerships and through its website, as well as third-party aggregator sites. Although the majority of the Company's customers were located in Florida and Texas, the Company sold vehicles to customers across the country and offered shipping services to customers who were not shopping locally.

23.     The majority of the Company's customers required financing to purchase a vehicle. The Company facilitated financing to customers through partnerships with a variety of lenders to whom the Company assigned such loans. When a customer sought to purchase a vehicle, the customer completed a loan application, which the Company submitted to a variety of lenders to determine customer qualification for a loan. In some cases, the Company maintained the ability to charge a margin in the form of either an interest rate or commission.. At the time of the sale, the lender paid the Company its margin or commission up front. In the event the loan was prepaid by the customer resulting in less margin owing to the Company over the life of the loan, the Company was obligated to remit the excess interest it received to the lender. Most lender agreements provided a cap of ninety (90) days at which time the Company would not be obligated to repay its margin or commission.

24.     In addition, the Company sold certain vehicles, which it determined were not sufficiently valuable to sell to retail customers, at wholesale prices at auction. These vehicles primarily consisted of those acquired through the We Buy Your Car and trade-in programs that were not added to Ally's Floorplan, as well as older vehicles on the Floorplan. Proceeds of

vehicles on the Floorplan sold at auction were paid to the Company who then remitted funds to Ally to satisfy the Floorplan obligation.

### 3.  Sale of F&I Products

25.      In connection with the sale of its vehicles, the Company partnered with third parties who provided certain insurance and other products including gap insurance, theft insurance, paint and fabric protection, dent and ding removal, tire and wheel coverage, key replacement, and vehicle service contracts providing coverage for repairs (collectively, "<u>F&I Products</u>").  When a customer purchased a vehicle, the customer had the ability to select the F&I Products he or she wished to purchase.  The Company collected the cost of the F&I Products from the customer and, pursuant to the Company's agreements with the providers of the F&I Products, paid a portion of the proceeds to the providers.

## PART II

## Events Leading to the Commencement of the Chapter 11 Cases

### A.  Declining Revenue and the Company's Prepetition Efforts

26.      Beginning in 2022, the Company experienced a significant decline in revenue due to macroeconomic factors impacting the used car industry.  The Company's business model was primarily centered on vehicles less than four (4) years old and with less than forty thousand (40,000) miles.  However, this model lost viability due to, among other things, supply chain disruptions post-COVID that reduced the availability of new vehicles in the market driving used vehicle wholesale prices to record levels as franchise dealers and others competed heavily for this limited available inventory.  In mid-2023, used vehicle prices remained approximately forty percent (40%) higher than they were prior to the COVID-19 pandemic.  The Company also faced increased competition from new car dealers who shifted to used car sales, particularly in the under

four (4) year and forty thousand (40,000) mile category to offset lower new car sales. The Company's access to supply of used cars also dropped, due to lower new car supply over the past several years, and the fact that the Company lost access to inventory from car rental companies and reduced lease return dynamics. Further, high interest rates and inflation also impacted consumers' ability to purchase cars, leading to a decrease in the Company's customer base and further impacting revenues.

27.     Beginning in mid-2022, the Company took a number of actions to reduce costs and improve profitability to offset these macroeconomic conditions.  The Company reduced its employee headcount significantly, implemented broad-based cost reduction, launched the We Buy Your Car program in 2022 to acquire inventory at lower prices, and increased dealer and administration fees charged to customers.  The Company also expanded its inventory to include higher mileage, older vehicles sold at lower prices in an attempt to address customer affordability.

28.     Despite the Company's efforts, as a result of the Company's declining performance and high percentage of inventory that had been on the Floorplan for over one hundred twenty (120) days, the Company began to face increased pressure from Ally.  In December 2022, Ally requested modifications to the Floorplan Agreement, including reductions in the Floorplan Line, increases in the amount of Restricted Cash held by Ally, interest rate increases, and the making of Curtailment Payments on inventory older than one hundred twenty (120) days, rather than the one hundred fifty (150) days as described above.  The Company engaged in negotiations with Ally and, in February 2023, agreed to certain concessions including a reduction of the Floorplan Line from $200 million to $180 million, an increase to the Restricted Cash in the event outstandings under the Floorplan Line exceed $160 million (which has not occurred), an increase to the interest rate spread of fifty (50) basis points, and certain other covenants.

29.     The Company also engaged in discussions with its other lenders, and obtained an approximately $20 million increase in the principal amount of the Cerberus Note in February 2023, and the $5 million Spirit Note in May 2023, each as described above.

30.     Despite liquidity injections from its other lenders, the Company's profits and liquidity position continued to deteriorate as the used vehicle market softened.  The Company determined the best path forward was to pursue a sale or merger transaction to achieve a long-term solution.  The Company engaged BofA Securities, Inc. ("BAML") as investment banker in June 2023, and commenced a marketing process.  In the months leading up to the Petition Date, BAML contacted seventy-nine (79) potential transaction partners, including both strategic and financial parties, several of which signed NDAs.  However, only two (2) submitted indications of interest, neither of which have been actionable to date.

31.     In August 2023, as a result of the Company's aging inventory and deteriorating liquidity profile, Ally suspended the Company's ability to request Floorplan financing for auction purchases, its main source of inventory acquisition. Ally also requested additional amendments to the Floorplan Agreement, including an increase in the Restricted Cash, restrictions on the number weekly vehicle purchases the Company could make using the Floorplan Line, and a reduction in the advance rate under the Floorplan Line for trade-in and We Buy Your Car acquisitions, among other things.  The Company engaged in negotiations with Ally and ultimately avoided any increase to the Restricted Cash, preserving some liquidity, but agreed to a reduction in Ally's advance rate. Additionally, Ally imposed restrictions on the number of vehicles the Debtors could acquire each week through the trade-in and We Buy Your Car programs.  As a result of the Ally-imposed restrictions on its ability to purchase vehicles and its limited liquidity, the Company was no longer able to buy sufficient profit generating inventory in August 2023.

**B.  The Chapter 11 Cases**

32.     With no viable going concern transaction, limited ability to purchase inventory, and a constrained liquidity profile, as a result of Ally's actions, the Company determined that its only option was to cease operations, allow Ally to collect the vehicles securing the Floorplan Line, and wind down its businesses in chapter 11.  The Company stopped selling vehicles on September 6, 2023.  On September 6, 2023, the Company issued notices to all employees pursuant to the federal Worker Adjustment and Retraining Notification Act (the "WARN Act") which, among other things, informed employees that they would be terminated effective September 7 and provided information regarding their benefits.  On or before September 7, each of the Company's employees received their final paycheck for wages through and including September 7, and payment of fifty-nine (59) days' wages pursuant to the WARN Act.  As explained below, the Company has funded medical benefits for its former employees through the end of September.

