**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| OFF LEASE ONLY LLC,[1] | ) | Case No. 23- 11388 (CTG) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) |  |

**OBJECTION OF ALLY**
**FINANCIAL INC. AND ALLY BANK TO MOTION**
**OF THE DEBTORS FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (I) AUTHORIZING THE USE OF CASH**
**COLLATERAL, (II) GRANTING ADEQUATE PROTECTION**
**TO PREPETITION SECURED PARTIES, (III) SCHEDULING**
**A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF AND**
**RESERVATION OF RIGHTS WITH RESPECT TO OTHER FIRST DAY MOTIONS**

Ally Financial Inc. and Ally Bank (together, the "Ally Parties") as secured lenders under

the floorplan financing arrangements described below with Off Lease Only LLC ("Off Lease

LLC") as borrower and Off Lease Only Parent LLC as guarantor ("Off Lease Parent", and

together with Off Lease LLC, the "Debtors") hereby submit this preliminary objection (the

"Objection") to the Debtors' cash collateral motion (the "Motion")[2] [Docket No. 7] and

reservation of rights to the other relief requested in the Debtors' other "first day" motions

[Docket Nos. 5, 6, 8, 9, 11, 14, 15, 16].  In support thereof, the Ally Parties respectfully state

as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if applicable) are: Off Lease Only LLC (7345), Off Lease Only Parent LLC (2753), and Colo Real Estate Holdings LLC (7453).  The location of the Debtors' service address in these chapter 11 cases is 1200 S. Congress Ave., Palm Springs, FL 33406.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

## I.    Preliminary Statement

1.      On Tuesday, September 5, 2023, the Debtors defaulted on, among other things, their payment obligations under their secured line of credit with the Ally Parties, which was established for wholesale floorplan automobile purchases, as well as all of the related cross-collateralized debt and guaranty obligations.  The next day, on Wednesday, September 6, 2023, just one day prior to the Petition Date, the Debtors notified the Ally Parties that they had ceased operations, intended to commence these bankruptcy proceedings no later than the following day, and requested authority to use the Ally Parties' secured cash collateral to fund the Debtors' chapter 11 cases.  The Ally Parties respectfully declined and the Debtors proceeded to commenced these proceedings on Thursday, September 7, 2023.

2.      The Ally Parties did not ask for the Debtors to file chapter 11 petitions, and the Debtors did not provide the Ally Parties with a meaningful opportunity to engage in any negotiations or discussions as to whether alternatives to the chapter 11 process would facilitate the transfer of the Ally Parties' secured collateral to the Ally Parties for liquidation in a more efficient and economical manner.

3.      While the Debtors suggest that the chapter 11 cases were filed for the "benefit" of the Ally Parties, the Ally Parties fundamentally disagree.  The Ally Parties are merely floorplan inventory lenders—they loaned money to the Debtors to allow the Debtors exclusively to purchase specific motor vehicles at wholesale auctions and directly from customers as trade-ins or individual purchases.  There is no "benefit" to the Ally Parties from the Debtors' bankruptcy.  The Ally Parties are not going-concern lenders or lenders providing loans for general corporate use by the Debtors.  They are also not lenders who are dependent upon a debtor-driven sale to maximize the value of their secured collateral.

2

4.      Failing to recognize this important distinction, the Debtors have proposed an entirely unnecessary, elongated and expensive process that seeks to shift the full cost of their bankruptcy proceedings on the Ally Parties without adequate protections for the Ally Parties as secured lenders.  Their proposed cash collateral budget needlessly forecasts expenses for additional rent, independent contractors and professional fees that largely can be avoided if the vehicles and titles held by the Debtors that are the Ally Parties' secured collateral are immediately transferred to the Ally Parties, as the relevant financial agreements mandate should have happened in the ordinary course.

5.      Under Section § 363(e) of the Bankruptcy Code, the Court can only authorize the Debtors' use of the cash collateral if the Debtors can establish that they can provide the Ally Parties with adequate protection.  Here, the Debtors miserably failed to meet the burden they have to prove that the Ally Parties are adequately protected to permit the use of the Ally Parties' cash collateral without their consent as they must under Section 363 of the Bankruptcy Code.  On the contrary, the Debtors' proposed plan to use cash collateral will cause undue delay in the required transfer of floorplan vehicles to the Ally Parties, resulting in further diminution in value of the vehicles which, together with the Debtors' remaining cash, serve as collateral for satisfaction of the secured debt owed to the Ally Parties under the floorplan financing agreements.

6.      These chapter 11 cases have been thrust upon the Ally Parties over their objection. Despite the not so veiled narrative in the *Declaration of Leland Wilson in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 4] (the "Wilson Declaration") and other First Day Papers, the Ally Parties have at all times acted in accordance with the rights afforded to them in the underlying floorplan financing documents.  These chapter 11 cases are entirely the result of

the Debtors' actions as well as macroeconomic forces negatively affecting the used car market, and now the Ally Parties are left to deal with the consequences.

