**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| OFF LEASE ONLY LLC,[1] | ) | Case No. 23- 11388 (CTG) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) |  |

**DECLARATION OF MICHAEL KEELER IN SUPPORT**
**OF OBJECTION OF ALLY FINANCIAL INC. AND ALLY BANK**
**TO MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND**
**FINAL ORDERS AUTHORIZING THE USE OF CASH COLLATERAL**

I, Michael Keeler, herby declare the following under penalty of perjury:

1.      I currently serve as the Executive Director of the Commercial Workout Team for Ally Bank. Ally Bank and Ally Financial (together, the "Ally Parties") are secured lenders under the wholesale floorplan financing agreements described below with Off Lease Only LLC ("Off Lease LLC") as borrower, as guaranteed by Off Lease Only Parent LLC ("Off Lease Parent", and together with Off Lease LLC, "Off Lease"). If called upon to testify, I would testify competently to the facts set forth in this Declaration based on my personal knowledge and/or my review of the books and records of the Ally Parties, as well as discussion with management of the Ally Parties.

**A.      Professional Experience**

2.      I have worked for the Ally Parties for the past 33 years in the auto floorplan financing business, which consists of providing lending to auto dealerships to finance their new and used vehicle inventory. I received a A.S. Degree in General Business from Champlain College

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if applicable) are: Off Lease Only LLC (7345), Off Lease Only Parent LLC (2753), and Colo Real Estate Holdings LLC (7453).  The location of the Debtors' service address in these chapter 11 cases is 1200 S. Congress Ave., Palm Springs, FL 33406.

in Vermont in 1990 and a B.S. Degree in Individualized Studies with a concentration in Accounting and Finance from Charter Oak College in Connecticut in 2004.

3.    The process by which a used independent dealership obtains financing for vehicles differs from the process by which a franchised new vehicle dealership obtains new vehicles, but the lending is similar.  On their own initiative, used independent dealerships search for and select used vehicles from auctions and other sources, including by accepting trade-in vehicles or direct purchases from consumers.  To purchase or otherwise finance the acquisition of these vehicles, dealers may request funding from the Ally Parties to add those used vehicle purchases to their floor plan.

4.    I have extensive experience in auto floorplan financing workouts in distressed debt situations.  In 2008, I was a leading member of the group that launched the Commercial Workout Team—a specialized business team that oversees the Ally Parties' workout situations involving dealerships across the United States that are financially distressed, meaning there are indications that the floorplan borrower may default or has defaulted on its payment obligations. From 2008 until 2011, I held various roles, including leadership roles on the Commercial Workout Team.  In 2011, I was transferred to another Commercial Automotive business team for 3 years.  In 2014, I returned to lead the national Commercial Workout Team as the Executive Director and have remained the Executive Director since then. As a result of my role and experience with the Ally Parties, my review of documents related to Off Lease's floorplan financing, and my oversight responsibilities for a potential commercial workout with Off Lease, I am familiar with the commercial lending relationship between the Ally Parties and Off Lease and the events surrounding Off Lease's default of its payment obligations to the Ally Parties. Except as otherwise noted, I have personal knowledge of the matters set forth herein. Except as otherwise stated, all

facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with members of the Commercial Lending Team, or my opinion based upon my experience and knowledge of workouts of distressed auto floorplan financing arrangements.

5.      Over the past three decades, in my various roles on the Ally Parties' commercial automotive lending team, including in my last decade as Executive Director of the Commercial Workout Team, I have overseen hundreds of workouts, hundreds of floorplan liquidations, and the transfer and sale of tens of thousands of floorplan vehicles to repay secured floorplan lending in situations where the dealership exits the floorplan lending arrangement and liquidates its motor vehicle inventory. In distressed or default situations, the Ally Parties work with dealerships to either (i) rehabilitate their floorplan credit situation, or (ii) exit the floorplan lending relationship with the goal of maximizing the Ally Parties' ability to recover on the liquidation of the inventory that constitutes their secured collateral. In a small percentage of workout scenarios, workout efforts are unsuccessful and the floorplan borrower commences bankruptcy proceedings.