33.     The Company has subsequently retained approximately sixty-seven (67) former employees as independent contractors to assist with the wind-down of its operations.  These independent contractors include myself, other former members of the Company's management team, and a small number of contractors at each retail location who will assist in consummating prepetition sales (including lien payoffs and transfers of title, as described below) and transferring vehicles to Ally, providing security at retail locations, and closing the locations.

34.     Pursuant to the Floorplan Agreement, I understand that Ally has a security interest in all of the Debtors' vehicles—regardless of whether such vehicles are on the Floorplan—as well as proceeds of such vehicles.  Prior to the Petition Date, the Debtors informed Ally of their decision to wind down their operations and allow Ally to recover its collateral.  The Debtors' independent contractors will assist in transferring vehicles to Ally as quickly as possible following the Petition

Date.  Simultaneously herewith, the Debtors filed a motion to reject each of their leases, effective at varying dates to coincide with Ally's removal of vehicles.  The Debtors anticipate that, upon removal, the Debtors shall wind down any remaining operations and assets.

35.    The Debtors believe, and I agree based on my experience, that allowing Ally—which has a senior lien on the Debtors' vehicles—to recover its collateral will maximize the value of the Debtors' estates by minimizing the cost to the Debtors of liquidating their assets, and may allow value to be distributed to creditors in accordance with the Bankruptcy Code.

**C.  The Debtors' Need to Use Cash Collateral**

36.    Simultaneously herewith, the Debtors filed a motion seeking authority to use cash collateral during the Chapter 11 Cases.  Because substantially all of the Debtors' assets are encumbered and the Debtors are no longer operating, the Debtors determined, in their business judgment, that new money debtor-in-possession financing is not a viable option.  Accordingly, the Debtors require immediate access to cash collateral to ensure they can complete an orderly wind-down of their operations, administer these Chapter 11 Cases, and maximize the value of their estates.  Furthermore, the wind-down is primarily being conducted for the benefit of Ally, the Debtors' largest creditor, and the use of cash collateral is necessary to protect Ally's collateral and assist Ally in recovering it.  Additionally, the return of the vehicles is a complicated logistical and administrative exercise further complicated by the dearth of available transport vehicles in the Company's areas of operation, which the Company's estimates will take two to four weeks to complete. Absent access to cash collateral, I do not believe Debtors will be able to complete a successful wind-down or deliver vehicles to Ally.

**PART III**

**The First Day Pleadings**

37.     Contemporaneously with the filing of this Declaration, the Debtors have filed a number of First Day Pleadings seeking relief to minimize the adverse effects of the commencement of these Chapter 11 Cases on the wind-down of their businesses, and to ensure that the wind-down can be completed with limited disruptions.  The Debtors have narrowly tailored the relief requested in the First Day Pleadings to meet their goals of (i) obtaining authority to pay amounts or satisfy obligations essential to the wind-down of their operations, in order to wind-down their businesses as efficiently, and (ii) establishing procedures for the efficient administration of the Chapter 11 Cases.

38.     I have reviewed each of the First Day Pleadings, and I believe that the facts set forth therein are true and correct to the best of my knowledge.  I believe that the relief sought in each of the First Day Pleadings is necessary to the successful wind-down of the Debtors' operations and to avoid immediate and irreparable harm to the Debtors' estates and creditors.

39.     A summary of the First Day Pleadings and the relief requested therein is set forth below.[2]

## A.  Administrative Motions

**1.  *Motion of the Debtors for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases* (the "<u>Joint Administration Motion</u>")**

40.     Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing procedural consolidation and joint administration of these Chapter 11 Cases and granting related relief.

41.     Each of the Debtors are affiliates.  Debtors Off Lease Only LLC and Colo Real Estate Holdings LLC are direct or indirect wholly-owned subsidiaries of Debtor Off Lease Only

---

[2]  Capitalized terms used but not defined below shall have the meanings given to them in the applicable First Day Pleading.

Parent LLC.  The Debtors anticipate that almost all of the papers, hearings, and orders in these cases will relate to all of the Debtors.  Because there will likely be numerous motions, applications, and other pleadings filed in the Chapter 11 Cases that will affect the Debtors, I believe joint administration will permit counsel for all parties-in-interest to include all of the Debtors' cases in a single caption for the numerous documents that are likely to be filed and served in the Chapter 11 Cases.  I believe administration will also enable parties-in-interest in both of the Debtors' cases to stay apprised of all the various matters before the Court with greater ease and efficiency. Moreover, I believe the entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings.

> **2.** ***Motion of the Debtors for Entry of an Order Extending Time for Filing Schedules and Statements* (the "<u>SOFAs and Schedules Motion</u>")**

42.     Pursuant to the SOFAs and Schedules Motion, the Debtors seek entry of an order extending the deadline by which the Debtors must file their Schedules and Statements by thirty-two (32) days, for a total of sixty (60) days from the Petition Date, to and including November 6, 2023 without prejudice to the Debtor's ability to request additional extensions, and granting related relief.

43.     I believe that good and sufficient cause exists for granting an extension of time to file the Schedules and Statements.  The Debtors' business operations required them to maintain voluminous books and records and complex accounting systems. To prepare the Schedules and Statements, the Debtors and their advisors must gather, review, and assemble information from books, records, and documents related to operations in numerous locations and business segments. Consequently, collecting information necessary to complete the Schedules and Statements will require substantial time and effort on the part of the Debtors and their advisors.

44. In the time leading to the Petition Date, the Debtors focused on pursuing a potential sale process, preparing for the Chapter 11 Cases, preparing the business to transition into chapter 11, and negotiating with their creditor constituencies and other parties in interest. While the Debtors have commenced the process to prepare and finalize the voluminous Schedules and Statements and are working diligently to complete the process, the Debtors anticipate that they may require an additional thirty-two (32) days to complete the Schedules and Statements. I believe that the extensive amount of information that must be assembled and compiled from multiple places, and the hundreds of employee and professional hours required to complete the Schedules and Statements constitute good and sufficient cause for granting the requested extension of time. Further, I believe that no party in interest will be prejudiced by the requested extension because the Debtors have financial and operational incentives to progress the Chapter 11 Cases expeditiously. Therefore, the Debtors request that the Court extend the deadline to file their Schedules and Statements for an additional thirty-two (32) days (in addition to the twenty-eight (28) days that I understand is provided for pursuant to Local Rule 1007-1(b)), through and including November 6, 2023, without prejudice to the Debtors' right to request further extensions, for cause shown.