7.      While the Ally Parties acknowledge that the Debtors' estates must pay certain costs to keep the vehicle collateral secure and to facilitate an orderly and expeditious transfer of possession of the vehicles and titles to the Ally Parties, they are unwilling to consent to a needlessly extended process that uses their cash collateral without their consent or any meaningful substitute collateral. Instead, the Ally Parties are willing to consent to the limited use of a limited amount of their cash collateral as set forth in the short-term cash collateral budget ("Proposed Budget") attached hereto as Exhibit 1 in order to fund the Debtors' estates for a three-week period, during which the vehicle collateral and titles can be transferred to the Ally Parties.  However, the Ally Parties do not consent to the wasteful budget proposed by the Debtors (the "Debtors' Budget"), that seeks to use over $12.1 million of the cash collateral in a span of eight weeks (with huge fees to their professionals) to conclude the winding down of their business.  This is an enormous sum by any measure, particularly where the only stated goal of the chapter 11 cases is to transition the motor vehicles to the Ally Parties for sale as soon as possible.

8.      Critically for purposes of their Motion, the Debtors have failed to establish (and do not seriously attempt to establish) that the Ally Parties are adequately protected.  The Bankruptcy Code simply does not permit a debtor to use a secured lender's collateral without such lender's consent unless the debtor establishes that the lender is adequately protected.  The Debtors have offered no testimony or evidence that the value of the Ally Parties' collateral exceeds the Ally Parties' secured claims, and therefore they fail to establish that the replacement liens to be granted on the vehicle collateral would provide any protection against its declining value.

9.       Moreover, Debtors' own conduct is the reason that there is insufficient cash collateral available to provide the Ally Parties with adequate protection.  In fact, in the days leading up to the Petition Date, the Debtors used more than $8 million of the cash collateral to pay certain wind-down expenses in advance of the bankruptcy proceeding, all contrary to the terms of the underlying floorplan financing documents with the Ally Parties.  Notwithstanding these actions and their request to usurp the remainder of the cash collateral, the Debtors have offered *no* evidence that the value of the vehicle collateral alone with be sufficient to pay the Ally Parties' claims in full.  The Debtors have also failed to identify any other unencumbered assets not covered by the Ally Parties' existing security interest that could be used to provide the Ally Parties with adequate protections against the continuing use of its cash collateral.  Accordingly, the Debtors cannot use the cash collateral under Section 363(c) of the Bankruptcy Code without the Ally Parties' consent, and the Motion must be denied.

10.       Finally, as set forth in the accompanying Declaration of Michael Keeler (the "Keeler Decl."), Executive Director of the Ally Parties' Commercial Workout Team, who has more than 30 years' experience in floorplan lending and liquidation of motor vehicle inventories from distressed dealers, the Ally Parties anticipate that they can receive the transfer of the vehicle collateral to prepare to be sold within the next three weeks, which will likely obviate the need for the lion's share of the Debtors' proposed use of the cash collateral because the vast majority of the costs identified in the Debtors' Budget will be substantially reduced and potentially obviated if the vehicles are transferred to the Ally Parties now.  Indeed, Debtors concede that "allowing Ally—which has a senior lien on the Debtors' vehicles—to recover its collateral will maximize the value of the Debtors' estates by minimizing the cost to the Debtors of liquidating their assets[.]"  Wilson Decl. ¶ 35.  Therefore, what should happen here—and what should have happened before Debtors

filed for bankruptcy—is that there should be a consensus for the reasonable use of the Ally Parties' cash collateral for a three-week period, conditioned on the immediate transfer of the vehicles and title on which the Ally Parties have senior liens, and the Ally Parties should be allowed to sell those vehicles at the highest price and in the most efficient and timely manner possible.[3] The transfer of the vehicle collateral to the Ally Parties should be able to be completed within a three-week period, making approval of the Debtors' Budget beyond three weeks simply unnecessary to resolve at this juncture.

11.     Accordingly, the Ally Parties respectfully request that the Court deny the Motion and limit any interim order authorizing the use of cash collateral to a period of not more than three weeks and for not more than the amounts set forth in the Proposed Budget attached hereto as Exhibit 1, with an order requiring the Debtors to transfer all vehicle collateral and corresponding vehicle titles to the Ally Parties within the next three weeks or as soon thereafter as is reasonably possible.

## II.     Factual Background

### A.     The Ally Parties' Wholesale Floorplan Lending and Security Interest

12.     On January 7, 2008, Off Lease Only Inc. (n/k/a Off Lease Only LLC) entered into a Wholesale Security Agreement (as amended from time to time, the "Wholesale Security Agreement") with GMAC (n/k/a Ally Financial Inc.) to provide a line of credit to finance Off Lease's acquisition of motor vehicles for retail sale. Keeler Decl. ¶ 10. The Wholesale Security Agreement provides that Off Lease is indebted to Ally Financial in the amount of the total aggregate advances and the monthly interest due thereon. *See* Keeler Decl. Ex. A ¶ 2. At the time

---

[3] To the extent a formal motion for relief from the automatic stay is required pursuant to 11 U.S.C. § 362(d)(2), the Ally Parties request that the Court set an expedited briefing schedule and hearing for such motion to preserve and maximize the value of the vehicle collateral to the greatest extent possible.

6

that Off Lease sells or otherwise disposes of vehicles, Off Lease is required to "immediately" pay Ally Financial the amount advanced with respect to such vehicle with any unpaid interest thereon. *Id.* ¶ 4.  Off Lease also granted Ally Financial "a security interest in all motor vehicle inventory, and the proceeds thereof . . . which shall include all new and used vehicles held for sale or lease, now owned or hereafter acquired, and all additions and accessions thereto and all proceeds of such vehicles, including insurance proceeds."  *Id.* ¶ 5.  The predecessors to the Ally Parties under the Wholesale Financing Documents filed required UCC statements to perfect a first priority security interest in all of the Debtors' vehicles and proceeds in May 2008.  Keeler Decl. ¶ 20.