**B.      The Ally Parties' Floorplan Lending Business**

6.      The Ally Parties have more than 100 years of lending experience in the auto industry.  With account executives averaging 15 years of dealer experience and the Ally Parties' workout team, with team members averaging in excess of 25 years of commercial automotive experience – and nearly 5,000 team members dedicated to auto finance operations – they are one of the largest auto finance companies in the United States.  In addition to other forms of lending, the Ally Parties specializes in wholesale floorplan lending to auto dealerships.

7.      Auto wholesale floorplan lending consists of extending lines of credit to auto dealerships exclusively to finance their purchases of new and used vehicle inventory for their showrooms and lots.

8.      Generally, after the dealership acquires or otherwise finances a vehicle with funds drawn from the floorplan lines of credit with the Ally Parties, the dealership is subsequently required to repay the Ally Parties the principal amount borrowed for acquisition of that individual vehicle within deadlines established by the Ally Parties, sometimes referred to as the release period.  Interest and insurance costs accrue from the date of initial financing through the date the principal balance is paid-in-full upon the sale of the vehicle.  Because dealerships are constantly purchasing and selling inventory, the purchases and sales of vehicles are continuously being debited and credited against the floorplan line of credit.

9.      The Ally Parties establish advance rates for vehicles they finance.  These advance rates are a percentage of a vehicle's acquisition price or Black Book average wholesale value "clean" with no additions (meaning no adjustments for mileage or options) that the Ally Parties will finance.  These advance rates vary based on such factors as the source of the vehicle and the creditworthiness of the dealership borrower.  For instance, a creditworthy dealership may borrow 100% of the acquisition price (including applicable fees assessed by the auction) for vehicles purchased at auctions that meet specified criteria, including if the auction house is one in which the Ally Parties have arranged for direct payment on behalf of their dealership customers. The advance rate for purchases of vehicles directly from customer trade-ins may be from 70% to 90% of the Black Book average wholesale value, clean with no additions.  As floorplan vehicles in inventory age or if they are being driven as demonstrators or loaner vehicles, their value often declines and the Ally Parties may require the dealership borrower to repay a portion of the initial amount advanced under the wholesale floorplan line of credit in order to ensure that the value of the vehicle does not fall below the amount advanced by the Ally Parties under the floorplan for

4

such vehicle. Interest and insurance charges must also be paid periodically for the period of time
the particular vehicle is on floorplan

### C.     The Wholesale Floorplan Financing Agreements with Off Lease

10.     In order to establish secured lines of credit to finance its acquisition of motor
vehicles, (i) as of January 7, 2008, Off Lease Only, Inc. (n/k/a Off Lease Only, LLC) entered into
a Wholesale Security Agreement (as amended from time to time, the "<u>Wholesale Security
Agreement</u>") with GMAC (n/k/a Ally Financial),[2] and (ii) as of October 11, 2010, Off Lease
entered into a GMAC Bank Master Wholesale Agreement (as amended from time to time, the
"<u>GMAC Bank Master Agreement</u>") with GMAC Bank (n/k/a Ally Bank).[3]

11.     The Wholesale Security Agreement provides that Off Lease LLC's lines of credit
are "exclusively for the purpose of acquiring motor vehicles to be placed in [Off Lease's] inventory
for sale or lease, or borrowing money on the security of motor vehicles already held in [Off
Lease's] inventory for sale or lease."[4]

12.     Paragraph 5 of the Wholesale Security Agreement details the security interest
granted under the Wholesale Financing Documents:

> In order to secure repayment of any and all Indebtedness now owing or hereafter
> owing to GMAC, whether such Indebtedness arises as a part of the transactions
> contemplated by this Agreement or otherwise, Dealer grants to GMAC a security
> interest in all motor vehicle inventory, and the proceeds thereof (the 'Collateral'),
> which shall include all new and used vehicles held for sale or lease, now owned or
> hereafter acquired, and all additions and accessions thereto and all proceeds of such
> vehicles, including insurance proceeds.