3. ***Motion of the Debtors for Entry of an Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix, (B) File a Consolidated Top 20 Creditors List, and (C) Redact Certain Personally Identifiable Information for Individual Creditors; and (II) Granting Related Relief*** (the "<u>**Creditor Matrix Motion**</u>")

45. Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' twenty (20) largest unsecured creditors in lieu of submitting a separate list for each Debtor, and

(c) redact certain personally identifiable information for the Debtors' individual creditors, and granting related relief.

46.     I believe that permitting the Debtors to maintain a single Consolidated Creditor Matrix, in lieu of filing a separate list of creditors for each Debtor, is warranted.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.  In addition, I believe that, because the Debtors' significant unsecured creditors are captured on the Consolidated Top 20 Creditors List, it will provide the U.S. Trustee with a sufficiently clear picture of the Debtors' unsecured creditor constituency.  In addition, the Consolidated Top 20 Creditors List will help alleviate administrative burdens, costs, and the possibility of duplicative service. Accordingly, I believe that filing a Consolidated Creditor Matrix and Consolidated Top 20 Creditors List is in the best interest of the Debtors' estates.

47.     Further, I believe it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases the email addresses and home addresses of any of the Debtors' individual equity security holders and creditors—including the Debtors' customers and current and former employees—to the extent applicable, because disclosing such information could be used by third parties, among other things, to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking who have otherwise taken steps to conceal their whereabouts.  The Debtors propose to provide an unredacted version of the Consolidated Creditor Matrix and any other redacted, applicable filings to this Court, the U.S. Trustee, counsel to any statutory committee appointed in the Chapter 11 Cases, and other parties in interest upon reasonable request to the Debtors or this Court that is reasonably related to these Chapter 11 Cases or as otherwise ordered by the Court.

**4.** ***Debtors' Application for Appointment of Stretto, Inc. as Claims and Noticing Agent (the "<u>Stretto 156(c) Retention Application</u>")***

48.     Pursuant to the Stretto 156(c) Retention Application, the Debtors seek entry of an order appointing Stretto, Inc. as Claims and Noticing Agent in these Chapter 11 Cases.

49.     Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Stretto to act as Claims and Noticing Agent is appropriate and in the best interests of the estates.  Moreover, the Debtors obtained and reviewed engagement proposals from two other court-approved claims and noticing agents to ensure selection through a competitive process.  I believe, based on all engagement proposals obtained and reviewed, that Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise.

50.     The Debtors anticipate that there will be thousands of persons and entities to be noticed in these Chapter 11 Cases.  In view of the number of anticipated claimants and the complexity of the Debtors' business, I believe that the appointment of a claims and noticing agent is in the best interests of both the Debtors' estates and their creditors.

**B.  Operational Motions**

**1.** ***Motion of the Debtors for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service, and (IV) Granting Related Relief (the "<u>Utilities Motion</u>")***

51.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors' proposed form of adequate performance of postpetition payment to the Utility Companies, (b) establishing procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance, (c) prohibiting the Utility Companies from altering, refusing or discontinuing service to or discriminating against the Debtors solely on the basis of the commencement of these Chapter 11 Cases, a debt that is owed by the Debtors for

services rendered prior to the Petition Date, or on account of any perceived inadequacy of the Debtors' Proposed Adequate Assurance, and (d) granting related relief.

52.     In connection with the normal operations of their business and the management of their property, the Debtors utilize electric and natural gas, internet and telephone, water and sewage, and other similar Utility Services to facilitate their business operations.  The Utility Services are utilized at the Debtors' various facilities throughout Florida and Texas.  While the Debtors have ceased the retail operation of their businesses, in the absence of continuous Utility Services, there would be risk attendant to the Debtors' assets and undermine the wind-down of the Debtors' operations.

53.     In general, the Debtors have established a good payment history with the Utility Companies, making payments on a regular and timely basis.  Historically, the Debtors have paid, on average, approximately One Hundred and Thirty-Eight Thousand One Hundred and Forty-Five dollars ($138,145.00) per month on account of Utility Services to the Utility Companies on the Utilities Company List.

54.     To provide additional assurance of payment for future services to the Utility Companies following the Petition Date, the Debtors propose that, on or before the date that is twenty (20) days after the Petition Date, the Debtors will (i) establish a newly-created, interest-bearing, Utility Deposit Account and (ii) place a Utility Deposit equal to the Debtors' estimated aggregate cost for two (2) weeks of Utility Services, calculated based on the historical average paid over the past seven (7) months to the Utility Companies into such Utility Deposit Account.

55.     The Debtors estimate, based on the average two (2) week cost of the Utility Services, that the aggregate Utility Deposit will be approximately Sixty-Four Thousand One Hundred and Sixty-Two dollars ($64,162.00). I believe that the Utility Deposit, in conjunction

with the Debtors' ability to pay for future Utility Services throughout the wind-down of their operations assures the Utility Companies of future payment during these Chapter 11 Cases.

> **2.** ***Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief* (the "<u>Taxes Motion</u>")**

56.    Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors, in their sole discretion, to pay certain Taxes and Fees without regard to whether such obligations accrued or arose before or after the Petition Date, and granting related relief.

57.    In the ordinary course of business prior to the Petition Date, the Debtors collected, withheld, and incurred sales, use, income, franchise, and property taxes, as well as other licensing fees.  The Debtors have determined that payment of certain taxes and fees consisting of sales tax, personal property tax, and vehicle inventory tax collected from customers in the State of Texas (collectively, the "<u>Taxes and Fees</u>") is critical to the success of these Chapter 11 Cases and Debtors' ability to wind-down their business, as set forth below.  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "<u>Taxing Authorities</u>").   The Debtors pay the Taxes and Fees to the Taxing Authorities on a periodic basis, remitting them monthly, semi-monthly, quarterly, semi-annually, or annually depending on the nature and incurrence of a particular Tax or Fee. The Debtors estimate that approximately $571,000 in Taxes and Fees are outstanding as of the Petition Date.

58.    <u>Sales Taxes</u>.  The Debtors incur, collect, and remit sales and use taxes, to the Taxing Authorities in connection with the prepetition sale of goods and services (collectively, the "<u>Sales and Use Taxes</u>"). Prior to the Petition Date, in the ordinary course of business, the Debtors paid approximately $2,209,756 in Sales and Use Tax, including an offset of $1,812,766 in a Sales and

Use Tax deposit with the State of Florida.  The Debtors estimate that, as of the Petition Date, approximately $383,000 in Sales and Use Taxes are accrued and unpaid.