13.    In the event of default or the Ally Parties' determination that the collateral is in danger of misuse, loss, seizure or confiscation, the Ally Parties are authorized to take immediate possession of their collateral without demand, further notice, or legal process. Keeler Decl. Ex. A ¶ 7. The Wholesale Security Agreement further provides that any and all cash proceeds of the sale of the vehicles must be fully accounted for and promptly paid.  *Id.* ¶ 9.  The terms of the Wholesale Security Agreement permit Ally Financial to cancel the line of credit at any time without notice or demand.  *Id.* ¶¶ 9, 11.

14.    On October 11, 2010, Off Lease entered into the GMAC Bank Master Wholesale Agreement with GMAC Bank (n/k/a Ally Bank), which provided that GMAC Bank would provide financial accommodations to Off Lease on the same terms and conditions of the Wholesale Security Agreement and related security documents.  *See* Keeler Decl. Ex. B.  The Wholesale Security Agreement and the GMAC Bank Master Agreement, together with all other agreements and security documents related thereto, are collectively referred to as the "Wholesale Financing Documents."

16300986/1

15.     On November 15, 2019, the Debtors and the Ally Parties entered into the General Security Agreement, which grants to each of the Ally Parties "a security interest in, and a collateral assignment of, any and all of the following described property in which [Off Lease] now or hereafter acquires an interest, wherever located, in whatever form, and in any and all proceeds thereof, including insurance proceeds: all vehicles, including but not limited to those vehicles for which either of the Ally Parties provides financing, and regardless of whether such vehicles are considered inventory or equipment, and all funds provided to or held by either of the Ally Parties, regardless of whether such funds are considered accounts, general intangibles, or otherwise."  Keeler Decl. ¶ 14, Ex. C.  The Debtors and the Ally Parties further entered into a Cross Collateral, Cross Default and Guaranty Agreement on August 13, 2020. *Id.* ¶ 15, Ex. D.  On September 6, 2022, Off Lease Parent executed the Guaranty in favor of the Ally Parties.  Pursuant to the Guaranty, Off Lease Parent unconditionally guaranteed the payment of all current and future obligations the Off Lease may owe to the Ally Parties.  *Id.* ¶ 16, Ex. E.

16.     On February 13, 2023, based on the Ally Parties' concerns regarding Off Lease's performance and financial condition, and in consideration of the Ally Parties' agreement to continue to provide the lines of credit to Off Lease, the Ally Parties and Off Lease entered into a Credit Balance Agreement.  *Id.* ¶ 18, Ex. F.  The Credit Balance Agreement provided that Off Lease would be required to deliver to Ally Bank a credit balance of at least $10 million (based on the outstanding amounts owed by Off Lease under the Wholesale Financing Documents).  Keeler Decl. Ex. F. ¶ 2.  Upon a default by Off Lease, the Credit Balance Agreement provided that Ally Bank had the right to "immediately apply all principal payments pursuant to the [Credit Balance Agreement] to such principal advances made pursuant to the [Wholesale Financing Documents] as [Ally Bank] may determine it its sole discretion" without any notice or demand of any kind.  *Id.*

8

¶ 7.  The Credit Balance Agreement did not, however, alter any obligation of Off Lease to pay proceeds of vehicle sales to the Ally Parties under the terms of the Wholesale Financing Documents. *Id.* ¶ 9.

      **B.**      **The Debtors' Default under the Wholesale Financing Documents**

     17.     During the week prior to the commencement of these bankruptcy cases, the Debtors failed to remit proceeds from its vehicle sales to the Ally Parties as required under the Wholesale Financing Documents.  Keeler Decl. ¶ 29.  As a result, the Debtors were in default, and the Ally Parties were entitled to apply the $10 million held by Ally Bank pursuant to the Credit Balance Agreement to the outstanding obligations.  The Ally Parties applied the $10 million credit balance on September 5 and 6, 2023.  *Id.* ¶ 30.

     18.     As of the Petition Date, the Debtors owed the Ally Parties no less than $57,691,584.50 under the Wholesale Financing Documents, which does not include accrued insurance, interest, fees and enforcement costs.  *Id.* ¶ 33.

      **C.**      **The Current Value of Verified Vehicle Collateral**

     19.     In the lead up to the Petition Date, the Ally Parties attempted to verify the floorplan vehicle collateral, but were only able to verify a total of 2,057 vehicles.  *Id.* ¶ 37.  The Ally Parties were unable to verify the location of 212 vehicles.  *Id.*  Unless these vehicles and their titles can be located and verified, they represent a total loss with no realizable value.  *Id.*  The Ally Parties also cannot verify the location of the non-floorplan vehicles.