---

[2] A true and correct copy of the Wholesale Security Agreement is attached hereto as Exhibit A.
[3] A true and correct copy of the GMAC Bank Master Agreement is attached hereto as Exhibit B.  The Wholesale
Security Agreement and the GMAC Bank Master Agreement, and all related agreements and security documents are
collectively referred to herein as the "<u>Wholesale Financing Documents</u>" and include, without limitation, (i) the
November 15, 2019 General Security Agreement, (ii) the Cross Collateral, Cross Default and Guaranty Agreement,
dated as of 13, August 13, 2020, (iii) the Guaranty executed by Off Lease Parent, dated as of September 6, 2022, and
(iv) the Credit Balance Agreement, dated as of February 13, 2023.
[4] Ex. A ¶ 1.

GMAC's security interest in the vehicles shall attach to the full extent provided or permitted by law to the proceeds, in whatever form, of any retail sale or lease thereof by Dealer until such proceeds are accounted for, and to the proceeds of any other disposition of said vehicles or any part thereof.  This grant of a security interest is additionally to secure collectively the payment by Dealer of the amounts of all advances or obligations to advance made by GMAC to any manufacturer, distributor or other seller, and the interest due thereon.[5]

13.    Paragraph 7 of the Wholesale Security Agreement further provides:

In the event of the Dealer's default in the payment of the amount advanced by GMAC or in the due performance of, or compliance with, any of the terms and conditions hereof, or in the event of a foreclosure proceeding or bankruptcy, insolvency or receivership instituted by or against the Dealer or the Dealer's property, or in the event that GMAC deems itself insecure or said Collateral or any part thereof is in danger of misuse, loss, seizure or confiscation, GMAC may take immediate possession of said Collateral, without demand or further notice and without legal process; for this purpose and in furtherance thereof, the Dealer shall, if GMAC so requests, assemble said Collateral and make it available for GMAC in a reasonably convenient place designated by it, and GMAC shall have the right, and the Dealer does hereby authorize and empower GMAC to enter upon the premises wherever said Collateral may be and remove same. In the event of repossession of said Collateral, GMAC shall have such rights and remedies as are provided and permitted under Article 9 of, and relating to secured transactions under, the Uniform Commercial Code and other applicable law. Dealer shall pay all expenses and reimburse GMAC for any expenditures, including reasonable attorneys' fees and legal expenses in connection with GMAC's exercise of any of its rights and remedies.[6]

14.    Paragraph 6 of the Wholesale Security Agreement also provides that "[u]pon request of GMAC, Dealer will also execute and deliver to GMAC from time to time security agreements, together with further documents as requested by GMAC, which security agreements (and further documents, if any) shall be in such form as GMAC may in its sole discretion require."[7] In furtherance of their ongoing floorplan financing relationship and consistent with paragraph 6 of the Wholesale Security Agreement, on or about November 15, 2019, Off Lease and the Ally Parties

[5] Ex. A ¶ 5.
[6] Ex. A ¶ 7.
[7] Ex. A ¶ 6.

6

entered into a General Security Agreement,[8] under which Off Lease grants to each of the Ally

Parties:

> a security interest in, and a collateral assignment of, any and all of the following
> described property in which Dealer now or hereafter acquires an interest, wherever
> located, in whatever form, and in any and all proceeds thereof, including insurance
> proceeds: all vehicles, including but not limited to those vehicles for which either
> of the Ally Parties provides financing, and regardless of whether such vehicles are
> considered inventory or equipment, and all funds provided to or held by either of
> the Ally Parties, regardless of whether such funds are considered accounts, general
> intangibles, or otherwise (the "Collateral").[9]

15.     Subsequently, Off Lease LLC and the Ally Parties entered into a Cross Collateral,

Cross Default and Guaranty Agreement as of August 13, 2020 (the "Cross Collateral Guaranty

Agreement"),[10] providing that all of the assets upon which one of the Ally Parties has a lien or

security interest will secure the payment and performance for all current and future loans, advances

and extensions of credit made by either of the Ally Parties and all obligations of every kind owed

by Off Lease LLC to the Ally Parties.