59.    <u>Vehicle Inventory Taxes</u>.  In the state of Texas, the Debtors collected vehicle inventory taxes (the "<u>Vehicle Inventory Taxes</u>") from their customers when they sold vehicles to customers prepetition.  The Debtors held the Vehicle Inventory Taxes in trust, and paid such Vehicle Inventory Taxes to the applicable Taxing Authority once the amount of Vehicle Inventory Taxes was assessed.  The Debtors estimate that, as of the Petition Date, approximately $125,000 in Vehicle Inventory Taxes are accrued and unpaid.

60.    <u>Personal Property Taxes</u>.  States and local laws in the jurisdictions where the Debtors operate generally grant Taxing Authorities the power to levy property taxes against the Debtors' personal property (collectively, the "<u>Personal Property Taxes</u>"). To avoid the imposition of statutory liens on their personal property, the Debtors typically paid Personal Property Taxes on personal property that they own in the ordinary course of business on an annual or semi-annual basis, depending on the Taxing Authority.  The Debtors estimate that, as of the Petition Date, approximately $65,000 in Personal Property Taxes are accrued and unpaid to the applicable Taxing Authorities, due and payable in 2024.

61.    <u>Regulatory and Other Taxes and Fees</u>.  Prior to the Petition Date, the Debtors incurred a variety of Taxes and Fees related to licenses and other governmental laws and regulations such as (i) motor vehicle dealer licensing fees, motor vehicle retail installment seller licensing fees, resale tax certificate fees, and motor vehicle repair shop registration fees, (ii) annual reporting fees to state governments to remain in good standing for purposes of conducting business within the state, (iii) other fees for various business licenses, permits, and certificates required by the Debtors to operate, and (iv) other taxes and fees, such as certain filing fees, on an annual basis

in the ordinary course of business (the "Regulatory and Other Taxes and Fees"). The Debtors typically remitted Regulatory and Other Taxes and Fees to the relevant Taxing Authorities on a monthly, quarterly, or annual basis depending on the type of tax or fee.  The Debtors believe that they are current on all Regulatory and Other Taxes and Fees necessary to wind-down their business operations as of the Petition Date.

62.     I believe that timely payment of the Taxes and Fees is necessary for the success of these Chapter 11 Cases and the wind-down of the Debtors' business operations.  I believe satisfaction of the prepetition Taxes and Fees is necessary to preserve the Debtors' resources, thereby better positioning the Debtors to successfully wind-down their operations and distribute value to creditors.  Delayed payment of the Taxes and Fees may cause the Taxing Authorities to take disruptive actions, including audits, lien filings, moving for relief from the automatic stay, and other administrative procedures, all of which would consume valuable time and resources and divert the Debtors' attention from their wind-down efforts.  Prompt and regular payment of the Taxes and Fees will avoid these distractions. Further, any seizure of the Debtors' property by the Taxing Authorities would jeopardize creditor recoveries from the Debtors' assets and proceeds thereof.  Thus, even if the Debtors could avoid payment of certain Taxes and Fees, I believe that the collateral consequences to the Debtors' wind-down process would vastly exceed whatever modest short-run cost savings the Debtors might achieve.

63.     In addition, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Taxing Authorities, and I understand these funds may not constitute property of the Debtors' estates. The United States and the States in which the Debtors operate have laws providing that the Debtors' officers, directors, or other responsible employees could, in certain circumstances, be held personally liable for the nonpayment of certain Taxes and

Fees.  To the extent that any Taxes and Fees remain unpaid as of the Petition Date and thereafter in these jurisdictions, the Debtors' officers and directors could be subject to lawsuits or other collection efforts during the pendency of these Chapter 11 Cases.  I believe collection efforts by the Taxing Authorities would be extremely distracting for the Debtors, their directors, and their independent contractors who were formerly officers, and their efforts to bring these Chapter 11 Cases to an expeditious, successful conclusion.

**3.    *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Existing Insurance Policies and the Surety Bond Program and Pay All Obligations Arising Thereunder and (B) Continue their Insurance Premium Financing Program and (II) Granting Related Relief* (the "Insurance Motion")**

64.    Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors, in their sole discretion, to (a) maintain their existing insurance policies and the surety bond program and pay all obligations arising thereunder or in connection therewith, and (b) continue their insurance premium financing program, and (c) granting related relief.

65.    Prior to the Petition Date, the Debtors maintained various insurance policies providing coverage for, among other things, commercial property and site pollution, management liability, commercial automobile liability, excess directors' and officers' liability, side A directors' and officers' liability, cyber liability, physical damage liability in Florida and Texas, and commercial umbrella liability and commercial excess liability.  Prior to the Petition Date, the Debtors ceased their retail operations and, accordingly, during the wind-down of their operations, the Debtors only require continuation of property, cyber liability, environmental liability, directors' and officers' and general liability policies (each an "Insurance Policy," collectively, the "Insurance Policies," and, collectively with the Financing Agreements, the "Insurance Program").

The Insurance Policies were obtained from various insurance carriers (each an "Insurance Carrier" and, collectively, the "Insurance Carriers").

66.     The aggregate amount of annual premiums on account of the Debtors' Insurance Policies is approximately Two Million Eight Hundred and Ninety Eight Thousand and Two Hundred and Sixty Dollars ($2,898,260.00) (including premiums the Debtors have already paid to date). The premiums for the Debtors' Insurance Policies are paid monthly, except with respect to those that are financed. As of the Petition Date, the Debtors are current on all amounts owed on account of the Insurance Policies. Two (2) of the Insurance Policies (collectively, the "Financed Policies") are financed through two (2) insurance premium financing agreements (the "Financing Agreements"), both maintained with AFCO. The Debtors believe that it is economically beneficial to finance the premiums rather than pay in a lump sum. Pursuant to the Financing Agreements, AFCO has agreed to pay the insurance premiums due under the Financed Policies in exchange for an aggregate upfront payment, and thereafter, monthly payments from the Debtors. The Debtors do not believe any amounts are accrued and unpaid on account of the Financing Agreements as of the Petition Date.