     20.     The current value of the 2,057 verified vehicles, if immediately transferred by the Debtors to the Ally Parties, is estimated to be $49,603,803.30.  *Id.* ¶ 42.  This valuation is an estimate made by Mr. Keeler and his team.  Mr. Keeler has decades of experience in the auto floorplan financing industry and extensive experience in auto floorplan financing workouts in distressed debt situations in particular.  *Id.* ¶ 4.  Mr. Keeler estimates that the realizable value of

16300986/1

the verified inventory will average no more than 90% of the clean Black Book value for the vehicles, an amount consistent with the Ally Parties' substantial experience in liquidating vehicle inventories from distressed or defaulting dealerships. *Id.* ¶ 38. The vehicles are unlikely to be worth a greater value because their value will likely depreciate in the several weeks (at the soonest) between now and the completion of the sale process. *Id.* ¶ 40. Moreover, the vehicles may have mechanical problems, interior or exterior wear, and/or other issues disclosed in the CARFAX reports. *Id.* In addition, there are costs associated with the sale process, including fees from the auction house, costs to transfer the title and cars from the Debtors' possession to the Ally Parties, and storage and insurance costs – all of which are estimated to cost $500 per vehicle. *Id.* ¶¶ 40-41.

### D.     The Ally Parties' Security Interest in Cash Collateral

21.     At the current estimated value of the verified vehicle collateral, even if transferred to the Ally Parties and sold, the Ally Parties would still have a secured claim for the remaining shortfall amount estimated to be $7,203,863.48, and a corresponding secured interest in cash collateral now held by the Debtors from proceeds from sales of vehicles, plus an additional amount of $883,917.74 in interest charges and insurance costs, as well as a total of $1,028,500.00 (for estimated costs of $500 per verified vehicle for transport, titling, etc.), and an unknown amount of fees and enforcement costs. Keeler Decl. ¶ 43.

### E.     The Ally Parties Are Best-Positioned to Sell the Vehicle Collateral

22.     The Ally Parties are industry leaders in floorplan financing and well-experienced in liquidating inventories for distressed or defaulting dealerships. *Id.* ¶ 46. They have well-established relationships with auction companies, transportation and other necessary vendors, as well as a proven track record of efficient sales of liquidating vehicle inventories to maximize sale prices under these circumstances. *Id.*

16300986/1

23. With respect to the vehicle collateral, the Ally Parties are best positioned to maximize the value of from sales of the vehicle collateral because they can market and sell the vehicles directly on the Ally Parties' online auction platform and through third-party auction houses. *Id*. ¶ 44. The Debtors agree that "allowing Ally to recover its collateral will maximize the value of the Debtors' estates by minimizing the cost to the Debtors of liquidating their assets" and Debtors state that they want to "transfer[] vehicles to Ally as quickly as possible." Wilson Decl. ¶ 35.

24. On September 7, 2023, the Debtors filed the Motion requesting authority to use the cash collateral to fund the wind-down of their business. In the Motion, the Debtors proposed to use over $12.1 million over eight weeks to wind-down their business. This amount includes payments for Debtors' legal and professional fees in connection with this bankruptcy, rent, and salaries for staff during the wind-down. *See* Debtors' Budget [Dkt. 7-1].

25. Debtors admit that they "expect to collect very few, if any, deposits into their Cash Management System postpetition," Wilson Decl. ¶ 104, meaning that the diminution of the cash collateral will not be replaced by future cash flows. Debtors did not offer additional or new assets to cover the diminution of the cash collateral. Instead, Debtors proposed to provide the Ally Parties with "the Adequate Protection Liens consisting of continuing, valid, binding, enforceable, and perfected liens" for unspecified assets. Motion ¶ 24. These Adequate Protection Liens would be "senior in priority to the Prepetition Lien held by the applicable Prepetition Secured Party" and "senior to all other security interests in, liens on, or claims against any of the Debtors' assets that constitute Prepetition Collateral" but junior to the Carve Out and Permitted Prior Liens. *Id.* Debtors further propose to provide the "Adequate Protection Superpriority Claims, consisting of allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any

16300986/1

Successor Cases." *Id.* But as explained below, these new proposed claims are nothing more than proposed new liens over which the Ally Parties already have senior secured liens.

26.     The Ally Parties attempted to reach a deal for a consensual use of cash collateral which would have allowed the Debtors to implement the stated goal of their chapter 11 filing—to effectuate the transfers of the motor vehicles to the Ally Parties for sale. However, the Debtors have refused to agree, instead taking the position that the Ally Parties must fund the entirety of the Debtors' chapter 11 process, which serves no reorganization purpose or benefit to the Ally Parties in any way aside from allowing the Ally Parties to obtain the motor vehicles which the Debtors are essentially holding hostage. Despite this lack of agreement from the Debtors, the Ally Parties are willing to consent to the use of the limited amount of cash collateral necessary to complete the transfer to them of the vehicle collateral over the next three weeks as provided for in the Proposed Budget attached hereto as Exhibit 1.

### III.     Preliminary Objection

27.     The Ally Parties present this preliminary objection to the Debtors' request for the Court to authorize the use of the cash collateral on the terms provided for in the Motion. The Court should deny the Motion for several reasons. First, the Debtors' have failed to meet their burden to prove that the Ally Parties are adequately protected. Second, the Ally Parties are not adequately protected and have not consented to the Debtors' proposed use of cash collateral. Third, even if not adequately protected, the Ally Parties are willing to consent to the limited use of cash collateral by the Debtors over a three-week period to administer the Debtors' estates for a sufficient period of time to transfer the vehicle collateral to the Ally Parties in order to maximize the value of the vehicle collateral. Fourth, the Debtors' proposed Carve Out to subordinate the Ally Parties' secured prior claims to more than $4 million in estimated fees for the Debtors' professionals in these Proceedings is unwarranted. Finally, there will be no immediate or irreparable harm to the

12

Debtors if the Court, in the first instance, issues an order limiting the use of cash collateral by the Debtors to a three-week period as set forth in the Ally Parties' Proposed Budget.