16.     On September 6, 2022, the Ally Parties and Off Lease Parent executed the Guaranty

in favor of the Ally Parties (the "Parent Guaranty Agreement") to guaranty repayment of Off Lease

LLC's indebtedness.[11]

17.     Generally, the Ally Parties advanced 100% of the acquisition costs for Off Lease

LLC's acquisition of vehicles for auctions where the Ally Parties have arranged for direct payment

on behalf of their dealership customers.  The Ally Parties also initially provided an advance rate

of 90% for Debtors' trade-ins and acquisitions via its "We Buy Your Car" program, a rate that

---

[8] A true and correct copy of the General Security Agreement is attached hereto as Exhibit C.
[9] Ex. C at 1.
[10] A true and correct copy of the Cross Collateral Guaranty Agreement is attached hereto as Exhibit D.
[11] A true and correct copy of the Parent Guaranty Agreement is attached hereto as Exhibit E.

changed after Debtors financial distress worsened, including when it no longer obtained additional financing from equity holders.

18.     On February 13, 2023, based on the Ally Parties' legitimate concerns regarding Off Lease LLC's financial performance and condition, and in consideration of the Ally Parties' agreement to continue lines of credit to Off Lease LLC, Ally Bank and Off Lease LLC entered into a Credit Balance Agreement.[12]  Under the terms of the Credit Balance Agreement, Off Lease LLC delivered money to Ally Bank to be held as principal payments under Off Lease LLC's Wholesale Security Agreement, but without requiring that the money be applied in the form of accounting entries to reduce the principal balances of individual floorplan principal advances. Such amount remitted to Ally Bank is referred to as the "Credit Balance."  The Credit Balance Agreement required Off Lease LLC to maintain "a Credit Balance equal to or greater than $10,000,000.00 so long as the consolidated floorplan Outstanding Amount is equal to or less than $160,000,000.00."[13]  It further provided that "[u]pon Default, [Ally] Bank may immediately apply all principal payments made pursuant to this Agreement to such principal advances made pursuant to the Wholesale Agreement as [Ally] Bank may determine in its sole discretion."[14]

19.     Pursuant to the Wholesale Security Agreement, "[a]t the time [Off Lease LLC] sells or otherwise disposes of vehicles or other assets for which [Ally Financial] has advanced funds pursuant to this Agreement, [Off Lease LLC] will <u>immediately pay</u> [Ally Financial] the amount of money which [Ally Financial] has advanced with respect to such vehicles or other assets."[15]

20.     On or about May 22, 2008, the predecessors to the Ally Parties under the Wholesale Financing Documents filed required UCC statements to perfect a first priority security interest in

---

[12] A true and correct copy of the Credit Balance Agreement is attached hereto as Exhibit F.
[13] Ex. F ¶ 2.
[14] Ex. F ¶ 7.
[15] Ex. A ¶ 4. (Emphasis added).

all vehicles, including but not limited to those vehicle for which either of the Ally Parties provides financing, and regardless of whether such vehicles are considered inventory or equipment, all funds provided to or held by either of the Ally Parties, regardless of whether such funds are considered accounts, general intangibles, or otherwise, and all proceeds of the foregoing, including, but not limited to insurance proceeds.

**D.    Off Lease LLC's Failure to Make Required Payments and Default**

21.    Beginning in late 2022, Off Lease's financial performance began deteriorating significantly, which raised concerns about Off Lease's ability to meet its financial obligations under the Wholesale Financing Documents.