67.     I believe it is critical that the Debtors maintain the Insurance Policies. If the Debtors are unable to make payments that will become due after the Petition Date on account of the Insurance Policies, I understand that the unpaid Insurance Carriers may seek relief from the automatic stay to terminate such Insurance Policies. The Debtors would be required to obtain replacement insurance on an expedited basis and at a significant cost to the estates. In light of the importance of maintaining insurance coverage with respect to their business activities during the wind-down of the Debtors' operations, I believe it is in the best interest of their estates to receive

Court approval to honor their obligations under the Insurance Program as necessary, during the wind-down of the Debtors' operations

68.     Further, the Debtors are required by certain statutes, rules, and regulations to maintain surety bonds in favor of certain third parties, often governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations (the "<u>Surety Bond Program</u>"). The Surety Bond Program secures essential obligations necessary for the Debtors' operations. As such, failing to provide, maintain, or timely replace their surety bonds will prevent the Debtors from undertaking essential functions related to the wind-down of their operations. I believe that the Surety Bond Program provides coverage that is typical in scope and amount for businesses within the Debtors' industry.  As of the Petition Date, the Debtors have three (3) outstanding surety bonds (the "<u>Surety Bonds</u>") totaling approximately Two Hundred Seventy-Five Thousand Dollars ($275,000.00), which are issued by Great American Insurance Company and Hartford Fire Insurance Company, (the "<u>Sureties</u>").  The total amount paid in Surety Premiums annually is approximately Six Thousand Sixty-Three Dollars ($6,063.00).

69.     For the duration of the wind-down of their operations, the Debtors must be able to provide financial assurance to governmental authorities and other third parties. This, in turn, requires the Debtors to maintain the existing Surety Bond Program. I believe that failing to provide, maintain, or timely replace their surety bonds, as necessary, will prevent the Debtors from undertaking essential functions related to the wind-down of their operations.  The Debtors believe they are current on all Surety Premiums as of the Petition Date.  In light of the importance of maintaining insurance coverage with respect to the wind-down of their operations, I believe it is in the best interest of the Debtors' estates to receive Court approval to honor their obligations under the Surety Bond Program as they come due.

**4.** ***Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief* (the "<u>Critical Vendor Motion</u>")**

70.     Pursuant to the Critical Vendor Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to continue paying prepetition claims of Critical Vendors whose services are essential to the success of the Debtors' wind-down, and granting related relief.

71.     The Debtors engage seven (7) providers of services that are essential to the wind-down of the Debtors' operations to assist with such wind-down (the "<u>Critical Vendors</u>").  The Critical Vendors, by and large, provide a material economic or operational advantage when compared to other available suppliers and vendors, and are essential for the successful wind-down of the Debtors' operations.  To that end, failure to pay prepetition claims held by certain Critical Vendors and accrued in the ordinary course of business could cause such Critical Vendors to refuse to provide the services necessary for the winding down of the Debtors' business.

72.     The Debtors hope to assure continuing services from the Critical Vendors postpetition through negotiation and consensual agreements with such vendors.  However, the Debtors acknowledge their fiduciary duties to consider and plan for the contingency that some or all of the Critical Vendors may refuse to continue providing services absent payment of their prepetition claims.  Even if the Debtors were able to identify adequate replacements for the Critical Vendors, such replacements would likely result in delay and substantially higher costs to the Debtors.

73.     Prior to the Petition Date, the Debtors, with the assistance of their advisors, engaged in a process to (a) identify those trade vendors, suppliers, and service providers that are most critical to the wind-down of the Debtors' business and (b) estimate the aggregate amounts owed to such vendors as of the Petition Date.  Through this process, the Debtors and their advisors spent

significant time reviewing and analyzing the Debtors' books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practice to identify certain critical suppliers services, the loss of which could materially harm the Debtors' ability to successfully wind-down their business.

74.    Following this analysis, the Debtors identified seven (7) Critical Vendors which are essential to the wind-down of the Debtors' business.  The Debtors believe that their relationships with these Critical Vendors may materially deteriorate without such payments, thereby causing disruption to the Debtors' wind-down process if the Debtors are unable to pay Critical Vendor Claims.

75.    The Debtors' Critical Vendors may be broadly grouped into three categories – Vehicle Title Registration, Software as a Service, and Payroll Administration.

76.    Certain Critical Vendors (the "Vehicle Title Registration Vendors") provide on-site title clerk staffing.  In connection with sales of vehicles to customers, in the ordinary course of business, the Debtors typically completed title and registration on the customer's behalf.  Pursuant to Texas and Florida law, the Debtors are required to complete title and registration, while, in other states, customers could elect to do so on their own.  Given the short period of time between the cessation of the Debtors' business operations and the filing of these Chapter 11 Cases, the Debtors have not yet completed title and registration for all vehicles sold in the days leading up to the Petition Date. The services provided by the Vehicle Title Registration Vendors play a critical role in the Debtors' wind-down efforts.  Although certain services provided by the Vehicle Title Registration Vendors might be obtained elsewhere, the Debtors do not believe that alternative providers could be found within a reasonable amount of time.

77.     Certain other Critical Vendors (the "<u>Software as a Service Vendors</u>") provide essential cloud-based services critical for the Debtors' wind-down efforts.  The Software as a Service Vendors provide access to corporate e-mail, data and analytics services, file and server hosting, as well as provide the dealer management system for the company.  The Software as a Service Vendors have developed services tailored specifically to the Debtors and/or their operations are embedded in the Debtors' operations.

78.     Certain other Critical Vendors (the "<u>Payroll Administration Vendors</u>") provide payroll administrative services.  The Payroll Administration Vendors are critical for the Debtors' wind-down efforts as their services will be required to disburse pre-petition wages to former employees, pay 1099 contractors post-petition and process and send former employees their W2s for 2023.

79.     Accordingly, it is essential that the Debtors be able to maintain their business relationships with, and honor outstanding payment obligations to, the Critical Vendors given the critical role that they play in the Debtors' wind-down efforts.  To prevent the commencement of these Chapter 11 Cases from causing an unexpected or inopportune interruption to the Debtors' wind-down efforts, the Debtors are seeking to pay Critical Vendor Claims to ensure the Debtors' continued receipt of services and favorable credit terms from the Critical Vendors.  As of the Petition Date, the Debtors believe that Critical Vendors hold prepetition Critical Vendor Claims totaling approximately $215,000, all of which may become due and payable within the first twenty-one (21) days after the Petition Date.

**5.  *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Maintenance, Administration, and Continuation of the Debtors' Customer Programs and Sale Programs, and (II) Granting Related Relief* (the "<u>Customer Programs Motion</u>")**

80.     Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to maintain and administer customer-related and inventory sale-related programs, practices, and policies in the ordinary course of business and honor certain prepetition obligations related thereto, and granting related relief.