A.    **The Debtors Have Not Met their Burden to Show that the Ally Parties Are Adequately Protected**

28.    The Debtors seek an order authorizing the use of more than $12.1 million of the Ally Parties' secured cash collateral over the course of the next eight weeks in this liquidating chapter 11 proceeding based on an illusory argument that the Ally Parties are adequately protected. The Debtors' argument lack merit because the Debtors fail to establish, as they must, that the Ally Parties are adequately protected.[4]

29.    Under Section 363 of the Bankruptcy Code, in the absence of creditor consent,[5] a debtor may not use, sell, or lease a secured creditor's cash collateral unless "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  Section 363(e) goes further to provide that "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Section 362(d)(1) of the Bankruptcy Code further provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556–57 (3d Cir. 1996) (*en banc*).

---

[4] Section 363(p) of the Bankruptcy Code provides that the debtor has the burden of proof on the issue of adequate protection. 11 U.S.C. § 363(p); *see also Save Power Ltd. v. Pursuit Athletic Footwear (In re Pursuit Athletic Footwear)*, 193 B.R. 713, 716 (Bankr. D. Del. 1996); *In re LTAP US, LLLP*, 2011 WL 671761, at *2 (Bankr. D. Del. Feb. 18, 2011); *In re Diaconx Corp.*, 69 B.R. 333, 338 (Bankr. E.D. Pa. 1987) ("The burden of proof on the issue of adequate protection falls upon [the debtor]."); *First Bank of Miller v. Wieseler*, 45 B.R. 871, 876 (D.S.D. 1985) (finding the burden is heightened when cash collateral is at issue).
[5] The Ally Parties do not consent to the Motion or the Debtors' proposed use of cash collateral on the terms set forth in the Motion.

30.     A secured creditor is entitled to adequate protection as a matter of right, which means it is entitled to have the value of its collateral maintained at all times.  *Price v. Del. State Police Fed. Credit Union (In re Price)*, 370 F.3d 362, 373 (3d Cir. 2004).  Adequate protection is provided both as a matter of policy and as a matter of constitutional law.  *See In re Townley*, 256 B.R. 697, 700 (Bankr. D.N.J. 2000) ("The right of a secured creditor to the value of its collateral is a property right protected by the Fifth Amendment.") (citing *In re Johnson*, 63 B.R. 550, 551 (Bankr. D. Colo. 1986); *Sumitomo Trust & Banking Co., Ltd. v. Holly's, Inc. (In re Holly's, Inc.)*, 140 B.R. 643, 686 (Bankr. W.D. Mich. 1992) (section 362(d)(1) serves to protect a secured creditor's Fifth Amendment rights) (citing *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273 (1940); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935)).

31.     "[A] determination of whether there is adequate protection is made on a case by case basis." *Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 564 (3d Cir. 1994).  While adequate protection may take the form of cash payments, replacement liens, or other relief  "as will result in the realization . . . of the indubitable equivalent of such entity's interest in" the cash collateral, 11 U.S.C. § 361, such replacement liens or other relief cannot diminish such entity's interest in the cash collateral.  *See id.* ("[t]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy….  In other words, the proposal should provide the pre-petition secured creditor with the same level of protection" as its post-petition position) (quoting *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987)); *In re Stoney Creek Techs., LLC*, 364 B.R. 882, 892 (Bankr. E.D. Pa. 2007) (creditor was not adequately protected where it would be impaired from realizing the value of its collateral if its first lien position was subordinated to a post-petition priming lien).

32.     Here, rather than establishing that the Ally Parties are adequately protected as secured creditors, the Debtors' Motion demonstrates that the Ally Parties are not adequately protected because the Motion seeks to subordinate the Ally Parties' secured interest in the cash collateral and seeks to use significantly more cash collateral than are required to preserve and protect the vehicle collateral for transfer to the Ally Parties.

33.     First, the Wilson Declaration concedes that "Ally has a security interest in all of the Debtors' vehicles—regardless of whether such vehicles are on the Floorplan—as well as the proceeds of such vehicles." Wilson Decl. ¶ 33.  However, in derogation of this very security interest, the Debtors seek to use the Motion to subordinate the Ally Parties' secured interest in the cash collateral (proceeds of vehicles sales) to more than $4 million in budgeted professional fees for the Debtors.  Indeed, the Debtors seek authorization to use $12.1 million of the cash collateral to fund the expenses outlined in the Cash Collateral Budget (Mot., Ex. 1) in exchange only for providing so-called "Adequate Protection Liens, consisting of continuing, valid, binding, enforceable, and perfected liens, which shall be senior in priority to the Prepetition Lien held by the applicable Prepetition Secured Party, upon such Prepetition Secured Party's Prepetition Collateral.  Mot. ¶ 24.