22.    Among other things, the Ally Parties observed that Off Lease had an inventory that, when compared to other used car dealerships, exceeded the average days' supply of inventory and with vehicles that remained on floorplan longer than most used car dealerships. This made it more difficult for Off Lease to sell its aging inventory, to fully repay the amounts due under the Wholesale Financing Documents, and to qualify for access to the floorplan credit lines under those Wholesale Financing Documents.

23.    In December 2022, Off Lease made representations to the Ally Parties that one of its equity investors, Cerberus, expressed intent to provide additional capital to offset Off Lease's cash burn and aging vehicle inventory.  However, once Cerberus declined to continue to provide additional cash to offset Off Lease's declining liquidity after February 2023, Off Lease's business began to experience significant additional financial distress.

24.    Leading up to September 2023, despite Off Lease's significant decline in revenue, its inability to achieve business projections and plans as promised, continuing increases in the average age of its floorplan inventory, failure to implement tighter controls for inventory management, and macroeconomic facts involving the used vehicle market and interest rates, the

Ally Parties agreed to continue to provide credit to Off Lease, albeit with certain modifications to the terms of the Wholesale Financing Documents.

25.    For example, on February 3, 2023, due to Off Lease's repeated failure to meet its own business plan projections and targets in early 2023, the Ally Parties wrote a letter to Off Lease requiring, among other things, that Off Lease LLC must continue to meet or exceed operation forecasts it provided to the Ally Parties on January 10, 2023. These statements were made because a successful turnaround for Off Lease required Off Lease to improve its inventory management, to reduce the average aging of its existing inventory, and to meet or exceed its operational forecasts.

26.    Unfortunately, during the remainder of the first half of 2023, Off Lease continuously failed to meet its January 10, 2023 operation forecasts. Under these circumstances, in June 2023, Off Lease informed the Ally Parties that it was engaging in efforts to sell the business to a potential third-party buyer. However, by mid-July 2023, Off Lease's efforts to sell its business had not materialized and Off Lease informed the Ally Parties that there were only a few parties even entertaining discussions about possibly entering into an NDA to participate in a potential sale process.

27.    As a result, in July 2023, after multiple meetings among Off Lease and the Ally Parties, the Ally Parties wrote to Off Lease concerning the Off Lease's on-going losses, its operating trends falling short of business plan, and recently communicated revisions to its business plan that delayed a return to break-even until 2024. Considering Off Lease's disclosures related to its lowered financial projections and lack of any immediate plan to return the business to profitability, while the Ally Parties agreed to leave the floorplan credit lines open, the Ally Parties specified that certain additional, reasonable conditions needed to be satisfied in order to maintain

the open credit lines in light of Off Lease's deteriorating financial condition, which included participation in weekly calls, delivery of daily sales reports, and delivery of weekly updates on the status of the sale of Off Lease's business.

28.     While Off Lease initially communicated with the Ally Parties concerning the requested information, towards the end of August, Off Lease refused to provide to the Ally Parties the same level of transparency concerning its business operations and plans.

29.     Amidst this lack of transparency, on Tuesday, September 5, 2023, Off Lease defaulted on its payment obligations under the Wholesale Financing Documents, when it failed to pay the Ally Parties **$3,260,351.05** in principal that was due and owing for vehicles sales under the Wholesale Financing Documents, as well as **$761,489.77** for unpaid and accrued interest and insurance expenses that was past due and owing for the month of August 2023 under the Wholesale Financing Documents.  The Ally Parties requested that Off Lease remit all amounts due and owing under the Wholesale Financing Documents, but Off Lease never remitted payment.