81.     Prior to the Petition Date, in the ordinary course of business, the Debtors maintained Customer Programs consisting of the Exchange Program, the Delivery Program, and the We Owe Program, pursuant to which the Debtors provided services to customers in connection with their purchase of vehicles.  In addition, when the Debtors sold a car to a customer, the Debtors were obligated to make payments on account of Sale Programs consisting of the payoff of existing liens, completion of title and registration, and the payment of certain amounts to contract counterparties offering F&I Products to customers.  Further, prior to the commencement of the financing process for customer purchases, the Debtors collected Customer Deposits from customers who intended to purchase a vehicle.

82.     Although the Debtors are no longer selling vehicles, given the short timeframe between the cessation of the Debtors' operations on September 6, 2023 and the Petition Date, the Debtors have not yet fulfilled their obligations in connection with the Customer Programs and Sale Programs for certain vehicles sold prepetition.  Such programs are key components of customers' purchases, and there are significant risks both to customers and to the revenue the Debtors earned prepetition if the Customer Programs and Sale Programs were not honored.  In addition, the Debtors seek to return the Customer Deposits to potential customers whose purchases were not yet financed prior to the Debtors' cessation of business, but which the Debtors were unable to return prior to the Petition Date due to the short timeframe between the cessation of operations and the filing of these Chapter 11 Cases.  I believe that honoring the Customer Programs and Sale

Programs, and returning the Customer Deposits, as described in the Customer Programs Motion, is essential to the success of these Chapter 11 Cases and to maximize value of the Debtors' estates.

**6.    *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Granting Related Relief* (the "<u>Wages Motion</u>")**

83.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to pay all prepetition wages, salaries, other compensation, reimbursable expenses, and other benefits on account of their Workforce Programs, to the extent any such amounts are accrued and unpaid, and granting related relief.

84.    Immediately prior to the Petition Date, the Debtors terminated the entirety of their workforce (the "<u>Prepetition Employees</u>"), which included approximately five hundred and forty-five (545) Prepetition Employees. Notices pursuant to the to the federal Worker Adjustment and Retraining Notification Act (the "<u>WARN Act</u>") were properly issued to all Prepetition Employees and Twenty-Four (24) Prepetition Employees terminated in July 2023, and all Prepetition Employees received their final paychecks, including all compensation and benefits owed to them through September 5, 2023, estimated compensation and benefits owed to them through September 7, 2023, and fifty-nine  (59) days' worth of wages and benefits pursuant to the WARN Act. Specifically, the Debtors were required to fund payroll on September 5, 2023, as well as all accrued payroll taxes and benefits, before Prepetition Employees had worked their last two (2) days, so the Debtors estimated the amount of outstanding wages owed to Prepetition Employees for the two (2) day period in their final payroll. As explained below, the Debtors seek authority to pay any additional amounts on account of prepetition wages to Prepetition Employees once the Debtors' have determined their actual hours worked from September 5 through 7, 2023, as well as any accrued but unpaid Prepetition Commissions. The Debtors estimate that the amounts accrued and

unpaid to Prepetition Employees as of the Petition Date is Two Hundred Fifty Thousand Dollars ($250,000.00).

85.     Prior to the Petition Date, the Debtors paid their salaried and hourly Prepetition Employees' wages (the "Prepetition Employee Wages"), and a portion of the Prepetition Commissions owed to Prepetition Commissioned Employees, through bi-weekly payroll on Thursdays (the "Payroll"). The Debtors utilized ADP and DailyPay for the administration of Payroll for the Prepetition Employees.  In addition, as is explained below, the Debtors reimbursed certain Reimbursable Expenses (as defined below) to Prepetition Employees through Payroll. Prepetition Employees were paid in one (1) week arrears, so that they received their bi-weekly earnings on the Thursday directly following the pay period that ended the previous Sunday.  As is explained above, the Debtors estimated Prepetition Employee Wages accrued in the two (2) days prior to the Petition Date in their final Payroll.

86.     Certain of the Prepetition Employees (the "Prepetition Commissioned Employees") received one hundred percent (100%) of their compensation in commissions (the "Prepetition Commissions") prior to the Petition Date. Specifically, Prepetition Commissioned Employees received an hourly wage in their bi-weekly Payroll in accordance with the requirement of section 7(i) of the Fair Labor Standards Act that Prepetition Commissioned Employees be paid at least one and one half (1½) times the applicable state's minimum wage for each hour worked.  Then, on a monthly basis, the Debtors determined the Prepetition Commissions earned by each Prepetition Commissioned Employee, and any Prepetition Commissions not already paid to such Prepetition Commissioned Employees through Payroll were paid on or before the twentieth (20th) day of the following month.  However, prior to the Petition Date, the Debtors paid the estimated

Prepetition Commissions owing to Prepetition Employees that accrued through the date the Debtors stopped selling vehicles.

87.     As is explained above, the Debtors paid (i) all prepetition wages to the Prepetition Employees, including estimated amounts for the two (2) day period between funding of Payroll and the filing of these Chapter 11 Cases, as well as related taxes and benefits, immediately prior to the Petition Date and (ii) the estimated Prepetition Commissions owing to Prepetition Employees that accrued through the date the Debtors stopped selling vehicles. Accordingly, the Debtors seek authority to pay any additional Prepetition Employee Wages and Prepetition Commissions that the Debtors determine are accrued and unpaid once the Debtors determined the number of hours actually worked by the Prepetition Employees during the two (2) day period between Payroll and the filing of these Chapter 11 Cases, and have calculated any outstanding Prepetition Commissions.  The Debtors estimate that approximately Two Hundred Fifty Thousand Dollars ($250,000.00) in Prepetition Employee Wages and Prepetition Commissions, in the aggregate, are accrued and outstanding as of the Petition Date.

88.     The Debtors also paid the premiums for the month of September 2023 prior to the Petition Date on account of the Medical Plans and the Debtors anticipate that the payment of such premiums, together with employee contributions from the September 7, 2023 Payroll, will enable Prepetition Employees to continue receiving medical benefits through September 2023. The Debtors also paid the premiums for the month of September 2023 prior to the Petition Date on account of the Dental Plans and Legal Assistance programs, which are both fully covered by the Prepetition Employees. The Debtors anticipate that the payment of such premiums with the employee contributions from the September 7, 2023 Payroll, will enable Prepetition Employees to continue receiving the benefits from the Dental Plans and Legal Assistance program through

September 2023. The Debtors anticipate that the Medical Plans, Dental Plans, and Legal Assistance will terminate following the month of September 2023, as the Debtors will have terminated all of the Debtors' other benefits programs (together with the Medical Plans, Dental Plans, and Legal Assistance program, the "Workforce Programs"), besides the 401(k) Plan (as defined below). However, no further amounts will accrue on account of the Workforce Programs as of the Petition Date.