34.     However, the Debtors seek to make the Adequate Protection Liens subject in all respects to the Carve Out," id., which includes the Debtors' professional fees.  Therefore, in addition to seeking to spend more than $12 million of the cash collateral, the Debtors also seek to subordinate the Ally Parties' secured interest in the cash collateral to more than $4 million in budgeted fees for the Debtors' professionals.[6]  Mot. at 8.  As such, the Debtors' Motion itself

---

[6] Further, the Carve Out as currently proposed (Proposed Order, ¶ 11(a)) does not cap the payment of professional fees for the professionals retained by the Debtors at the amounts set forth in the Debtors' proposed budget, which puts the Ally Parties' interests in the cash collateral at greater risk.

establishes that their request for authorization to use the cash collateral in exchange for subordinated Adequate Protection Liens does not provide the Ally Parties with adequate protection in the cash collateral.

35.     The Debtors next argue that approval of the Motion to spend more than $12 million of cash collateral is necessary to protect the Ally Parties against "diminution in the value of" the vehicle collateral, Mot. ¶ 26, but that argument fails as well.  As factual matter, Debtors concede that they estimate it will only "take two to four weeks to complete" the transfer of vehicle inventory to the Ally Parties. Wilson Decl. ¶ 36. Thus, the Debtors have failed to meet their burden to show that their request to use $12 million in cash collateral over an 8-week period is necessary to preserve the value of vehicle collateral that can be turned over to the Ally Parties in two to four weeks.

36.     The Debtors' proposal in its Motion is similar the proposal that was rejected in *Roach Auto., L.P. v. Daimler Chrysler Fin. Servs. Americas, LLC (In re Roach Automotive, L.P.)*, 540 B.R. 146, 152 (Bankr. W.D. Pa. 2007).  There, the debtor offered to make monthly payments of $17,000 from the sales proceeds of vehicles which the creditor already had a secured interest in, while using over $100,000 of the cash collateral on a monthly basis.  *Id.* at 152.  The Court rejected that proposal because it did not provide adequate protection to the creditor.  Notably, the Court found that the debtor "has no additional assets to pledge to [the creditor]" and the proposed monthly payments were proceeds that were already part of the creditor's collateral.  *Id.* at 152–53. Further, the debtor proposed to use the cash collateral to pay expenses, "some of which may benefit [the creditor] and some may not." *Id.* at 153.  The same is true here, where Debtors' Motion seeks approval to spend more than $5 million in cash collateral during the month after the time required

to transfer the vehicle collateral to the Ally Parties has passed, which will have no benefit to the Ally Parties.

37.     Accordingly, the Court should deny the Motion because the Debtors have failed to satisfy their burden under Section 363 to establish that the Ally Parties' secured interests in the cash collateral are adequately protected if the Debtors' Motion is granted.

**B.     The Ally Parties Are Not Adequately Protected by the Value of their Vehicle Collateral**

38.     Even if the vehicle collateral is transferred to the Ally Parties immediately, the Ally Parties are still not adequately protected from the diminution of value of their collateral because the value of the vehicle collateral (*i.e.,* Debtors' inventory) is below the total amount of the Ally Parties' secured claim and the Debtors have no other assets or future cash flows that can adequately replace the Debtors' proposed $12.1 million diminution of the cash collateral.[7]

39.     Valuation for purposes of adequate protection necessarily relies on Section 506(a) of the Bankruptcy Code "for a determination of the amount of a secured claim." *Winthrop Old Farm Nurseries v. New Bedford Inst. for Sav. (In re Winthrop Old Farm Nurseries)*, 50 F.3d 72, 74 (1st Cir. 1995) (citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 371–72 (1988) (stating that statutory construction is a "holistic endeavor" and defining value of "entity's interest in property" entitled to adequate protection under §§ 361 and 362 in light of meaning of value of "creditor's interest" in property under § 506(a))).  Section 506(a) of the Bankruptcy Code directs the Court to determine value of collateral "in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any

---

[7] In the context of cash collateral and the provision of non-cash replacement collateral, "'indubitable equivalence' analysis imports a necessary comparison of the relative risks of loss to the secured creditor if it has recourse on the replacement collateral instead of the cash collateral."  4 Collier on Bankr. P 506.03[7][a][iii] (citing *In re Krumm*, 87 B.R. 76, 77 (Bankr. D. Neb. 1988) (finding it was impermissible to replace cash collateral with a lien on future crops due to the inherent risk accompanying the latter); *Metropolitan Life Ins. Co. v. Murel Holding Corp. (In re Murel Holding Corp.)*, 75 F.2d 941, 942 (2d Cir. 1935); *In re Walat Farms, Inc.*, 70 B.R. 330, 336 (E.D. Mich. 1987)).

hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a).

40.    Here, the transfer of the vehicle collateral alone to the Ally Parties does not provide adequate protections in the cash collateral to the Ally Parties.  First, the Debtors admit that the used vehicle market has softened and that the Debtors' inventory is aging relative to when it was purchased.  *See* Wilson Decl. ¶¶ 30–31; *see also VW Credit, Inc. v. CTE2, LLC*, 2019 WL 6649381, at *2 (D.N.J. Dec. 6, 2019) (vehicles that "are continuing to sit without maintenance and unattended… are depreciating in value by the day"); *In re Roach Automotive* 540 B.R. at 152 (vehicle "inventory is depreciating in value every day").  Second, the Debtors have not yet transferred the vehicle collateral to the Ally Parties and have failed to remit sale proceeds, *id.* ¶¶ 12, 23–24, causing the Ally Parties to have neither the vehicles themselves nor the proceeds thereof.  Third, the softening of the used car market and the aging inventory of the vehicles means that the returns on these vehicles will be lower.  *See* Wilson Decl. ¶¶ 30–31.  Finally, the Debtors owe additional amounts secured by the vehicle and cash collateral, including those for interest, insurance, and enforcement costs.  *See* Keeler Decl. ¶ 43.