30.     Upon Off Lease's default of its payment obligations under the Wholesale Financing Documents, on September 5, 2023 (two days before Off Lease and Off Lease Parent filed for bankruptcy), the Ally Parties applied $9,105,235.55 of the Credit Balance being held pursuant to the Credit Balance Agreement to paydown Off Lease's full principal obligations under the Wholesale Financing Documents for vehicles no longer in Off Leases inventory, as they had the right to do.  On the morning of September 6, 2023 (one day before Off Lease and Off Lease Parent filed for bankruptcy), the Ally Parties applied the remaining $894,764.45 of the entire $10-million Credit Balance being held pursuant to the Credit Balance Agreement to make partial principal paydowns of vehicles that remained on floorplan for more than 120 days to paydown Off Lease's obligations under the Wholesale Financing Documents, as they had the right to do.  The VIN-

specific application of the Credit Balance was against (i) the full principal amount for vehicles Off Lease had already sold without making a corresponding payment of such principal amounts to the Ally Parties, and (ii) a partial principal amount for certain aged vehicles that had been held in inventory for more than one hundred twenty (120) days.

31.     Leading up to Off Lease's payment defaults and other defaults, the Ally Parties consistently attempted to engage Off Lease to discuss a commercial workout that would maximize the value of the existing floorplan inventory and their ability to repay the Ally Parties amounts Off Lease owed under the Wholesale Financing Documents, while also minimizing losses caused by delays with respect to aging vehicles in a deteriorating used vehicle market.  Rather than reach an agreement on a commercial workout, on September 6, 2023, Off Lease discontinued commercial operations, locked its dealerships, and refused to permit the Ally Parties to review Debtors' records (including sales folders, delivery receipts, cash receipts and the like), which Debtors previously allowed the Ally Parties to do.

**E.     The Balance Owed by Off Lease and Off Lease Parent under the Wholesale Financing Documents as of the Petition Date**

32.     I understand that Off Lease and Off Lease Parent commenced Chapter 11 Proceedings on September 7, 2023 (the "Petition Date").

33.     As of the Petition Date, Off Lease and Off Lease Parent owe the Ally Parties no less than **$57,691,584.50** under the Wholesale Financing Documents for amounts advanced under the wholesale floorplan line of credit for the unpaid principal advance for unsold or missing vehicle inventory, as well as accrued (but unpaid) interest and insurance costs. This amount does not account for certain legal fees and enforcement costs incurred before the Petition Date or any interest, legal fees or enforcement cost incurred or to be incurred on or after the Petition Date.

34.     The total amount owed by Off Lease and Off Lease Parent as of the Petition Date was known or readily available to Off Lease and Off Lease Parent.  In addition to sending monthly wholesale billing statements showing the total amount owed for each vehicle, including accrued interest and insurance expenses for each vehicle in inventory, Off Lease and Off Lease Parent also had online access to view the daily balance owed for the credit advance, accrued interest and accrued insurance costs for each vehicle on any given day.

**F.     The Value of the Remaining Vehicle Inventory, if Transferred Immediately to the Ally Parties**

35.     As time passes, the value of the used vehicle inventory that serves as collateral for the funds Off Lease and Off Lease Parent borrowed under the Wholesale Financing Documents continues to decline.  In order to maximize the value of the vehicle inventory, the vehicles need to be transferred and sold as quickly as possible.

36.     To determine an estimate of the likely value of the remaining vehicle inventory the total number of vehicles remaining in inventory must first be determined, as the Ally Parties only have records relating to vehicle collateral that is currently on floorplan and not to vehicle collateral that is not on floorplan.  Second, the estimated net sales proceeds for the remaining inventory must be calculated.   Third, the estimated costs associated with transferring the vehicles and titles to conclude sales of the vehicle inventory to third parties must be deducted.