89.     Prior to the Petition Date, the Debtors retained approximately sixty-seven (67) former employees as independent contractors (collectively, the "Independent Contractors"), who the Debtors determined are essential to wind down the Debtors' operations.  The sixty-seven (67) Independent Contractors consist of corporate Independent Contractors including management, accounting, and information technology staff, and certain other Independent Contractors at each of the Debtors retail locations who remain employed by the Debtors to assist with the orderly wind-down of the Debtors' operations.  The Debtors intend to pay compensation as it comes due and owing to the Independent Contractors pursuant to the terms of the individual agreements entered into between the Debtors and each Independent Contractor (the "Independent Contractor Agreements").  The Independent Contractors' compensation is consistent with the compensation they received as Prepetition Employees.  The Debtors report payment to the Independent Contractors pursuant to IRS Form 1099.

90.     The Independent Contractors are integral to the wind-down of the Debtors' operations. They perform a wide variety of functions critical to the Debtors' wind-down process, both at the Debtors' corporate headquarters and retail locations in Florida and Texas, including, among other things, overseeing the wind-down of the Debtors' operations, the processing of vehicle related items including administration of customer programs in connection with prepetition

sales and management of title processing issues, security, bankruptcy court reporting requirements, record-keeping and accounting, and other general wind-down activities. As a whole, the Independent Contractors have an essential working knowledge of the Debtors' business that cannot be easily replaced during the wind-down process. The efforts of and service of the Independent Contractors will ensure a smooth transition into chapter 11 and a successful wind-down of the Debtors' estates.

91.     To the extent any Independent Contractor Agreements have not been finalized and entered into prior to the Petition Date, the Debtors will enter into and otherwise finalize the Independent Contractor Agreements with the Independent Contractors who are necessary for the wind-down of the Debtors' operations. Without the continued service and dedication of the Independent Contractors, it will be difficult, if not impossible, to wind-down the Debtors' businesses without an unexpected or inopportune interruption and to prosecute these Chapter 11 Cases in a manner that will maximize the value of the Debtors' estates.

92.     In the ordinary course of their businesses, the Debtors made deductions from Prepetition Employees' paychecks for payments to third parties on behalf of Prepetition Employees including for, without limitation, various federal payroll and unemployment taxes, insurance premiums, health savings account premiums, payroll advances, court-ordered child support and garnishments, and relocation recoupment and other similar programs (collectively, the "Deductions"). Deductions were made twenty-four (24) times per year, where there are two (2) months in which three (3) payrolls are administered and therefore, two (2) payrolls without any benefit deduction. All applicable Deductions were made from Prepetition Employees' final paychecks and WARN Act payments. Accordingly, except to the limited extent set forth herein, the Debtors do not believe there are any petition amounts outstanding on account of Deductions.

93.     However, the Debtors were required to garnish certain Prepetition Employees' wages pursuant to applicable state court orders on account of child support and other obligations of the Prepetition Employees.   The Debtors made such Deductions from the Prepetition Employees' final paychecks and WARN Act payments prior to the Petition Date.   Pursuant to certain of the garnishment orders, however, the Debtors are holding approximately $15,100 of cash on hand for the beneficiaries of such garnishments, which cannot be paid to beneficiaries until certain actions are taken in the applicable state court.   The Debtors intend to work with the beneficiaries' counsel to ensure that such actions are taken and that garnishments held in trust can be distributed to beneficiaries as soon as practicable after the Petition Date.

94.     Prior to the Petition Date, the Debtors offered a variety of benefits to the Prepetition Employees in the form of the Workforce Programs and paid various fees and premiums in connection therewith, including, among others things, (i) reimbursing certain Prepetition Employees for certain expenses incurred in the scope of their duties ("Reimbursable Expenses"), (ii) fully insured medical and prescription drug benefit programs (the "Medical Plans") administered by Florida Blue, (iii) one hundred percent (100%) employer paid life and accidental death and dismemberment insurance coverage (the "Basic Life and AD&D Insurance") through Unum, (iv) disability coverage to executives and certain directors (the "Executive Disability Benefits") administered by The Guardian Life Insurance Company of America, (v) paid time off ("PTO"), (vi) certain other paid (the "Paid Time Off") and unpaid time off (the "Unpaid Time Off"), (vii) a severance plan (the "Severance Plan") that provides severance pay to Prepetition Employees upon a qualifying termination of employment or other qualifying event, (viii) a 401(k)-retirement savings plan (the "401(k) Plan"), and (ix) workers' compensation coverage for claims arising from or related to their employment (the "Workers' Compensation Program").

95.     As mentioned above, the Debtors paid all prepetition wages to the Prepetition Employees, as well as related taxes and benefits, immediately prior to the Petition Date and paid the premiums for the month of September 2023 prior to the Petition Date on account of the Medical Plans, which will enable Prepetition Employees to continue receiving the medical benefits through September 2023. Furthermore, while, the Debtors have terminated the Workforce Programs (besides the 401(k) Plan) and no further amounts will accrue on account of the Workforce Programs as of the Petition Date, the Debtors believe that, as of the Petition Date, there is approximately Fifty Thousand Dollars ($50,000.00) in Reimbursable Expenses to be reimbursed to the Prepetition Employees and approximately Twenty-Six Thousand Dollars ($26,000.00) outstanding in prepetition amounts related to the Workers' Compensation Program, all of which will come due during the first twenty-one (21) days of these cases. The Debtors further seek authority to pay the aggregate prepetition amounts owed to the Prepetition Employees on account of the Reimbursable Expenses and Workers' Compensation Program.