41.    In addition to the admissions by the Debtors, Mr. Keeler makes clear in his declaration that the current value of the verified vehicle collateral, even if transferred to the Ally Parties immediately, is estimated to be more than $8 million lower than the Ally Parties' secured debt – before actual inspection of the vehicles, their titles, and other contingencies that could affect the value of the vehicles.  *Id.* ¶¶ 37-39.  Moreover, the total value of the verified vehicle collateral is also likely to depreciate in the several weeks between now and the completion of the sale process, *id.* ¶¶ 40-41, further reducing the Ally Parties' recovery on the sale of vehicle collateral

and increasing the amount of its secured shortfall claim to the cash collateral, which is estimated to exceed $8 million, *id.* ¶ 43.

42.     Notwithstanding these facts, the Debtors have not offered a replacement lien over new assets that could adequately protect the Ally Parties' interests nor any alternative assets or future cash flows that can cover for the depletion of the cash collateral.  The Debtors' proposal to wind-down the business using the cash collateral similarly does not generate any future cash flows that the Ally Parties do not already have a secured interest in.

43.     Therefore, the Court should deny the Motion because the Ally Parties are already undersecured and the Debtors should not be permitted to further erode the cash collateral.  *See, e.g., In re LTAP US, LLLP*, 2011 WL 671761, at *2 (Bankr. D. Del. Feb. 18, 2011) (denying the use of cash collateral where "the value of Debtor's assets do not provide [the creditor bank] with the required protection against the use of its cash collateral); *In re LightStyles, Ltd*., 2012 WL 3115902 (Bankr. M.D. Pa. July 27, 2012) (denying use of cash collateral because "the Bank's interest in Debtor's collateral is undersecured and any diminution in the value of the collateral will result in a loss to the Bank"); *In re Roach Automotive*, 540 B.R. at 151 n.7 (an "equity cushion which is eroding rapidly may not constitute adequate protection") (citing *In re Liona Corporation*, 68 B.R. 761, 768 (Bankr. E.D. Pa. 1987)).

**C.     The Ally Parties Are Willing to Consent to Limited Use of the Cash Collateral in a Manner Consistent with the Proposed Budget to Facilitate the Transfer of the Vehicle Collateral and Titles to the Ally Parties**

44.     Although the Debtors have failed to meet their burden to establish that the relief requested in the Motion provides adequate protections for the proposed use of the cash collateral in the Debtor's Budget, subject to certain conditions, the Ally Parties are willing to consent to the use of approximately $5.5 million of cash collateral over the next 3 weeks, as set forth in the attached Proposed Budget (Ex. 1), in order to provide an orderly and expeditious transfer of the

vehicle collateral and titles to the Ally Parties. The Ally Parties are not willing to consent to the interim order proposed by the Debtors permitting the use of more than $12 million in cash collateral over the course of the next 8 weeks.

45.     The Ally Parties understand that because the Debtors refused to permit the Ally Parties to repossess the vehicle collateral and corresponding titles, certain limited costs must be paid to facilitate the Debtors' transfer of the vehicles to the Ally Parties for a liquidation process. However, contrary to the Debtors' assertion that "[a]bsent the use of Cash Collateral . . . the value of Ally's security interest in their vehicles would deteriorate rapidly, with the risk of permanent loss and the necessity for Ally to retrieve such vehicles immediately, a virtual impossibility," Mot. ¶ 26, if permitted by the Court, the Ally Parties are willing to immediately begin the process of taking possession of the titles and keys to the vehicle collateral, as well as place security to protect the vehicle collateral within 24 hours with an orderly and prompt removal of the vehicle collateral thereafter from their current locations.

46.     For these reasons, while not necessary to protect against the diminution in the value of vehicle collateral (as the Debtors' contend), Mot. ¶ 26, under certain conditions, the Ally Parties are willing to consent to limited use of cash collateral for a three-week period in accordance with their Proposed Budget to expedite the transfer of vehicle collateral to the Ally Parties as quickly as possible. The Ally Parties have clearly communicated this to the Debtors, along with their willingness to work cooperatively to facilitate an expedient transfer of the vehicle collateral in order to minimize transfer costs and maximize sale proceeds. However, in response, the Debtors have conditioned consent to any such transfer on unilateral releases, unacceptable waivers of all shortfall claims and rights to any cash collateral, and conditions that are not related to the transfer of the vehicles to the Ally Parties. The Ally Parties respectfully submit that an interim cash

16300986/1

collateral order should be entered authorizing the use of cash collateral only as set forth in the Ally Parties' Proposed Budget and allowing the Ally Parties to obtain the vehicles and titles as soon as possible, since even the Debtors concede that "allowing Ally . . . to recover **its** collateral will maximize the value of the Debtors' estate by minimizing the cost to the Debtors of liquidating their assets."  Wilson Decl. ¶ 35 (emphasis added).