37.     **Number of Vehicles**. Determining the total number and identify by VIN of the vehicles remaining in Off Lease's inventory is an essential starting point.  To date, the Ally Parties have only been able to verify that 2,036 of the vehicles floorplanned by the Ally Parties and in Off Lease's inventory are on-site, plus an additional 21 vehicles in Off Lease's inventory were verified that were not onsite at Off Lease's dealerships (rentals, company use).   There are still 212 floorplanned vehicles listed in the Ally Parties floorplan records that the Ally Parties have not been

able to verify.  Unless these vehicles and their titles can be located and verified, they represent a total loss with no realizable value.  The Ally Parties also need access to records relating to vehicles constituting their collateral that are not on Off Lease's floorplan.

38.     **Net Value of Verified Vehicles in Off Lease's Inventory**. Based upon my experience in the industry, including more than a decade of experience as the Executive Director of the Ally Parties' Commercial Workout Team and my role overseeing the wholesale and auction of tens of thousands of vehicles in workout situations and bankruptcies, as well as the Ally Parties' experience more generally, I estimate that the most likely realizable value of the remaining vehicles will average only 90% of the clean Black Book value for the vehicles.  The clean Black Book value is one of the commonly used industry sources for determining a vehicle's value based on a number of criteria (e.g., make, model, mileage, general condition, etc.), and is what the Ally Parties used in assessing value when making advances to Debtors under the Wholesale Financing Documents.

39.     The clean Black Book value is a published value that indicates the wholesale or auction value of a vehicle with very little interior or exterior wear.  However, the more time that passes, the less likely it is that even 90% clean Black Book value of the vehicles can be realized upon liquidation of the used-vehicle inventory.

40.     In my experience, the reasons why it is unlikely to achieve greater than 90% of the clean Black Book value on average for Off Lease's verified vehicle inventory and covered by the Wholesale Financing Documents are that (i) the values are likely to decline between now and completion of the eventual sale process that will occur several weeks after approval by the Court, (ii) a fair number of the vehicles will have mechanical problems and/or interior or exterior wear that is more extensive than qualifies for a Black Book clean classification, (iii) some of the

CARFAX reports will disclose issues that may cause further declines in the value for certain vehicles, and (iv) the auction houses charge fees that are charged against sale proceeds. However, it must also be recognized that the 90% of clean Black Book value is only my estimate as of today, based on the limited information the Ally Parties have to date. The Ally Parties have not had the opportunity to inspect the vehicles in inventory, review their CARFAX histories, determine whether they have clear title, or assess any other issues that could result in recoveries significantly lower than 90%.

41.     **Wholesale Costs**. While I estimate that the average net sales amount will be 90% of the clean Black Book value for Off Lease's verified inventory, there are additional costs not accounted for in the net sales price that  are required for transferring the vehicles from the Off Lease dealerships to auction houses or other storage locations for online sales, storing the vehicles, securing the vehicles, insuring the vehicles, and changing title to the vehicles to ensure the sale of vehicles with clean title. I estimate that these costs are likely to total approximately $500 for each vehicle, assuming full cooperation from the dealership in transferring title to the Ally Parties. This also does not include legal fees which are accrued and continue to accrue.

42.     The table below summarizes my estimate of the realizable value of the vehicle inventory acquired under the Wholesale Financing Documents compared to the total outstanding amount owed under the Wholesale Financing Documents for the vehicles, including total accrued but unpaid interest and insurance costs from August 1 until September 6, 2023. It also includes an estimated average cost of $500 per verified vehicle in Off Lease's inventory for transporting, titling, and preparing the vehicles to sell.

| Row Labels | Count of VIN | Sum of OS | Collateral Value * | Surplus / (Deficiency) |
|---|---|---|---|---|
| In Stock | 2,036 | $ 51,380,504.88 | $ 49,142,779.20 | |
| Off Site Verified | 21 | $ 476,315.50 | $ 461,024.10 | |
| SOT (Sold / Missing) | 212 | $ 4,950,846.40 | | |
| Aug. Interest Charges | | $ 683,757.30 | | |
| Est. Sept. Interest Charges (9/1-9/6) | | 109,975.46 | | |
| Aug. Insurance Charges | | $ 77,732.47 | | |
| Est. Sept. Insurance Charges (9/1-9/6) | | $ 12,452.51 | | |
| Estimated Fees ($500/unit) ** | | $ 1,028,500.00 | | |
| **Grand Total** | | **$ 58,720,084.52** | **$ 49,603,803.30** | **($9,116,281.22)** |

\* Based on 90% of clean Black Book value

\*\* Represents transportation, titles, marshalling fees, etc.