96.     The Debtors did not terminate the 401(k) Plan prior to the Petition Date as there are necessary steps to properly wind-down the 401(k) Plan and distribute all plan assets, which I understand to be the following: (i) amend and terminate the 401(k) Plan; (ii) restore any forfeited accounts that are required to be restored under the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code of 1986; (iii) distribute all plan assets, including, among other things, (a) locating any missing participants in fulfillment of applicable fiduciary responsibilities, such as engaging a commercial locator service; (b) providing notice to participants and beneficiaries to comply with legal requirements and applicable fiduciary responsibilities; and (c) engaging a provider of individual retirement accounts to which remaining account balances may be transferred; and (iv) preparing and filing a final Form 5500 with the Department of Labor and

the Internal Revenue Service. To properly complete the aforementioned steps to wind-down the 401(k) Plan, the Debtors will be required to incur minor costs and expenses relating to the termination and wind-down of the 401(k) Plan. To properly complete the aforementioned steps to wind-down the 401(k) Plan, the Debtors will be required to incur minor costs and expenses relating to the termination and wind-down of the 401(k) Plan. The Debtors seek authority to pay any such amounts incurred in connection with the wind-down and termination of the 401(k) Plan. The Debtors estimate that the amount of costs and expenses incurred relating to the orderly wind-down of the 401(k) Plan will be approximately $50,000

97.     Prepetition Employees were also able to participate in certain supplemental benefits (collectively, the "Other Benefits Programs"), including, dental insurance administered by Cigna Dental (the "Dental Plans"), legal services administered by Metlife (the "Legal Assistance"), vision insurance plans administered by Unum Vision, health savings accounts, supplemental life and AD&D insurance, short-term and long-term disability benefits, voluntary hospital indemnity, voluntary critical illness insurance, and voluntary accident insurance, each administered by Unum, identity theft protection administered by Infoarmor, travel assistance administered through Unum, and pet insurance administered by Benefit Solutions. The Debtors did not make any contributions on account of the Other Benefits Programs.

98.     The Debtors paid the premiums for the month of September 2023 prior to the Petition Date on account of the Dental Plans and Legal Assistance programs, which are both fully covered by the Prepetition Employees. The Debtors anticipate that the payment of such premiums with the employee contributions from the September 7, 2023 Payroll, will enable Prepetition Employees to continue receiving the benefits from the Dental Plans and Legal Assistance program through September 2023. The Debtors anticipate that the Dental Plans, and Legal Assistance will

terminate following the month of September 2023, as the Debtors will have terminated all of the Debtors' other benefits programs. Accordingly, as of the Petition Date, the Debtors estimate that they are not holding any accrued, but unremitted, Prepetition Employee contributions on account of the Other Benefits Programs.

**7.** ***Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and (B) Maintain Existing Business Forms, and (II) Granting Related Relief*** **(the "<u>Cash Management Motion</u>")**

99.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to (a) continue to operate their cash management system, (b) honor certain prepetition obligations related thereto, and  (c) maintain existing business forms, authorizing the Debtors' banks to honor all related payment requests, and granting related relief.

100.     As of the Petition Date, the Debtors maintained a cash management system (the "<u>Cash Management System</u>") consisting of ten (10) bank accounts (each, a "<u>Bank Account</u>" and collectively, the "<u>Bank Accounts</u>").  The Debtors utilize the Bank Accounts to manage payments from customers, make disbursements, and hold cash.  Five (5) Bank Accounts are maintained at Bank of America and five (5) are maintained at Truist Bank ("<u>Truist</u>" and, together with Bank of America, the "<u>Banks</u>").

101.     The Debtors maintain an operating account at each Bank (each, an "<u>Operating Account</u>").  Each Operating Account is structured in the same manner.  The Operating Accounts are primarily used to hold deposits received from third parties, such as customers, and to transfer funds to other Bank Accounts held by the Debtors, which consist of zero balance accounts used to make certain disbursements.  These additional Bank Accounts, all of which are zero balance accounts, are as follows: (i) at Truist: (a) a primary checking account (the "<u>Truist Primary Checking Account</u>"), (b) a We Buy Your Car checking account (the "<u>Truist WBYC Account</u>"),

(c) a tag fees disbursement account (the "Tag Fees Disbursement Account"), and a wire account (the "Truist Wire Account"); and (ii) at Bank of America: (a) a primary checking account (the "BofA Primary Checking Account" and, together with the Truist Primary Checking Account, the "Primary Checking Accounts"), (b) a We Buy Your Car checking account (the "BofA WBYC Account" and, together with the Truist WBYC Account, the "WBYC Accounts"), and (c) a wire account (the "BofA Wire Account" and, together with the Truist Wire Account, the "Wire Accounts").

102.     The Debtors use the Primary Checking Accounts for accounts payable transactions made through manual checks and ACH transfers, while the Wire Accounts are used for wire transfers.  The Tag Fees Disbursement Account is used for the payment of tag and title fees in connection with customers' purchases of vehicles.[3]  Prior to the Petition Date, the WBYC Accounts were used to purchase vehicles from consumers participating in the We Buy Your Car program. The Debtors do not anticipate that any postpetition disbursements will be made from the WBYC Accounts.

103.     In addition, the Debtors maintain an interest-bearing checking account at Bank of America. This account is used to fund the Truist Operating Account as required.

104.     The Debtors' principal source of revenue prior to the Petition Date was payments from their customers.  Accordingly, the Debtors expect to collect very few, if any, deposits into their Cash Management System postpetition.  However, I believe Debtors' continued use of the Cash Management System and Bank Accounts, and the Debtors' ability to make disbursements therefrom, is critical to the wind-down of the Debtors' operations and a seamless transition into

---

[3] As is explained above, pursuant to the Customer Programs Motion, the Debtors are seeking authority to pay any outstanding prepetition amounts on account of tag and title fees in the ordinary course of business.

these Chapter 11 Cases.  The Cash Management System is customary, and is similar to those commonly employed companies operating in the Debtors' industry.  The Cash Management System allows the Debtors to control and monitor funds and reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balances.  Without the continued use of the Bank Accounts, the Debtors could experience significant disruption in the wind-down of their business, which I believe would cause immediate and irreparable harm and impede the success of these Chapter 11 Cases.

105.    On a monthly basis, the Debtors pay approximately $35,000 in service fees and other amounts owing to the Banks (collectively, the "Bank Fees").   As of the Petition Date, the Debtors estimate that they owe approximately $8,000 on account of Bank Fees.  If the Debtors fail to pay the Bank Fees, I believe the Banks are likely to refuse to continue working with the Debtors, which would be detrimental to the Debtors' ability to wind-down their businesses and is likely to cause immediate and irreparable harm.

106.    In the ordinary course of business prior to the Petition Date, as part of the Cash Management System, the Debtors used a number of preprinted business forms including letterhead, deposit slips, checks, and invoices (collectively, the "Business Forms").  The Debtors seek authority to continue using their prepetition Business Forms without reference therein to the Debtors' status as "Debtors in Possession," *provided*, that the Debtors shall include a "Debtor in Possession" designation along with the case number of Off Lease Only LLC on all replacement Business Forms in accordance with Local Rule 2015-2.

## C.  Conclusion

107.    For the reasons stated herein and in each of the First Day Pleadings, I believe that each First Day Pleading should be granted in its entirety, together with such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: September 7, 2023

_/s/ Leland Wilson_
Leland Wilson