        **D.**     **The Debtors Will Not Suffer Immediate and Irreparable Harm if the Debtors' Motion Is Denied**

      47.    The Debtors argue that the "relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors[.]"  Mot. ¶ 29.  The Debtors are wrong.

      48.    There is no need for the Court to issue an interim cash management order permitting the Debtors to use more than $12 million in cash collateral over an 8-week period to avoid immediate and irreparable harm to the Debtors' estates.  As the Debtors admit, "[s]ubstantially all of the Debtors' available cash constitutes the Cash Collateral of secured lenders."  Mot. ¶ 29.  It is for this very reason that the Court should not grant the Debtors' Motion and permit them to use nearly all or nearly all of the cash collateral belonging to the Ally Parties as secured lenders for purposes other than to deliver the physical collateral (in the form of vehicles and titles) to the Ally Parties, which can be completed in three weeks.  The issuance of an interim cash collateral order that contemplates funding beyond three weeks is unnecessary at this time to prevent immediate and irreparable harm to the Debtors' estates.  Moreover, the permitted use of cash collateral in any interim cash collateral order should be limited to activities required for the transfer of vehicle collateral to the Ally Parties.  No immediate or irreparable harm will befall the Debtors if they are unable to obtain an order during the First Day Hearing that permits them to use essentially all of the cash collateral belonging to their secured creditors, largely for the payment of their professional fees (more than $4.3 million) for an unnecessarily elongated period (8 weeks).

#### IV.    Additional Objections and Reservation of Rights

49.    The Ally Parties have additional objections to other features of the proposed form of cash collateral order.  The Ally Parties have provided to the Debtors a list of those issues and remain willing to work through those issues to the extent the use of cash collateral is resolved.

50.    Additionally, the relief requested in several of the other "first day" motions filed by the Debtors is premised on the Debtors' ability to use the cash collateral to make the associated payments.  The Ally Parties object to all requested first day relief to the extent that such relief requires the use of the cash collateral without the Ally Parties' consent.

51.    To the extent the Court permits the use of cash collateral over the objection of the Ally Parties, at a minimum the orders authorizing such first day relief must provide that the proposed payments may only be made in accordance with and to the extent set forth in the budget approved by the Court and on the terms set forth in the cash collateral order.

52.    The Ally Parties additionally assert a limited objection to the relief requested in the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management Systems and (B) Maintain Existing Business Forms, and (II) Granting Related Relief* [Docket No. 6] (the "Cash Management Motion").  While the Ally Parties do not generally object to the continued use of the Debtors' existing bank accounts and business forms, the Ally Parties request that any post-petition receipts received by the Debtors be segregated from the Debtors' existing cash, be maintained in an account separate from the existing operating accounts, and be maintained for the benefit of the Ally Parties.  The Debtors admit that the only receipts that may be coming into the estate on a post-petition base are proceeds from vehicle sales, which unequivocally constitute the Ally Parties' collateral.  Wilson Decl. ¶¶ 34; 104.  The sale proceeds therefore cannot be used by the Debtors absent the Ally Parties' consent or upon a demonstration that the Ally Parties' are adequately protected, and must be preserved.

Accordingly, the Ally Parties request that any order of the Court with respect to the Cash Management Motion incorporates the modifications the Ally Parties have requested herein.

53.     While the Ally Parties are hopeful that they and the Debtors will consensually resolve this Objection, the Ally Parties reserve their rights to supplement and amend this Objection based on any new facts that come to light, to seek an adjournment of the hearing on the Motion or the Cash Management Motion, and to introduce evidence at any hearing relating to this Objection, without limiting any other rights the Ally Parties may have. The Ally Parties further reserve their right to raise further objections with respect to the Motion, the Cash Management Motion, the Debtors' other "first day" motions and any other pleadings filed by the Debtors on any and all grounds.

## V.     Conclusion

For the foregoing reasons, the Ally Parties request that the Court deny the Debtors' Cash Collateral Motion and Cash Management Motion, and grant such other and further relief as the Court deems appropriate under the circumstances.

Dated: September 11, 2023                           Respectfully submitted,
Wilmington, Delaware

/s/ *Brya M. Keilson*
**MORRIS JAMES LLP**                                **SIDLEY AUSTIN LLP**
Eric J. Monzo (No. 5214)                            Matthew A. Clemente (*pro hac vice* pending)
Brya M. Keilson (No. 4643)                          Allison Ross Stromberg (*pro hac vice* pending)
500 Delaware Avenue                                 Ian C. Ferrell (*pro hac vice* pending)
Suite 1500                                          One South Dearborn
Wilmington, Delaware 19801                          Chicago, Illinois 60603
Telephone: (302) 888-6800                           Telephone: (312) 853-7000
Facsimile: (302) 571-1750                           Facsimile: (312) 853-7036
Email: emonzo@morrisjames.com                       Email: mclemente@sidley.com
        bkeilson@morrisjames.com                            astromberg@sidley.com
                                                            iferrell@sidley.com

23

—and—

John J. Kuster (*pro hac vice* pending)
Martin B. Jackson (*pro hac vice* pending)
787 7th Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: jkuster@sidley.com
        mjackson@sidley.com

*Co-Counsel to Ally Financial, Inc. and Ally Bank*