43.     My current estimate of the shortfall between the net value of the verified floorplan vehicle collateral (when combined with unpaid interest and insurance charges under the Wholesale Financing Agreements from August 1 – September 6, totaling **$883,917.74**, and a total of **$1,028,500.00** for estimated costs of $500 per verified vehicle for transport, titling, etc.) as compared to the amounts owed by Off Lease for the vehicles acquired pursuant to the Wholesale Financing Documents as of the Petition Date is a total of **$9,116,281.22** ($58,720,084.52 - $49,603,803.30).

**G.      The Ally Parties Are the Best-Suited to Maximize the Value of the Remaining Vehicle Inventory through Wholesale Auctions and Online Sales**

44.     If the Ally Parties are permitted to take possession of the vehicle inventory and corresponding titles covered by the Wholesale Financing Documents, the Ally Parties can promptly maximize their value by marketing and selling them (i) directly on the Ally Parties' online SmartAuction – an industry-leading internet auction that offers access to a virtual inventory of wholesale vehicles for eligible dealers of all brands, and/or (ii) through third-party auction houses.  The means by which the Ally Parties will liquidate the collateral from Debtors will be the same as the commercially reasonable means they routinely use to remarket and sell repossessions and off lease vehicles in their own consumer automotive portfolio.

45.     In order to sell and liquidate the remaining vehicle inventory, the following will need to occur (i) inspection of all vehicles and titles in their current locations by the Ally Parties, (ii) transfer of all vehicles by the Ally Parties and required third parties to either auction houses for third-party auction sales or new secure facilities for listing and sale on the SmartAuction website, (iii) a limited power of attorney to facilitate reassignment of all vehicle titles to the Ally Parties to clear title and to improve resale value, (iv) deliver clean title and provide consent to auction vehicles to third-party auction house or obtain clean title and obtain consent to sell vehicles on SmartAuction, and (v) obtain net sale proceeds from auction house (sale price less auction house fees and costs) or obtain net sale proceeds from purchaser from SmartAuction (sale price less SmartAuction fees and costs).

46.     For all the reasons set forth above, the Ally Parties are best-suited to sell the vehicle inventory in a way that maximizes their value because they are industry leaders in floorplan financing – including liquidating inventories for distressed or defaulting dealerships – and have well-established relationships with auction companies, transportation and other necessary vendors, as well as a proven track record of efficient sales of liquidating vehicle inventories to maximize sale prices under these circumstances.  Moreover,  I note that in Mr. Leland Wilson's declaration, submitted in support of Debtors' Chapter 11 Petitions and First Day Pleadings (Dkt. 4), he avers that Debtors and he all agree that "allowing Ally to recover its collateral will maximize the value of the Debtors' estates by minimizing the cost to the Debtors of liquidating their assets" (Wilson Decl. at ¶ 35).   As such, the Ally Parties would consent to Debtors' limited use of their cash collateral over a three week period, according to a revised budget to which the Ally Parties must consent, further conditioned on an appropriate arrangement for the immediate transfer with all due speed of the Ally Parties' vehicle collateral (including all titles) from the Debtors to locations to

be selected by the Ally Parties, and subject to customary arrangements regarding transport and security. This will allow the parties to get the process for the sale of those vehicles started as soon as possible, in order to "maximize the value of the Debtors' estates by minimizing the cost to the Debtors of liquidating their assets." (*Id.*).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: September 11, 2023

Michael Keeler