**Exhibit B**

**Keeler Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| OFF LEASE ONLY LLC,[1] | ) | Case No. 23- 11388 (CTG) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) |  |

**DECLARATION OF MICHAEL KEELER IN SUPPORT**
**OF OBJECTION OF ALLY FINANCIAL INC. AND ALLY BANK**
**TO MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND**
**FINAL ORDERS AUTHORIZING THE USE OF CASH COLLATERAL**

I, Michael Keeler, herby declare the following under penalty of perjury:

1.      I currently serve as the Executive Director of the Commercial Workout Team for Ally Bank. Ally Bank and Ally Financial (together, the "Ally Parties") are secured lenders under the wholesale floorplan financing agreements described below with Off Lease Only LLC ("Off Lease LLC") as borrower, as guaranteed by Off Lease Only Parent LLC ("Off Lease Parent", and together with Off Lease LLC, "Off Lease"). If called upon to testify, I would testify competently to the facts set forth in this Declaration based on my personal knowledge and/or my review of the books and records of the Ally Parties, as well as discussion with management of the Ally Parties.

A.      **Professional Experience**

2.      I have worked for the Ally Parties for the past 33 years in the auto floorplan financing business, which consists of providing lending to auto dealerships to finance their new and used vehicle inventory. I received a A.S. Degree in General Business from Champlain College

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if applicable) are: Off Lease Only LLC (7345), Off Lease Only Parent LLC (2753), and Colo Real Estate Holdings LLC (7453).  The location of the Debtors' service address in these chapter 11 cases is 1200 S. Congress Ave., Palm Springs, FL 33406.

1

in Vermont in 1990 and a B.S. Degree in Individualized Studies with a concentration in Accounting and Finance from Charter Oak College in Connecticut in 2004.

3.      The process by which a used independent dealership obtains financing for vehicles differs from the process by which a franchised new vehicle dealership obtains new vehicles, but the lending is similar.  On their own initiative, used independent dealerships search for and select used vehicles from auctions and other sources, including by accepting trade-in vehicles or direct purchases from consumers.  To purchase or otherwise finance the acquisition of these vehicles, dealers may request funding from the Ally Parties to add those used vehicle purchases to their floor plan.

4.      I have extensive experience in auto floorplan financing workouts in distressed debt situations.  In 2008, I was a leading member of the group that launched the Commercial Workout Team—a specialized business team that oversees the Ally Parties' workout situations involving dealerships across the United States that are financially distressed, meaning there are indications that the floorplan borrower may default or has defaulted on its payment obligations. From 2008 until 2011, I held various roles, including leadership roles on the Commercial Workout Team.  In 2011, I was transferred to another Commercial Automotive business team for 3 years.  In 2014, I returned to lead the national Commercial Workout Team as the Executive Director and have remained the Executive Director since then. As a result of my role and experience with the Ally Parties, my review of documents related to Off Lease's floorplan financing, and my oversight responsibilities for a potential commercial workout with Off Lease, I am familiar with the commercial lending relationship between the Ally Parties and Off Lease and the events surrounding Off Lease's default of its payment obligations to the Ally Parties. Except as otherwise noted, I have personal knowledge of the matters set forth herein. Except as otherwise stated, all

2

facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with members of the Commercial Lending Team, or my opinion based upon my experience and knowledge of workouts of distressed auto floorplan financing arrangements.

5.       Over the past three decades, in my various roles on the Ally Parties' commercial automotive lending team, including in my last decade as Executive Director of the Commercial Workout Team, I have overseen hundreds of workouts, hundreds of floorplan liquidations, and the transfer and sale of tens of thousands of floorplan vehicles to repay secured floorplan lending in situations where the dealership exits the floorplan lending arrangement and liquidates its motor vehicle inventory. In distressed or default situations, the Ally Parties work with dealerships to either (i) rehabilitate their floorplan credit situation, or (ii) exit the floorplan lending relationship with the goal of maximizing the Ally Parties' ability to recover on the liquidation of the inventory that constitutes their secured collateral. In a small percentage of workout scenarios, workout efforts are unsuccessful and the floorplan borrower commences bankruptcy proceedings.

**B.       The Ally Parties' Floorplan Lending Business**

6.       The Ally Parties have more than 100 years of lending experience in the auto industry.  With account executives averaging 15 years of dealer experience and the Ally Parties' workout team, with team members averaging in excess of 25 years of commercial automotive experience – and nearly 5,000 team members dedicated to auto finance operations – they are one of the largest auto finance companies in the United States.  In addition to other forms of lending, the Ally Parties specializes in wholesale floorplan lending to auto dealerships.

7.       Auto wholesale floorplan lending consists of extending lines of credit to auto dealerships exclusively to finance their purchases of new and used vehicle inventory for their showrooms and lots.

3

8.      Generally, after the dealership acquires or otherwise finances a vehicle with funds drawn from the floorplan lines of credit with the Ally Parties, the dealership is subsequently required to repay the Ally Parties the principal amount borrowed for acquisition of that individual vehicle within deadlines established by the Ally Parties, sometimes referred to as the release period.  Interest and insurance costs accrue from the date of initial financing through the date the principal balance is paid-in-full upon the sale of the vehicle.  Because dealerships are constantly purchasing and selling inventory, the purchases and sales of vehicles are continuously being debited and credited against the floorplan line of credit.

9.      The Ally Parties establish advance rates for vehicles they finance.  These advance rates are a percentage of a vehicle's acquisition price or Black Book average wholesale value "clean" with no additions (meaning no adjustments for mileage or options) that the Ally Parties will finance.  These advance rates vary based on such factors as the source of the vehicle and the creditworthiness of the dealership borrower.  For instance, a creditworthy dealership may borrow 100% of the acquisition price (including applicable fees assessed by the auction) for vehicles purchased at auctions that meet specified criteria, including if the auction house is one in which the Ally Parties have arranged for direct payment on behalf of their dealership customers. The advance rate for purchases of vehicles directly from customer trade-ins may be from 70% to 90% of the Black Book average wholesale value, clean with no additions.  As floorplan vehicles in inventory age or if they are being driven as demonstrators or loaner vehicles, their value often declines and the Ally Parties may require the dealership borrower to repay a portion of the initial amount advanced under the wholesale floorplan line of credit in order to ensure that the value of the vehicle does not fall below the amount advanced by the Ally Parties under the floorplan for

4

such vehicle. Interest and insurance charges must also be paid periodically for the period of time
the particular vehicle is on floorplan

### C. The Wholesale Floorplan Financing Agreements with Off Lease

10.     In order to establish secured lines of credit to finance its acquisition of motor
vehicles, (i) as of January 7, 2008, Off Lease Only, Inc. (n/k/a Off Lease Only, LLC) entered into
a Wholesale Security Agreement (as amended from time to time, the "<u>Wholesale Security
Agreement</u>") with GMAC (n/k/a Ally Financial),[2] and (ii) as of October 11, 2010, Off Lease
entered into a GMAC Bank Master Wholesale Agreement (as amended from time to time, the
"<u>GMAC Bank Master Agreement</u>") with GMAC Bank (n/k/a Ally Bank).[3]

11.     The Wholesale Security Agreement provides that Off Lease LLC's lines of credit
are "exclusively for the purpose of acquiring motor vehicles to be placed in [Off Lease's] inventory
for sale or lease, or borrowing money on the security of motor vehicles already held in [Off
Lease's] inventory for sale or lease."[4]

12.     Paragraph 5 of the Wholesale Security Agreement details the security interest
granted under the Wholesale Financing Documents:

> In order to secure repayment of any and all Indebtedness now owing or hereafter
> owing to GMAC, whether such Indebtedness arises as a part of the transactions
> contemplated by this Agreement or otherwise, Dealer grants to GMAC a security
> interest in all motor vehicle inventory, and the proceeds thereof (the 'Collateral'),
> which shall include all new and used vehicles held for sale or lease, now owned or
> hereafter acquired, and all additions and accessions thereto and all proceeds of such
> vehicles, including insurance proceeds.

---

[2] A true and correct copy of the Wholesale Security Agreement is attached hereto as Exhibit A.
[3] A true and correct copy of the GMAC Bank Master Agreement is attached hereto as Exhibit B.  The Wholesale
Security Agreement and the GMAC Bank Master Agreement, and all related agreements and security documents are
collectively referred to herein as the "<u>Wholesale Financing Documents</u>" and include, without limitation, (i) the
November 15, 2019 General Security Agreement, (ii) the Cross Collateral, Cross Default and Guaranty Agreement,
dated as of 13, August 13, 2020, (iii) the Guaranty executed by Off Lease Parent, dated as of September 6, 2022, and
(iv) the Credit Balance Agreement, dated as of February 13, 2023.
[4] Ex. A ¶ 1.

GMAC's security interest in the vehicles shall attach to the full extent provided or permitted by law to the proceeds, in whatever form, of any retail sale or lease thereof by Dealer until such proceeds are accounted for, and to the proceeds of any other disposition of said vehicles or any part thereof. This grant of a security interest is additionally to secure collectively the payment by Dealer of the amounts of all advances or obligations to advance made by GMAC to any manufacturer, distributor or other seller, and the interest due thereon.[5]

13.     Paragraph 7 of the Wholesale Security Agreement further provides:

In the event of the Dealer's default in the payment of the amount advanced by GMAC or in the due performance of, or compliance with, any of the terms and conditions hereof, or in the event of a foreclosure proceeding or bankruptcy, insolvency or receivership instituted by or against the Dealer or the Dealer's property, or in the event that GMAC deems itself insecure or said Collateral or any part thereof is in danger of misuse, loss, seizure or confiscation, GMAC may take immediate possession of said Collateral, without demand or further notice and without legal process; for this purpose and in furtherance thereof, the Dealer shall, if GMAC so requests, assemble said Collateral and make it available for GMAC in a reasonably convenient place designated by it, and GMAC shall have the right, and the Dealer does hereby authorize and empower GMAC to enter upon the premises wherever said Collateral may be and remove same. In the event of repossession of said Collateral, GMAC shall have such rights and remedies as are provided and permitted under Article 9 of, and relating to secured transactions under, the Uniform Commercial Code and other applicable law. Dealer shall pay all expenses and reimburse GMAC for any expenditures, including reasonable attorneys' fees and legal expenses in connection with GMAC's exercise of any of its rights and remedies.[6]

14.     Paragraph 6 of the Wholesale Security Agreement also provides that "[u]pon request of GMAC, Dealer will also execute and deliver to GMAC from time to time security agreements, together with further documents as requested by GMAC, which security agreements (and further documents, if any) shall be in such form as GMAC may in its sole discretion require."[7] In furtherance of their ongoing floorplan financing relationship and consistent with paragraph 6 of the Wholesale Security Agreement, on or about November 15, 2019, Off Lease and the Ally Parties

---

[5] Ex. A ¶ 5.
[6] Ex. A ¶ 7.
[7] Ex. A ¶ 6.

entered into a General Security Agreement,[8] under which Off Lease grants to each of the Ally Parties:

> a security interest in, and a collateral assignment of, any and all of the following described property in which Dealer now or hereafter acquires an interest, wherever located, in whatever form, and in any and all proceeds thereof, including insurance proceeds: all vehicles, including but not limited to those vehicles for which either of the Ally Parties provides financing, and regardless of whether such vehicles are considered inventory or equipment, and all funds provided to or held by either of the Ally Parties, regardless of whether such funds are considered accounts, general intangibles, or otherwise (the "Collateral").[9]

15.     Subsequently, Off Lease LLC and the Ally Parties entered into a Cross Collateral, Cross Default and Guaranty Agreement as of August 13, 2020 (the "Cross Collateral Guaranty Agreement"),[10] providing that all of the assets upon which one of the Ally Parties has a lien or security interest will secure the payment and performance for all current and future loans, advances and extensions of credit made by either of the Ally Parties and all obligations of every kind owed by Off Lease LLC to the Ally Parties.

16.     On September 6, 2022, the Ally Parties and Off Lease Parent executed the Guaranty in favor of the Ally Parties (the "Parent Guaranty Agreement") to guaranty repayment of Off Lease LLC's indebtedness.[11]

17.     Generally, the Ally Parties advanced 100% of the acquisition costs for Off Lease LLC's acquisition of vehicles for auctions where the Ally Parties have arranged for direct payment on behalf of their dealership customers.  The Ally Parties also initially provided an advance rate of 90% for Debtors' trade-ins and acquisitions via its "We Buy Your Car" program, a rate that

---

[8] A true and correct copy of the General Security Agreement is attached hereto as Exhibit C.
[9] Ex. C at 1.
[10] A true and correct copy of the Cross Collateral Guaranty Agreement is attached hereto as Exhibit D.
[11] A true and correct copy of the Parent Guaranty Agreement is attached hereto as Exhibit E.

changed after Debtors financial distress worsened, including when it no longer obtained additional financing from equity holders.

18.    On February 13, 2023, based on the Ally Parties' legitimate concerns regarding Off Lease LLC's financial performance and condition, and in consideration of the Ally Parties' agreement to continue lines of credit to Off Lease LLC, Ally Bank and Off Lease LLC entered into a Credit Balance Agreement.[12]  Under the terms of the Credit Balance Agreement, Off Lease LLC delivered money to Ally Bank to be held as principal payments under Off Lease LLC's Wholesale Security Agreement, but without requiring that the money be applied in the form of accounting entries to reduce the principal balances of individual floorplan principal advances. Such amount remitted to Ally Bank is referred to as the "Credit Balance."  The Credit Balance Agreement required Off Lease LLC to maintain "a Credit Balance equal to or greater than $10,000,000.00 so long as the consolidated floorplan Outstanding Amount is equal to or less than $160,000,000.00."[13]  It further provided that "[u]pon Default, [Ally] Bank may immediately apply all principal payments made pursuant to this Agreement to such principal advances made pursuant to the Wholesale Agreement as [Ally] Bank may determine in its sole discretion."[14]

19.    Pursuant to the Wholesale Security Agreement, "[a]t the time [Off Lease LLC] sells or otherwise disposes of vehicles or other assets for which [Ally Financial] has advanced funds pursuant to this Agreement, [Off Lease LLC] will immediately pay [Ally Financial] the amount of money which [Ally Financial] has advanced with respect to such vehicles or other assets."[15]

20.    On or about May 22, 2008, the predecessors to the Ally Parties under the Wholesale Financing Documents filed required UCC statements to perfect a first priority security interest in

---

[12] A true and correct copy of the Credit Balance Agreement is attached hereto as Exhibit F.
[13] Ex. F ¶ 2.
[14] Ex. F ¶ 7.
[15] Ex. A ¶ 4. (Emphasis added).

all vehicles, including but not limited to those vehicle for which either of the Ally Parties provides financing, and regardless of whether such vehicles are considered inventory or equipment, all funds provided to or held by either of the Ally Parties, regardless of whether such funds are considered accounts, general intangibles, or otherwise, and all proceeds of the foregoing, including, but not limited to insurance proceeds.

### D.   Off Lease LLC's Failure to Make Required Payments and Default

21.     Beginning in late 2022, Off Lease's financial performance began deteriorating significantly, which raised concerns about Off Lease's ability to meet its financial obligations under the Wholesale Financing Documents.

22.     Among other things, the Ally Parties observed that Off Lease had an inventory that, when compared to other used car dealerships, exceeded the average days' supply of inventory and with vehicles that remained on floorplan longer than most used car dealerships. This made it more difficult for Off Lease to sell its aging inventory, to fully repay the amounts due under the Wholesale Financing Documents, and to qualify for access to the floorplan credit lines under those Wholesale Financing Documents.

23.      In December 2022, Off Lease made representations to the Ally Parties that one of its equity investors, Cerberus, expressed intent to provide additional capital to offset Off Lease's cash burn and aging vehicle inventory.  However, once Cerberus declined to continue to provide additional cash to offset Off Lease's declining liquidity after February 2023, Off Lease's business began to experience significant additional financial distress.

24.     Leading up to September 2023, despite Off Lease's significant decline in revenue, its inability to achieve business projections and plans as promised, continuing increases in the average age of its floorplan inventory, failure to implement tighter controls for inventory management, and macroeconomic facts involving the used vehicle market and interest rates, the

Ally Parties agreed to continue to provide credit to Off Lease, albeit with certain modifications to the terms of the Wholesale Financing Documents.

25.     For example, on February 3, 2023, due to Off Lease's repeated failure to meet its own business plan projections and targets in early 2023, the Ally Parties wrote a letter to Off Lease requiring, among other things, that Off Lease LLC must continue to meet or exceed operation forecasts it provided to the Ally Parties on January 10, 2023.  These statements were made because a successful turnaround for Off Lease required Off Lease to improve its inventory management, to reduce the average aging of its existing inventory, and to meet or exceed its operational forecasts.

26.     Unfortunately, during the remainder of the first half of 2023, Off Lease continuously failed to meet its January 10, 2023 operation forecasts.  Under these circumstances, in June 2023, Off Lease informed the Ally Parties that it was engaging in efforts to sell the business to a potential third-party buyer.  However, by mid-July 2023, Off Lease's efforts to sell its business had not materialized and Off Lease informed the Ally Parties that there were only a few parties even entertaining discussions about possibly entering into an NDA to participate in a potential sale process.

27.     As a result, in July 2023, after multiple meetings among Off Lease and the Ally Parties, the Ally Parties wrote to Off Lease concerning the Off Lease's on-going losses, its operating trends falling short of business plan, and recently communicated revisions to its business plan that delayed a return to break-even until 2024.  Considering Off Lease's disclosures related to its lowered financial projections and lack of any immediate plan to return the business to profitability, while the Ally Parties agreed to leave the floorplan credit lines open, the Ally Parties specified that certain additional, reasonable conditions needed to be satisfied in order to maintain

the open credit lines in light of Off Lease's deteriorating financial condition, which included participation in weekly calls, delivery of daily sales reports, and delivery of weekly updates on the status of the sale of Off Lease's business.

28.     While Off Lease initially communicated with the Ally Parties concerning the requested information, towards the end of August, Off Lease refused to provide to the Ally Parties the same level of transparency concerning its business operations and plans.

29.     Amidst this lack of transparency, on Tuesday, September 5, 2023, Off Lease defaulted on its payment obligations under the Wholesale Financing Documents, when it failed to pay the Ally Parties **$3,260,351.05** in principal that was due and owing for vehicles sales under the Wholesale Financing Documents, as well as **$761,489.77** for unpaid and accrued interest and insurance expenses that was past due and owing for the month of August 2023 under the Wholesale Financing Documents.  The Ally Parties requested that Off Lease remit all amounts due and owing under the Wholesale Financing Documents, but Off Lease never remitted payment.

30.     Upon Off Lease's default of its payment obligations under the Wholesale Financing Documents, on September 5, 2023 (two days before Off Lease and Off Lease Parent filed for bankruptcy), the Ally Parties applied $9,105,235.55 of the Credit Balance being held pursuant to the Credit Balance Agreement to paydown Off Lease's full principal obligations under the Wholesale Financing Documents for vehicles no longer in Off Leases inventory, as they had the right to do.  On the morning of September 6, 2023 (one day before Off Lease and Off Lease Parent filed for bankruptcy), the Ally Parties applied the remaining $894,764.45 of the entire $10-million Credit Balance being held pursuant to the Credit Balance Agreement to make partial principal paydowns of vehicles that remained on floorplan for more than 120 days to paydown Off Lease's obligations under the Wholesale Financing Documents, as they had the right to do.  The VIN-

specific application of the Credit Balance was against (i) the full principal amount for vehicles Off Lease had already sold without making a corresponding payment of such principal amounts to the Ally Parties, and (ii) a partial principal amount for certain aged vehicles that had been held in inventory for more than one hundred twenty (120) days.

31.     Leading up to Off Lease's payment defaults and other defaults, the Ally Parties consistently attempted to engage Off Lease to discuss a commercial workout that would maximize the value of the existing floorplan inventory and their ability to repay the Ally Parties amounts Off Lease owed under the Wholesale Financing Documents, while also minimizing losses caused by delays with respect to aging vehicles in a deteriorating used vehicle market.  Rather than reach an agreement on a commercial workout, on September 6, 2023, Off Lease discontinued commercial operations, locked its dealerships, and refused to permit the Ally Parties to review Debtors' records (including sales folders, delivery receipts, cash receipts and the like), which Debtors previously allowed the Ally Parties to do.

### E.     The Balance Owed by Off Lease and Off Lease Parent under the Wholesale Financing Documents as of the Petition Date

32.     I understand that Off Lease and Off Lease Parent commenced Chapter 11 Proceedings on September 7, 2023 (the "Petition Date").

33.     As of the Petition Date, Off Lease and Off Lease Parent owe the Ally Parties no less than **$57,691,584.50** under the Wholesale Financing Documents for amounts advanced under the wholesale floorplan line of credit for the unpaid principal advance for unsold or missing vehicle inventory, as well as accrued (but unpaid) interest and insurance costs. This amount does not account for certain legal fees and enforcement costs incurred before the Petition Date or any interest, legal fees or enforcement cost incurred or to be incurred on or after the Petition Date.

34.     The total amount owed by Off Lease and Off Lease Parent as of the Petition Date was known or readily available to Off Lease and Off Lease Parent.  In addition to sending monthly wholesale billing statements showing the total amount owed for each vehicle, including accrued interest and insurance expenses for each vehicle in inventory, Off Lease and Off Lease Parent also had online access to view the daily balance owed for the credit advance, accrued interest and accrued insurance costs for each vehicle on any given day.

**F.      The Value of the Remaining Vehicle Inventory, if Transferred Immediately to the Ally Parties**

35.     As time passes, the value of the used vehicle inventory that serves as collateral for the funds Off Lease and Off Lease Parent borrowed under the Wholesale Financing Documents continues to decline.  In order to maximize the value of the vehicle inventory, the vehicles need to be transferred and sold as quickly as possible.

36.     To determine an estimate of the likely value of the remaining vehicle inventory the total number of vehicles remaining in inventory must first be determined, as the Ally Parties only have records relating to vehicle collateral that is currently on floorplan and not to vehicle collateral that is not on floorplan.  Second, the estimated net sales proceeds for the remaining inventory must be calculated.   Third, the estimated costs associated with transferring the vehicles and titles to conclude sales of the vehicle inventory to third parties must be deducted.

37.     **Number of Vehicles**. Determining the total number and identify by VIN of the vehicles remaining in Off Lease's inventory is an essential starting point.  To date, the Ally Parties have only been able to verify that 2,036 of the vehicles floorplanned by the Ally Parties and in Off Lease's inventory are on-site, plus an additional 21 vehicles in Off Lease's inventory were verified that were not onsite at Off Lease's dealerships (rentals, company use).   There are still 212 floorplanned vehicles listed in the Ally Parties floorplan records that the Ally Parties have not been

13

able to verify.  Unless these vehicles and their titles can be located and verified, they represent a total loss with no realizable value.  The Ally Parties also need access to records relating to vehicles constituting their collateral that are not on Off Lease's floorplan.

38.     **Net Value of Verified Vehicles in Off Lease's Inventory**.  Based upon my experience in the industry, including more than a decade of experience as the Executive Director of the Ally Parties' Commercial Workout Team and my role overseeing the wholesale and auction of tens of thousands of vehicles in workout situations and bankruptcies, as well as the Ally Parties' experience more generally, I estimate that the most likely realizable value of the remaining vehicles will average only 90% of the clean Black Book value for the vehicles.  The clean Black Book value is one of the commonly used industry sources for determining a vehicle's value based on a number of criteria (e.g., make, model, mileage, general condition, etc.), and is what the Ally Parties used in assessing value when making advances to Debtors under the Wholesale Financing Documents.

39.     The clean Black Book value is a published value that indicates the wholesale or auction value of a vehicle with very little interior or exterior wear.  However, the more time that passes, the less likely it is that even 90% clean Black Book value of the vehicles can be realized upon liquidation of the used-vehicle inventory.

40.     In my experience, the reasons why it is unlikely to achieve greater than 90% of the clean Black Book value on average for Off Lease's verified vehicle inventory and covered by the Wholesale Financing Documents are that (i) the values are likely to decline between now and completion of the eventual sale process that will occur several weeks after approval by the Court, (ii) a fair number of the vehicles will have mechanical problems and/or interior or exterior wear that is more extensive than qualifies for a Black Book clean classification, (iii) some of the

CARFAX reports will disclose issues that may cause further declines in the value for certain vehicles, and (iv) the auction houses charge fees that are charged against sale proceeds. However, it must also be recognized that the 90% of clean Black Book value is only my estimate as of today, based on the limited information the Ally Parties have to date. The Ally Parties have not had the opportunity to inspect the vehicles in inventory, review their CARFAX histories, determine whether they have clear title, or assess any other issues that could result in recoveries significantly lower than 90%.

      41.    **Wholesale Costs**. While I estimate that the average net sales amount will be 90% of the clean Black Book value for Off Lease's verified inventory, there are additional costs not accounted for in the net sales price that are required for transferring the vehicles from the Off Lease dealerships to auction houses or other storage locations for online sales, storing the vehicles, securing the vehicles, insuring the vehicles, and changing title to the vehicles to ensure the sale of vehicles with clean title. I estimate that these costs are likely to total approximately $500 for each vehicle, assuming full cooperation from the dealership in transferring title to the Ally Parties. This also does not include legal fees which are accrued and continue to accrue.

      42.    The table below summarizes my estimate of the realizable value of the vehicle inventory acquired under the Wholesale Financing Documents compared to the total outstanding amount owed under the Wholesale Financing Documents for the vehicles, including total accrued but unpaid interest and insurance costs from August 1 until September 6, 2023. It also includes an estimated average cost of $500 per verified vehicle in Off Lease's inventory for transporting, titling, and preparing the vehicles to sell.

| Row Labels | Count of VIN | Sum of OS | Collateral Value * | Surplus / (Deficiency) |
|---|---|---|---|---|
| In Stock | 2,036 | $ 51,380,504.88 | $ 49,142,779.20 | |
| Off Site Verified | 21 | $ 476,315.50 | $ 461,024.10 | |
| SOT (Sold / Missing) | 212 | $ 4,950,846.40 | | |
| Aug. Interest Charges | | $ 683,757.30 | | |
| Est. Sept. Interest Charges (9/1-9/6) | | 109,975.46 | | |
| Aug. Insurance Charges | | $ 77,732.47 | | |
| Est. Sept. Insurance Charges (9/1-9/6) | | $ 12,452.51 | | |
| Estimated Fees ($500/unit) ** | | $ 1,028,500.00 | | |
| **Grand Total** | | $ 58,720,084.52 | $ 49,603,803.30 | (**$9,116,281.22**) |

\* Based on 90% of clean Black Book value

\*\* Represents transportation, titles, marshalling fees, etc.

43.     My current estimate of the shortfall between the net value of the verified floorplan vehicle collateral (when combined with unpaid interest and insurance charges under the Wholesale Financing Agreements from August 1 – September 6, totaling **$883,917.74**, and a total of **$1,028,500.00** for estimated costs of $500 per verified vehicle for transport, titling, etc.) as compared to the amounts owed by Off Lease for the vehicles acquired pursuant to the Wholesale Financing Documents as of the Petition Date is a total of **$9,116,281.22** ($58,720,084.52 - $49,603,803.30).

G.     **The Ally Parties Are the Best-Suited to Maximize the Value of the Remaining Vehicle Inventory through Wholesale Auctions and Online Sales**

44.     If the Ally Parties are permitted to take possession of the vehicle inventory and corresponding titles covered by the Wholesale Financing Documents, the Ally Parties can promptly maximize their value by marketing and selling them (i) directly on the Ally Parties' online SmartAuction – an industry-leading internet auction that offers access to a virtual inventory of wholesale vehicles for eligible dealers of all brands, and/or (ii) through third-party auction houses.  The means by which the Ally Parties will liquidate the collateral from Debtors will be the same as the commercially reasonable means they routinely use to remarket and sell repossessions and off lease vehicles in their own consumer automotive portfolio.

16

45.     In order to sell and liquidate the remaining vehicle inventory, the following will need to occur (i) inspection of all vehicles and titles in their current locations by the Ally Parties, (ii) transfer of all vehicles by the Ally Parties and required third parties to either auction houses for third-party auction sales or new secure facilities for listing and sale on the SmartAuction website, (iii) a limited power of attorney to facilitate reassignment of all vehicle titles to the Ally Parties to clear title and to improve resale value, (iv) deliver clean title and provide consent to auction vehicles to third-party auction house or obtain clean title and obtain consent to sell vehicles on SmartAuction, and (v) obtain net sale proceeds from auction house (sale price less auction house fees and costs) or obtain net sale proceeds from purchaser from SmartAuction (sale price less SmartAuction fees and costs).

46.     For all the reasons set forth above, the Ally Parties are best-suited to sell the vehicle inventory in a way that maximizes their value because they are industry leaders in floorplan financing – including liquidating inventories for distressed or defaulting dealerships – and have well-established relationships with auction companies, transportation and other necessary vendors, as well as a proven track record of efficient sales of liquidating vehicle inventories to maximize sale prices under these circumstances.  Moreover,  I note that in Mr. Leland Wilson's declaration, submitted in support of Debtors' Chapter 11 Petitions and First Day Pleadings (Dkt. 4), he avers that Debtors and he all agree that "allowing Ally to recover its collateral will maximize the value of the Debtors' estates by minimizing the cost to the Debtors of liquidating their assets" (Wilson Decl. at ¶ 35).   As such, the Ally Parties would consent to Debtors' limited use of their cash collateral over a three week period, according to a revised budget to which the Ally Parties must consent, further conditioned on an appropriate arrangement for the immediate transfer with all due speed of the Ally Parties' vehicle collateral (including all titles) from the Debtors to locations to

be selected by the Ally Parties, and subject to customary arrangements regarding transport and security.  This will allow the parties to get the process for the sale of those vehicles started as soon as possible, in order to "maximize the value of the Debtors' estates by minimizing the cost to the Debtors of liquidating their assets." (*Id.*).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: September 11, 2023

Michael Keeler

**Exhibit A**

## WHOLESALE SECURITY AGREEMENT

This Agreement made this ___7th___ day of __January__, 20_08_ by  and . between **Off Lease Only, Inc.** (hereinafter referred to as "Dealer") and GMAC, an entity organized under the laws of Delaware, with an office at **12740 Gran Bay Parkway, West – Suite 2200, Jacksonville, FL. 32258**.

WHEREAS, Dealer has made application for a line of credit with GMAC, to finance Dealer's acquisition of motor vehicles from manufacturers, distributors, or others, to be secured by one or more security agreements covering motor vehicle inventory and other assets of Dealer.

NOW, THEREFORE, in consideration of the mutual promises contained herein, Dealer and GMAC agree as follows:

1.  GMAC hereby extends to Dealer a line of credit on the terms and conditions hereinafter set forth. The line of credit which has been extended, and which is extended hereunder, shall be used exclusively for the purpose of acquiring motor vehicles to be placed in Dealer's inventory for sale or lease, or borrowing money on the security of motor vehicles already held in Dealer's inventory for sale or lease. GMAC will advance funds in payment of said vehicles so acquired or held in an amount not in excess of the invoice price thereof in the case of new motor vehicles so acquired or held by Dealer, and not in excess of a mutually agreed valuation of used motor vehicles so acquired or held.

2.  The amount owed by Dealer to GMAC under this Agreement shall at any time be the total aggregate advances under Paragraph 1 of this Agreement, together with interest at the rate described in Paragraph 3 below, (collectively, the "Indebtedness").

3.  Dealer shall pay GMAC interest on a monthly basis, as billed, calculated on the amount of advances outstanding from the date of each such advance to the date of repayment thereof, at the rate per annum herein incorporated by reference to the rate designated under the GMAC Wholesale Plan as the rate currently in force at each such date of advance, provided, however, that if the rate designated under the GMAC Wholesale Plan is subsequently changed, the rate per annum, commencing on the effective date of each such change, shall, at the option of GMAC be such changed rate as to each prior advance hereunder which is outstanding on said effective date for such portion of said period or periods remaining after said effective date, and provided further that as to each advance hereunder which remains outstanding after the date repayment thereof is due, the rate per annum, commencing on such date, shall be the highest contract or corporate rate permitted by law. In no event will the interest rate to be applied to any advance hereunder exceed the highest contract or corporate rate permitted by law at the date of such advance.

4.  At the time the Dealer sells or otherwise disposes of vehicles or other assets for which GMAC has advanced funds pursuant to this Agreement, Dealer will immediately pay GMAC the amount of money which GMAC has advanced with respect to such vehicles or other assets, together with any unpaid interest thereon.

5.  In order to secure repayment of any and all Indebtedness now owing or hereafter owing to GMAC, whether such Indebtedness arises as a part of the transactions contemplated by this Agreement or otherwise, Dealer grants to GMAC a security interest in all motor vehicle inventory, and the proceeds thereof (the "Collateral"), which shall include all new and used vehicles held for sale or lease, now owned or hereafter acquired, and all additions and accessions thereto and all proceeds of such vehicles, including insurance proceeds.

    GMAC's security interest in the vehicles shall attach to the full extent provided or permitted by law to the proceeds, in whatever form, of any retail sale or lease thereof by Dealer until such proceeds are accounted for, and to the proceeds of any other disposition of said vehicles or any part thereof. This grant of a security interest is additionally secure collectively the payment by Dealer of the amounts of all advances or obligations to advance made by GMAC to any manufacturer, distributor or other seller, and the interest due thereon.

6.  Upon the request of GMAC, Dealer will also execute and deliver to GMAC from time to time security agreements, together with further documents as requested by GMAC, which security agreements (and further documents, if any) shall be in such form as GMAC may in its sole discretion require.

7.  In the event of the Dealer's default in the payment of the amount advanced by GMAC or in the due performance of, or compliance with, any of the terms and conditions hereof, or in the event of a foreclosure proceeding or bankruptcy, insolvency or receivership instituted by or against the Dealer or the Dealer's property, or in the event that GMAC deems itself insecure or said Collateral or any part thereof is in danger of misuse, loss, seizure or confiscation, GMAC may take immediate possession of said Collateral, without demand or further notice and without legal process; for this purpose and in furtherance thereof, the Dealer shall, if GMAC so requests, assemble said Collateral and make it available for GMAC in a reasonably convenient place designated by it, and GMAC shall have the right, and the Dealer does hereby authorize and empower GMAC to enter upon the premises wherever said Collateral may be and remove same. In the event of repossession of said Collateral, GMAC shall have such rights and remedies as are provided and permitted under Article 9 of, and relating to secured transactions under, the Uniform Commercial Code and other applicable law. Dealer shall pay all expenses and reimburse GMAC for any expenditures, including reasonable attorneys' fees and legal expenses in connection with GMAC's exercise of any of its rights and remedies.

8.  No transfer, renewal, extension or assignment of this Agreement or any interest hereunder and no loss, damage or destruction of the Collateral, shall release Dealer from the obligation secured hereunder.

9.  Dealer shall at all times keep the Collateral free from all taxes, liens and encumbrances, and any sums of money that may be paid by GMAC in release or discharge thereof, or for insurance coverage if Dealer fails to arrange for such coverage as required by this Agreement or otherwise, shall be paid on demand as an additional part of the Indebtedness secured hereunder. Dealer shall not mortgage, pledge, grant or create any other security interest in the Collateral and shall not transfer or otherwise dispose of said Collateral without the consent of GMAC until the payment of the Indebtedness hereunder. Any and all cash proceeds of any sale permitted shall be fully accounted for and promptly paid to GMAC, to be applied to the payment of the Indebtedness secured hereunder. Dealer authorizes GMAC or any of its officers or employees or agents to execute such documents in Dealer's behalf and to supply any omitted information and correct patent errors in any document executed by Dealer.

10. Dealer will insure the Collateral against loss, damage or destruction due to fire or physical damage and shall procure and maintain liability insurance against all liability for bodily injury or damage to property in such form and amount as GMAC may require. Copies of such policies will be provided to GMAC upon request. Dealer grants to GMAC a security interest in any proceeds of insurance affecting the Collateral.

11. Notwithstanding any provision in this Agreement to the contrary, the line of credit extended hereunder may be canceled at any time by GMAC at its election without notice or demand; and in such event, all sums for which Dealer shall be indebted to GMAC under this Agreement or otherwise, plus interest, shall immediately become due and payable without notice.

12. All provisions of the GMAC Wholesale Plan, including the insurance requirements expressed therein, shall apply to all floor plan financing transacted hereunder, except insofar as any provision of such plan may be inconsistent with the provisions of this Agreement, in which event the provisions of this Agreement shall control.

13. Dealer will do all acts and execute all instruments of further assurance as shall be reasonably required by GMAC to do or effectuate for the purpose of fully carrying out and effecting this Agreement and its intent, and shall furnish all documents that GMAC shall reasonably request. When requested, Dealer also agrees to do all things necessary to perfect GMAC's security interest in the Collateral.

14.  No delay or omission in the exercise of any power or remedy herein provided or otherwise available to GMAC shall impair or affect GMAC's right thereafter to exercise same.

15.  Any provision of this Agreement prohibited by law shall be ineffective to the extent of such prohibition without invalidating the remaining provisions hereof.

16.  This Agreement shall be interpreted according to the laws of the State of Florida and shall be binding upon and inure to the benefit of each of the parties hereto and their respective legal representatives, successors and assigns.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed by its duly authorized representative this _7th_ day of _January_ , 20 _08_ .

WITNESS:

_____
(Signature)

Print Name: _Joseph S. Glevenyak_

_____
(Signature)

Print Name: _Connie Lynn Destance_

**Off Lease Only, Inc.**

By: _____

_Mark Fischer_
Type or print Name

Title: _Director_

_____
(Signature)

Print Name: _Joseph S. Glevenyak_

_____
(Signature)

Print Name: _Connie Lynn Destance_

**GMAC**

By: _____

_F.W. Rose_
Type or print Name

Title: Assistant ~~Secretary~~ / Treasurer

GMAC Form W-178FL
(1/2000)

**Exhibit B**

# GMAC BANK MASTER WHOLESALE AGREEMENT

## I. THE PARTIES TO THIS AGREEMENT

This GMAC Bank Master Wholesale Agreement ("Master Agreement") is made by and between GMAC Bank and Off Lease Only, Inc. ("Dealership").

## II. THE RECITALS

The essential facts relied on by GMAC Bank and Dealership as true and complete, and giving rise to this Agreement, are as follows:

A. GMAC (formerly known as General Motors Acceptance Corporation and GMAC LLC) provides wholesale accommodations to Dealership under the GMAC Wholesale Plan, pursuant to the agreements executed or which may be executed hereafter by Dealership in favor of GMAC, and any other documents evidencing the agreements between Dealership and GMAC, a nonexclusive list being attached as Exhibit "A" hereto ("GMAC Wholesale Financing Documents").

B. In the ordinary course of its business, GMAC Bank provides wholesale financing accommodations to motor vehicle dealerships ("GMAC Bank Wholesale Accommodations").

C. In addition to the wholesale accommodations GMAC provides to Dealership, Dealership desires GMAC Bank to provide Dealership with GMAC Bank Wholesale Accommodations. Subject to Subsection III.C.1.(b) below, such GMAC Bank Wholesale Accommodations may be in addition to financing accommodations GMAC provides to Dealership.

D. GMAC Bank is willing to provide GMAC Bank Wholesale Accommodations to Dealership in accordance with the terms and conditions of this Master Agreement and the GMAC Wholesale Financing Documents, which are amended pursuant to the provisions of Subsection III.C.1. below (individually and collectively "GMAC Bank Wholesale Financing Documents").

E. For administrative convenience, Dealership wants to evidence its agreement to and acceptance of all terms and conditions of the GMAC Bank Wholesale Financing Documents for all intents and purposes by signing only this Master Agreement. Dealership acknowledges that it is not receiving copies of the GMAC Wholesale Financing Documents in connection with the signing of this Master Agreement, but that it has had the opportunity to review, and fully understands, such documents. Dealership specifically executes this Master Agreement in connection with floor plan financing which may be provided by GMAC Bank to Dealership.

## III. THE AGREEMENT

In consideration of the Recitals above, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, GMAC Bank and Dealership agree as follows:

A. By signing this Master Agreement, Dealership agrees that the GMAC Wholesale Financing Documents, as amended by Subsection III.C.1. below, are incorporated into this Master Agreement by reference as though fully set forth in it.

For avoidance of doubt, upon the execution of this Master Agreement, two separate groups of wholesale financing documents will be deemed to exist: the GMAC Wholesale Financing Documents, wherein GMAC is the lender, and the GMAC Bank Wholesale Financing Documents, wherein GMAC Bank is the lender.

B.   Dealership's signature on this Master Agreement constitutes its signature on each of the GMAC Bank Wholesale Financing Documents, including in each signature block and any other part of any GMAC Bank Wholesale Financing Document that calls for Dealership's signature.

C.   By signing this Master Agreement, Dealership:

1.   Agrees to and accepts all provisions, terms, and conditions of each of the GMAC Bank Wholesale Financing Documents, except that such GMAC Wholesale Financing Documents are modified as follows:

   a.   Any reference to "GMAC", "General Motors Acceptance Corporation," "GMAC LLC," "GMAC Inc.", or other name of GMAC in any of the GMAC Wholesale Financing Documents is amended to read "GMAC Bank;"

   b.   The amount of the credit line established for Dealership and communicated to the Dealership from time to time will be an aggregate amount for both GMAC and GMAC Bank. In no case will the amounts outstanding under both the GMAC Bank's and GMAC's Wholesale Financing Documents exceed the credit line initially established by GMAC.

2.   Waives any right to disavow or otherwise challenge the validity or enforceability of any of the GMAC Bank Wholesale Financing Documents (in whole or in part) on the basis that such GMAC Bank Wholesale Financing Document does not contain the Dealership's signature, was not signed by an authorized signatory, or on any similar basis, provided, however, that the Dealership cannot be bound by any document, or term or condition therein, unless the Dealership, or an authorized signatory, has signed an identical document in favor of GMAC Bank or GMAC, as the case may be.

3.   Agrees that from time to time, a portion of the principal amount, fees and other charges in connection with the GMAC Wholesale Plan may be assessed by GMAC under the GMAC Bank Wholesale Financing Documents and will be paid by Dealership.

4.   Agrees that the GMAC Bank Wholesale Financing Documents are executed in addition to the GMAC Wholesale Financing Documents and in consideration of future floor plan financing by GMAC Bank pursuant to these agreements and documents.

5.   Agrees that:

   a.   GMAC Bank will not assume any obligation of GMAC to Dealership; and

   b.   That GMAC Bank will not make any payment to GMAC for any inventory financed by GMAC or otherwise; and

   c.   That it will not in any way take any actions which will have the direct or indirect effect of refinancing GMAC-financed inventory with any funding provided by GMAC Bank.

D.   Dealership hereby appoints GMAC Bank as its attorney in fact and grants GMAC Bank a limited power of attorney to sign any of the GMAC Bank Wholesale Financing Documents on Dealership's behalf, as deemed necessary or appropriate by GMAC Bank for enforcement of any of the GMAC Bank Wholesale Financing Documents or related legal rights ("Power of Attorney") for the purpose of correcting manifest errors, signing documents that the Dealership had intended to sign, for perfecting security interests granted by the Dealer, and for endorsing checks and other instruments of payment where GMAC Bank is entitled to the proceeds of the check or other instrument under its agreements and/or applicable law.

1.   This limited Power of Attorney continues until all of Dealership's obligations to GMAC Bank have been fully and irrevocably paid.

2.   This Power of Attorney is in addition to, and does not supersede, any other power of attorney or authorization granted to GMAC Bank under the GMAC Bank Wholesale Financing Documents or otherwise.

E.   Dealership authorizes GMAC Bank to file financing statements and take any and all other actions necessary to perfect its security interest in Dealership's property, as granted under the GMAC Bank Wholesale Financing Documents or otherwise.

F.   Nothing in this Master Agreement or any GMAC Bank Wholesale Financing Document constitutes a commitment by GMAC Bank to provide GMAC Bank Wholesale Accommodations or any other loans or credit accommodations to Dealership.

    1.   GMAC Bank Wholesale Accommodations are expressly subject to the terms and conditions of the agreements under which they are extended.

    2.   GMAC Bank Wholesale Accommodations are discretionary in nature and are subject to modification, suspension, and termination at GMAC Bank's election in its sole, absolute discretion.

G.   Dealership may not assign this Master Agreement (or any portion thereof) without GMAC Bank's written consent. Upon notice to Dealership, GMAC Bank may assign this Master Agreement (or any portion thereof) without Dealership's consent to any affiliate or subsidiary of GMAC Bank or pursuant to a merger, reorganization, sale of all or substantially all of the assets of GMAC Bank or sale of sufficient stock to constitute a change of control. This Master Agreement will be binding on the parties and their respective successors and permitted assigns. In the event of an assignment of all or part of this Master Agreement to an affiliate or subsidiary of GMAC Bank pursuant to this Section G, (i) the performance and obligations that have been assigned to the affiliate or subsidiary are the exclusive responsibility of the entity to whom the performance and obligations were assigned and (ii) the affiliate or subsidiary has all of the rights and benefits of GMAC Bank under the Master Agreement. Any assignment in violation of this Section will be void.

H.   For the avoidance of doubt, GMAC and GMAC Bank are separate lenders and each has its own rights and obligations pursuant to its respective wholesale financing documents. Neither lender shall have responsibility or liability for the acts or omissions of the other lender.

I.   This Master Agreement and the GMAC Bank Wholesale Financing Documents are effective as of ___10/11/10_____.

Off Lease Only, Inc.

Signature: _____

By (print): _MARK KSCH___

Title: _Director_

GMAC Bank

Signature: _____

By (print): _Keith Regan_

Title: _Ass't Secretary_

**Exhibit "A" to the GMAC Bank Master Wholesale Agreement**

| | | | | Titles | | | | |
|---|---|---|---|---|---|---|---|---|
| Wholesale Security Agreement | | | | | | | | |
| Amendment to Wholesale Security Agreement | | | | | | | | |
| Security Agreement | | | | | | | | |
| Intercreditor Agreement with Manheim Automotive Financial Services | | | | | | | | |
| Florida Addendum to Security Agreement | | | | | | | | |

51856

**Exhibit C**

## GENERAL SECURITY AGREEMENT

Dated <u>November 15, 2019</u>

For the purpose of securing the payment and performance of any and all obligations, loans, credit extensions, indebtedness, liabilities, and duties, whether contingent or matured, now or hereafter owing to Ally Bank (Ally Capital in Hawaii, Mississippi, Montana and New Jersey) ("Bank") and Ally Financial Inc. ("Ally" and together with Bank, the "Ally Parties"), and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Off Lease Only, LLC f/k/a Off Lease Only Inc. conducting business at <u>1200 S Congress Avenue, Palm Springs, Florida  33406</u>, grants to each of the Ally Parties a security interest in, and a collateral assignment of, any and all of the following described property in which Dealer now or hereafter acquires an interest, wherever located, in whatever form, and in any and all proceeds thereof, including insurance proceeds: all vehicles, including but not limited to those vehicles for which either of the Ally Parties provides financing, and regardless of whether such vehicles are considered inventory or equipment, and all funds provided to or held by either of the Ally Parties, regardless of whether such funds are considered accounts, general intangibles, or otherwise (the "Collateral").

Dealer has the power and authority to enter into this Security Agreement, and has taken all steps necessary to ensure that this Agreement is legally valid and enforceable.

Unless the Ally Parties provide written consent, Dealer must not sell, transfer, encumber, or otherwise dispose of any Collateral other than sales in the ordinary course of Dealer's business. Each of the Ally Parties has the right to inspect the Collateral and Dealer's related books and records.  Dealer authorizes each of the Ally Parties or their respective designee(s) to execute on behalf of Dealer and to file any and all UCC financing statements to confirm, create, perfect, continue, modify, or extend the Ally Parties' security interest in and to the Collateral.

Upon default and in addition to all other rights and remedies provided by law, each of the Ally Parties has the remedies of a secured party under the Uniform Commercial Code including, without limitation, the right to take possession, or receive, collect, endorse, and negotiate any of the Collateral.  For this purpose each of the Ally Parties may enter upon the premises where the Collateral is situated and remove the Collateral.  In the event either or both of the Ally Parties takes possession of the Collateral, such party(ies) may sell it at public or private sale or otherwise in a commercially reasonable manner and apply the proceeds of this sale or disposition, less the expenses of retaking, holding, preparing for sale, and selling the Collateral and reasonable attorney's fees and legal expenses incurred by the Ally Parties, to the partial or complete satisfaction of any of Dealer's indebtedness or obligation to the Ally Parties.  Upon default by Dealer and demand by one or both of the Ally Parties, Dealer must segregate and account for the Collateral and the proceeds thereof.

If any notification of intended disposition of any of the Collateral is required by law, notice will be considered reasonably and properly given if it is mailed at least ten days before the scheduled disposition (unless a different time is specifically allowed or required by law) and addressed to the Dealer at the address shown above.

Any provision of this Agreement prohibited by law is ineffective only to the extent of the prohibition without invalidating the remaining provisions of this Agreement.  The non-enforcement by the Ally Parties of any right under this Agreement is not a waiver thereof.

Off Lease Only LLC, f/k/a Off Lease Only Inc.

Signature: _____

By:     Leland Wilson

Title:    President and Chief Executive Officer

Date:    November 15, 2019

[Witness for Dealer]

Signature: _____

By:     CLAUDIA GIACONE

Title:    ADMIN ASSISTANT

Date:    NOVEMBER 15th, 2019

[Signature Page to General Security Agreement]

This Agreement is binding on Dealer and each of the Ally Parties and their respective successors, administrators and assigns.

**Off Lease Only, LLC, f/k/a Off Lease Only Inc.**

Signature:_____

By:_____

Title:_____

Date:_____

**[Witness for Dealer]**

Signature:_____

By:_____

Title:_____

Date:_____

**Ally Bank**

Signature:_____

By:_____

Title:_____

Date:_____

**Ally Financial Inc.**

Signature:_____

By:_____

Title:_____

Date:_____

**Exhibit D**

## CROSS COLLATERAL, CROSS DEFAULT, AND GUARANTY AGREEMENT

THIS AGREEMENT is effective this 13th day of August, 2020, and is entered into by and among **Ally Financial Inc.**, a Delaware corporation and **Ally Bank** (Ally Capital in Hawaii, Mississippi, Montana and New Jersey), a Utah state-chartered bank, each with a local business address at 3885 Crestwood Parkway Suite 400, Duluth, GA 30096, (together with Ally Financial Inc., the "Ally Parties"), and the entities and individuals listed below (collectively the "Dealership Parties"):

A.  **Off Lease Only LLC**, a Florida limited liability company, located at 1200 S. Congress Ave., West Palm Beach, FL 33406.

### Recitals:

A.  One or more of the Ally Parties have made loans and advances to some or all of the Dealership Parties, which are affiliated and share a close business nexus.

B.  One or more of the Ally Parties may make additional loans, advances, and other extensions of credit to some or all of the Dealership Parties, or continue to extend credit to one or more of the Dealership Parties, if the Dealership Parties agree to provide additional security by cross-collateralizing, cross-defaulting, and guarantying all of said existing, proposed and future loans, advances, and extensions of credit.

C.  It is the intention of the Dealership Parties and the Ally Parties that all of the Dealership Parties' assets which one or more of the Ally Parties now has, or may hereafter obtain, a lien on or security interest in, secures payment and performance for all current and future loans, advances, and extensions of credit made by the Ally Parties to some or all of the Dealership Parties.

D.  It is the intention of the Dealership Parties and the Ally Parties that any default in the payment or performance of any obligation of any of the Dealership Parties to any of the Ally Parties, at the option of one or more of the Ally Parties, will constitute a default of all then-existing obligations of all Dealership Parties to the Ally Parties.

E.  It is the intention of each of the Dealership Parties individually to guaranty the performance and payment of Obligations of every other of the Dealership Parties.

### Agreement:

For good and valuable consideration, the receipt and sufficiency of which are acknowledged, including the inducement of each of the Ally Parties, in its sole discretion, to extend credit or continue existing financial accommodations to the Dealership Parties, it is agreed as follows:

1)  <u>DEFINITIONS</u>:  As used in this Agreement, the terms listed below have the following meaning:

   a)  <u>Obligation(s)</u> means any liability, indebtedness, or obligation of every kind and nature, now existing or hereafter arising, whether created directly, indirectly, or acquired by assignment, whether matured or unmatured, owed by any one or more of the Dealership Parties to one or more of the Ally Parties, any successor, assign, subsidiary, or affiliate of the Ally Parties and any cost or expense, including without limitation reasonable attorneys' fees, incurred in the collection or enforcement of this Agreement or any obligation of any one or more of the Dealership Parties.

   b)  <u>Security Agreement(s)</u> means any existing or future agreement between one or more of the Dealership Parties and one or more of the Ally Parties which creates or provides for a security interest in or lien upon any of the assets or property (tangible, intangible, real, or personal) of any of the Dealership Parties, including but not limited to this Agreement, wholesale floorplan agreements (i.e., Wholesale Security Agreement or Inventory Financing and Security Agreement), other security agreements, deeds of trust and mortgages.

1

c) Financing Accommodation(s) means the Security Agreement(s) and any and all other agreements evidencing an Obligation.

2) **CROSS-COLLATERALIZATION:** To secure payment and performance of all Obligations, each of the Dealership Parties grants to each of the Ally Parties a continuing security interest in all collateral in which one of the Ally Parties now has a security interest, and each of the Dealership Parties agrees that any future grant of a security interest in any assets of any one of the Dealership Parties to one of the Ally Parties will be deemed a grant to the other of the Ally Parties. Each of the Dealership Parties agrees that either or both of the Ally Parties are authorized to file financing statements, mark chattel paper, notify account debtors, note liens on documents of title, and take all other actions necessary to establish, confirm, and maintain a perfected security interest in such existing and future collateral. Each of the Dealership Parties agrees that all collateral now or hereafter subject to a security interest or lien of one or more of the Ally Parties pursuant to any or all of the Security Agreements secures any and all Obligations, including Obligations subsequently assigned to one of the Ally Parties by the other of the Ally Parties or by a third party, and subject to applicable law, each of the Ally Parties may apply, in its sole, absolute discretion, proceeds of any collateral to any of the Obligations of any of the Dealership Parties.

3) **CROSS DEFAULT:** In addition to and not in substitution for any provisions in any of Financing Accommodations, it is agreed that any default or breach by any of the Dealership Parties in the payment or performance under any of the Financing Accommodations will, at the option of the Ally Parties, constitute a default under each Financing Accommodation.

4) **GUARANTY:**

a) All Dealership Parties, jointly and severally, unconditionally guarantee the performance and payment of all Obligations owing by any of the Dealership Parties to any of the Ally Parties, including Obligations subsequently assigned to one of the Ally Parties by the other of the Ally Parties or by a third party. Each of the Dealership Parties waives and dispenses with notice of acceptance of this guaranty; notice of non-payment or non-performance; notice of amount of indebtedness outstanding at any time; protests; demands; and prosecution of collection, foreclosure, and possessory remedies. Each of the Dealership Parties waives any right to require any of the Ally Parties to institute suit or otherwise proceed against other persons or other Dealership Parties; to advise the Dealership Parties of the results of any collateral checks or examinations; to require any or all of the Dealership Parties to comply with the Financing Accommodations; or, to proceed against or exhaust any security. Any liability of the Dealership Parties hereunder will not be affected by, nor will it be necessary to procure the consent of any of the Dealership Parties or give any notice in reference to: the release by the Ally Parties of any one or more of the Dealership Parties from this Agreement or any other agreement; any settlement, or variation of terms of any obligation of any of the Dealership Parties, or of a guarantor or any other interested person, by operation of law or otherwise; nor by failure to file, record, or register any security document. Each of the Dealership Parties recognizes that the Ally Parties may utilize various means of attempting to verify compliance with the credit terms by any borrower under any of the Financing Accommodations, including periodic collateral checks and examination of books and records, and expressly agrees that such steps are for the sole benefit of the Ally Parties and the adequacy of such checks and examinations will not be considered as a defense to or mitigation of liability hereunder. Each of the Dealership Parties acknowledges and agrees that this guaranty is for a commercial obligation and not a consumer obligation which is primarily for personal, family, or household purposes. Each of the Dealership Parties authorizes the Ally Parties, from time to time, to investigate any financial information provided and to examine or review such party's credit history (including obtaining a credit report) and agrees to provide the Ally Parties with financial statements satisfactory to the Ally Parties upon request. This is an absolute, continuing payment guaranty and remains in effect as to each of the

2

Dealership Parties until discharged pursuant to the terms of this Agreement or in writing by the Ally Parties. However, a single one of the Dealership Parties can terminate its own guaranty by sending written notice of its intent to the Ally Parties, which termination is effective forty-eight (48) hours after receipt by both of the Ally Parties of the written termination notice; provided, however, that such termination will not operate to release such party from liability hereunder with respect to any Obligations incurred prior to the effective date of such termination notice. In order to be effective, notice of termination must be sent as outlined in numbered paragraph 8, below, to the Ally Parties at the address listed above and also to: Ally Bank and Ally Financial Inc., 500 Woodward Avenue, MC: MI-01-16-RISK, Detroit, Michigan 48226, Attn.: Senior Vice President, Commercial Credit Operations. Except as noted in this Agreement, the Ally Parties make no promises to the Dealership Parties to induce execution of this guaranty provision.

b) Each of the Dealership Parties acknowledges that: it is such Dealership Party's responsibility to review the Financing Accommodations and any other documents governing the guaranteed obligations before signing this Agreement and to obtain and review any future documentation that may affect the aggregate obligations of the Dealership Parties to the Ally Parties; it has knowledge of and adequate means to obtain the other Dealership Parties' financial information; and, the nature and amount of the guaranteed obligations may increase without notice to such Dealership Party. Each of the Dealership Parties expressly waives any duty of either of the Ally Parties to disclose to such Dealership Party any information related to any other Dealership Party's ability to repay the guaranteed obligations, including, without limitation, the state of any other Dealership Party's business, its condition (financial, operating, or otherwise) or any facts or circumstances that may affect a Dealership Party's risks under or related to this guaranty.

c) No act or thing need occur to establish the liability of any of the Dealership Parties hereunder, and no act or thing, except full payment and discharge of all Obligations, will in any way exonerate any of the Dealership Parties or modify, reduce, limit, or release the liability of any of the Dealership Parties.

d) The Ally Parties may in their discretion apply to the Obligations any sums received by, or available to, them on account of the Obligations, out of the collateral security, or any other source of payment. Such application will not reduce, affect, or impair the liability of the Dealership Parties.

e) Each of the Dealership Parties waives any and all defenses, claims, and discharges of any of the other Dealership Parties pertaining to the Obligations, except the defense of discharge by payment in full. No Dealership Party will assert, plead, or enforce against either of the Ally Parties any defense of waiver, release, statute of limitations, res judicata, statutes of frauds, fraud, incapacity, minority, usury, illegality, or unenforceability which may be available to another Dealership Party in respect of any Obligation, or any setoff available against either of the Ally Parties by any other Dealership Party, whether or not on account of a related transaction.

f) Each Dealership Party expressly agrees that it will be and will remain liable, to the fullest extent permitted by applicable law, for any deficiency remaining after foreclosure of any mortgage or security interest securing the Obligations, whether or not the liability of any other obligor for such deficiency is discharged pursuant to statute or judicial decision. Further, each Dealership Party expressly waives any condition precedent that may be required of either or both of the Ally Parties under applicable law prior to proceeding with any action to recover any deficiency remaining after foreclosure.

5) EFFECT ON OTHER AGREEMENTS: This Agreement constitutes an amendment of and supplement to each of the Financing Accommodations now or hereafter executed; augments and is in addition to, and is not in substitution for, any provisions of any Financing Accommodation, including any other Cross Collateral. Cross Default and Guaranty Agreements between or among any of the

3

Dealership Parties and either or both of the Ally Parties; and does not otherwise limit or affect the rights and remedies of any of the Ally Parties under any such Financing Accommodation.

6) <u>FUTURE LOANS</u>: Each of the Ally Parties may, in its sole and absolute discretion, make additional loans and other financing accommodations to any of the Dealership Parties, all of which will be subject to the terms of this Agreement. Notwithstanding anything to the contrary, any future change in the terms of or indebtedness owed by any of the Dealership Parties to one or more of the Ally Parties requires the written consent of the applicable Ally Party.

7) <u>WAIVER OF TRIAL BY JURY</u>: Each of the Dealership Parties waives trial by jury in any action or proceeding brought by any of the Ally Parties; in any counterclaim asserted by any of the Ally Parties against one or more of the Dealership Parties; and, in any matter connected in any manner with this Agreement or any Financing Accommodation.

8) <u>NOTICES</u>: Any notices or other communications required or permitted to be given by this Agreement must be in writing and must be personally delivered, mailed by prepaid certified, registered, or first class mail, or delivered by a nationally recognized overnight courier, to the Ally Parties or to the Dealership Parties to whom such notice or communication is directed at the addresses set forth above in this Agreement. Notwithstanding anything herein to the contrary, any notice or other communication will be deemed to have been given (whether actually received or not) on the day it is personally delivered or, if mailed or delivered by overnight courier, on the third (3rd) day after it is mailed or delivered as aforesaid. Any of the Ally Parties or of the Dealership Parties may change its address for purposes of this document by giving ten (10) days prior written notice of such change to the others pursuant to the terms of this clause.

9) <u>NO OTHER UNDERSTANDING</u>: The Dealership Parties acknowledge that the Ally Parties have made no promises to induce execution of this Agreement except as set forth herein; that there are no other agreements or understandings, either oral or in writing, affecting this Agreement; and nothing in this Agreement may be considered a waiver by any of the Ally Parties of any existing or future defaults by any of the Dealership Parties of any Financing Accommodation. Modifications or amendments to this Agreement other than a release or termination of obligations under this Agreement can only be made in a writing executed by all of the Ally Parties and all of the Dealership Parties.

10) <u>SUCCESSORS AND ASSIGNS</u>: The provisions of this Agreement bind and inure to the benefit of the heirs, administrators, successors, and assigns of each of the Dealership Parties and each of the Ally Parties.

11) <u>SEVERABILITY</u>: Any provision of this Agreement prohibited by law is ineffective only to the extent of the prohibition without invalidating the remaining provisions of this Agreement.

12) <u>COUNTERPARTS</u>: This Agreement may be executed in multiple counterparts and all of such counterparts taken together will be deemed to constitute one and the same agreement. Any electronically placed or delivered (e.g., via fax or email) signatures of the parties constitute and are deemed original signatures for all purposes.

4

**DEALERSHIP:**

**Off Lease Only LLC,**
a Florida limited liability company

By: _____
      Ejola Maria Christlieb-Cook, Vice President

STATE OF FLORIDA        )
                             : SS
COUNTY OF Broward )

      The foregoing instrument was acknowledged before me by means of physical presence this 14th day of August, 2020, by Ejola Maria Christlieb-Cook, Vice President of Off Lease Only LLC, a Florida limited liability company. She [ ✓ ] is personally known to me or [ _ ] has produced a driver's license as identification.

[Notary Seal]

Notary Public:

Sign: _____
Print Name:     Jasmin  Vega .
My Commission Expires:
                      10/01/2021

**JASMIN M VEGA**
MY COMMISSION # GG147563
EXPIRES October 01, 2021

5

CCCDG-A2 (7/19)

**ALLY PARTIES:**

**Ally Financial Inc.,**
a Delaware corporation

By: _~RA~_____
Name: _Robert Neath_____
Its: _Authorized Representative_____

STATE OF GEORGIA           )
                                        : SS
COUNTY OF _Gwinnett_       )

    The foregoing instrument was acknowledged before me by means of physical presence this _12_ day of August, 2020 by _Robert North_, Authorized Representative, of Ally Financial Inc., a Delaware corporation. He/She [__] is personally known to me or [✓] has produced a driver's license as identification.

[Notary Seal]

Notary Public:

Sign: _____
Print Name: _Sunil Patel_____
My Commission Expires: _08/16/2022_

Sunil Patel
Gwinnett County
Notary Public
Expires
08-16-2022
STATE OF GEORGIA

6

**ALLY PARTIES:**

**Ally Bank,**
a Utah state-chartered bank

By: _~BA~_ _____
Name: _R-B2ST___NoRTH_ _____
Its: Authorized Representative _____

STATE OF GEORGIA          )
                                        :SS
COUNTY OF _Gwinnetт_ )

     The foregoing instrument was acknowledged before me by means of physical presence this _12_ day of August, 2020 by _RoBCRT___NoRTH_ Authorized Representative of Ally Bank, a Utah state-chartered bank. He/She [___] is personally known to me or [_X_] has produced a driver's license as identification.

[Notary Seal]

     Sunil Patel
     Gwinnett County
     Notary Public
     Expires 08-16-2022
     STATE OF GEORGIA

Notary Public:

Sign: _____
Print Name: _SUNIL___PATEL_ _____
My Commission Expires: _08/16/2022_

4828-6383-4052 v1 [49572-75316]

7

**Exhibit E**

# GUARANTY

To induce Ally Bank (Ally Capital in Hawaii, Mississippi, Montana and New Jersey), a Utah chartered state bank and Ally Financial Inc. (collectively with Ally Bank, the "Ally Parties"), a Delaware corporation, each with a local business address at 1735 N Brown Road, Suite 500, Lawrenceville, Georgia 30043 to extend or continue credit and other financial accommodations to Off Lease Only LLC, a Florida entity ("Dealership"), Off Lease Only Parent LLC ("Guarantor") does hereby unconditionally guarantee the payment of all obligations of Dealership to the Ally Parties now existing or hereafter arising under the Dealership's Wholesale Security Agreement with Ally Financial Inc., f/k/a GMAC dated January 7, 2008 and its Wholesale Security Agreement with Ally Bank, f/k/a GMAC Bank as created by the GMAC Bank Master Wholesale Agreement dated October 11,2010 (as such agreements may have been or in the future may be amended, restated, or substituted), together with all costs, expenses, and attorneys' fees incurred by the Ally Parties in connection with any default of Dealership and all costs, expenses, and attorneys' fees incurred by the Ally Parties in connection with the enforcement of this guaranty (collectively, the "Obligations"), effective as of September 6 , 2022.

Any liability of Guarantor hereunder will not be affected by, nor will it be necessary to procure the consent of Guarantor or give any notice in reference to, any settlement, or variation of terms of any obligation of Dealership or of a guarantor or any other interested person, by operation of law or otherwise; nor by failure to file, record, or register any security document. Guarantor recognizes that the Ally Parties may utilize various means of attempting to verify Dealership's compliance with its credit terms, including periodic collateral checks and examination of books and records, and hereby expressly agrees that such steps are for the sole benefit of the Ally Parties and the adequacy of such checks and examinations will not be considered as a defense to or mitigation of liability hereunder. Guarantor acknowledges and agrees that this guaranty is for a commercial obligation and not a consumer obligation that is primarily for personal, family, or household purposes. Guarantor authorizes the Ally Parties, from time to time, to investigate any financial information provided and to examine or review Guarantor's credit history (including obtaining a credit report) and agrees to provide the Ally Parties with financial statements in a form satisfactory to the Ally Parties upon request by either of the Ally Parties.

Guarantor does hereby expressly waive and dispense with notice of acceptance of this guaranty, notices of non-payment or nonperformance, notice of amount of the Obligations outstanding at any time, protests, demands and prosecution of collection, foreclosure, and possessory remedies. Guarantor hereby waives any right to require either of the Ally Parties to: (i) institute suit or otherwise proceed against other persons or Dealership, (ii) advise Guarantor of the results of any collateral checks or examinations, (iii) require Dealership to comply with its agreements with either or both of the Ally Parties, or (iv) proceed against or exhaust any security. Guarantor acknowledges: (i) it is Guarantor's responsibility to review the documents governing the guaranteed Obligations before signing this guaranty and to obtain and review any future documentation that may affect Dealership's aggregate obligation to either or both of the Ally Parties, (ii) Guarantor has knowledge of and adequate means to obtain Dealership's financial information, and (iii) that the nature and amount of the guaranteed Obligations may increase without notice to Guarantor. Guarantor expressly waives any duty of either of the Ally Parties to disclose to Guarantor: (i) any information related to Dealership's or anyone else's ability to repay the guaranteed Obligations, including, without limitation, the state of Dealership's business, its condition (financial, operating, or otherwise), or (ii) any facts or circumstances that may affect Guarantor's risks under or related to this guaranty.

No act or thing need occur to establish the liability of Guarantor hereunder, and no act or thing, except full payment and discharge of all Obligations, will in any way exonerate Guarantor or modify, reduce, limit, or release the liability of Guarantor.

The Ally Parties may in their discretion apply to the Obligations or any other obligations of Dealership any sums received by, or available to, them on account of the Obligations or any other obligations of Dealership, out of the collateral security, or any other source of payment. Such application will not impair the liability of Guarantor or relieve the Guarantor from liability under this Guaranty.

Guarantor waives any and all defenses, claims, and discharges of any other party pertaining to the Obligations or any other obligations of Dealership except the defense or discharge of the Obligations by payment in full. Guarantor will not assert, plead or enforce against the Ally Parties any defense of waiver, release, statute of limitations, res judicata, statutes of frauds, fraud, incapacity, minority, usury, illegality, or unenforceability which may be available to any other party in respect of the Obligations or any other obligations, or any setoff available against either of the Ally Parties by Guarantor, whether or not on account of a related transaction.

Guarantor expressly agrees that it will be and will remain liable, to the fullest extent permitted by applicable law, for any deficiency remaining after foreclosure of any mortgage or security interest securing the Obligations, whether or not the liability of any other obligor for such deficiency is discharged pursuant to statute or judicial decision. Further, Guarantor expressly waives any condition precedent that may be required of the Ally Parties under applicable law prior to proceeding with any action to recover any deficiency remaining after foreclosure.

This is an absolute, continuing payment guaranty and will remain in full force and effect until forty-eight (48) hours after receipt by the Ally Parties of written notice by Guarantor terminating this guaranty; provided, however, that such notice will not operate to release Guarantor from liability hereunder with respect to any Obligations incurred prior to the effective date of such notice. In order to be effective, notice of termination must be sent to the Ally Parties at the address listed above and also to: Ally Bank and Ally Financial Inc., 500 Woodward Avenue, MC: MI-01-16-RISK, Detroit, Michigan 48226, Attn: Senior Vice President, Commercial Credit Operations. All notices must be mailed by prepaid certified, registered or first class mail or delivered by a nationally recognized overnight courier or delivery service.

Except as noted herein, neither of the Ally Parties has made any promises to Dealership or Guarantor to induce execution of this guaranty and there are no written or unwritten agreements or understandings among either or both of the Ally Parties and Guarantor affecting this guaranty. The obligation of all Guarantors signing this guaranty, where more than one, will be joint and several. This Guaranty may not be changed orally and will bind and inure to the benefit of the heirs, administrators, successors, and assigns of Guarantor and each of the Ally Parties, respectively. If any part of this guaranty is not valid or enforceable according to applicable law, all other parts will remain enforceable.

This Guaranty and the performance hereunder will be construed and determined according to the law of the state where Dealership maintains its principal executive office without regard to that state's conflict of laws rules.

Transmission by telecopier, facsimile or email of a signature to this guaranty will be deemed to constitute due and sufficient delivery of the guaranty.

Off Lease Only Parent LLC

Witness: _(Signature)_

Guarantor: _(Signature)_

Print Name: SOPHIE REINER

Print Name: Jonathan Rosman

Date: 9/2/22

Date: 9/2/22

Address: 4489 LUXEMBURG CT

Address: 1200 S. Congress Ave

LAKE WORTH

Palm Springs, FL 33406

State of FLORIDA

County of PALM BEACH

On this 2 day of SEPTEMBER, 2022, before me personally came and appeared JON ROSMAN who is personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) who executed this instrument and acknowledged that they executed the same as, or on behalf of, guarantor(s).

SOPHIE REINER
Commission # HH 211228
Expires December 27, 2025

SOPHIE REINER
Notary Public in and for

PALM BEACH
County

Accepted:

| Ally Bank | Ally Financial Inc. |
|---|---|
| Signature | Signature |
| Print Name: Kenneth D. Geyer | Print Name: Kenneth D. Geyer |
| Title: Authorized Representative | Title: Authorized Representative |
| Date: | Date: |

**Exhibit F**

Ally Confidential

## CREDIT BALANCE AGREEMENT

This Credit Balance Agreement ("Agreement") is between Ally Bank (Ally Capital in Hawaii, Mississippi, Montana and New Jersey) ("Bank"), and Off Lease Only LLC fka Off Lease Only Inc., an entity organized under the laws of Florida, whose address is 1200 S Congress Ave, Palm Springs, Florida 33406 ("Obligor").

### Recitals

A. Obligor has executed a Wholesale Security Agreement and/or Inventory Financing and Security Agreement (as amended from time to time, the "Wholesale Agreement") with the Bank.

B. The Bank has entered or may later enter into other commercial finance agreement(s) to provide loans, financing, or other credit accommodations to Obligor under which interest accrues and is payable to the Bank (all such agreements by Obligor, including the Wholesale Agreement, being the "Finance Agreements").

C. Obligor has a substantial interest in the satisfactory performance of the Finance Agreements because, among other reasons, Obligor has an obligation (direct or contingent) for repayment of the amounts due.

D. Obligor wishes to deliver money to Bank to provide a basis for reducing the principal indebtedness of the Obligor to the Bank (such outstanding indebtedness, the "Outstanding Amount") thereby reducing the amount of interest payable to the Bank under the Wholesale Agreement as more fully set forth in paragraph 6 of this Agreement, but without requiring that the money be applied in the form of accounting entries to reduce the principal balances of individual advances made pursuant to the Wholesale Agreement on the books of the Bank. The Bank is willing to accommodate that request on the terms and conditions set forth in this Agreement.

Bank and Obligor agree as follows:

### Agreement

In consideration of the premises and mutual covenants set forth herein, the sufficiency of which is acknowledged, the parties agree that each of the Recitals is incorporated herein and deemed to be the agreement of the parties to this Agreement and relied upon by the parties in agreeing to the terms of this Agreement and further agree as follows:

1. Obligor may, at its election, deliver drafts, checks, electronic monetary credits, or other good funds to Bank to be held as principal payments made on the Obligor's obligations under the Wholesale Agreement, and the Bank will hold and treat these principal payments as a reduction of the Obligor's indebtedness on the Wholesale Agreement for the total of these funds (the "Credit Balance"). Obligor acknowledges that principal payments made pursuant to this Agreement will not result in the release of any collateral pledged to Bank and that Obligor remains obligated to repay the principal amount advanced for each vehicle financed by Bank within Obligor's established release period. Bank may, in its sole discretion, modify the means by which funds may be transmitted or provided to Bank.

2. Obligor agrees to maintain (a) a Credit Balance equal to or greater than $10,000,000.00 so long as the consolidated floorplan Outstanding Amount is equal to or less than $160,000,000.00 and (b) a Credit Balance equal to or greater than $11,250,000.00 so long as the consolidated floorplan Outstanding Amount is greater than $160,000,000.00 at all times so long as any Obligor owes any debt to Bank or until Bank otherwise agrees in writing (the "Minimum Required Balance").

Ally Confidential

3.  The Credit Balance must be no less than the Minimum Required Balance and no greater than 50% of the total principal amount (excluding principal amounts owed by Obligor to Bank for financing accommodations provided in connection with vehicles ordered, sold or leased under the delayed payment privilege and/or as fleet vehicles ("Fleet Vehicles") owed to the Bank from time to time for new and used vehicle inventory financed by the Bank under the Wholesale Agreement (the "Wholesale Financing"). Although Fleet Vehicles do not generally qualify for purposes of determining the maximum amount of the Credit Balance, the Bank may, in its sole discretion, permit Fleet Vehicles to qualify in certain limited instances where, for example, the Fleet Vehicles do not represent significant volume or are not readily identifiable. In the event that the Credit Balance exceeds the maximum amount permitted by this Agreement, Bank may, in its sole discretion, refund the excess to Obligor via SmartCash.

4.  Subject to the limitations of paragraph 3, Obligor may, on any business day, increase the Credit Balance by making a principal payment of not less than $1,000. Bank will use its best efforts to add payments received by Bank in immediately available funds to the Credit Balance on the same business day or as soon thereafter as practicable. Principal payments received in other than immediately available funds will be added to the Credit Balance when good funds become available to the Bank.

5.  Absent a default under any obligation of Obligor to the Bank ("Default"), Obligor may, upon written request, require Bank to repay all or a portion of the Credit Balance that exceeds the Minimum Required Balance. Except upon termination of this Agreement, the minimum repayment amount is $1,000. Bank will honor such requests as soon as practicable; however, funds delivered to Bank via check will not be available for repayment for at least ten business days after receipt by Bank and funds delivered to Bank via ACH will not be available for repayment for at least three business days after receipt by Bank.

6.  Once each month, the Bank will credit against interest owed under the Wholesale Agreement the applicable amount described in the remainder of this paragraph 6 (the "Applicable Interest Credit"). Additionally, at the election of the Bank, in its sole discretion and with notice to the Obligor, the Bank may apply the Applicable Interest Credit to interest obligations due and owing under other Finance Agreements. The Applicable Interest Credit will be determined by multiplying each daily Credit Balance by a rate (the "Rate") calculated in accordance with the following formula:

    a)  For that portion of the Credit Balance that is less than or equal to 10% of the principal amount owed to Bank for Wholesale Financing, the Rate will be the then-current Wholesale Financing new vehicle rate of interest (less any applicable incentives) less one-hundred basis points (1.00%).

    b)  For that portion of the Credit Balance that exceeds 10% but is less than or equal to 50% of the principal amount owed to Bank for Wholesale Financing, the Rate will be the then-current Wholesale Financing new vehicle rate of interest (less any applicable incentives) less two-hundred basis points (2.00%).

Obligor understands that the Bank will incur expense in providing this Credit Balance service to Obligor and the Applicable Interest Credit afforded to the Obligor reflects an allowance to the Bank for its expenses in providing this service.

The Bank may modify the Applicable Interest Credit in its sole discretion upon thirty days prior written notice to Obligor. If the Applicable Interest Credit exceeds the interest owed Bank under the Wholesale Agreement for a particular monthly billing period, the excess will be either carried forward as a credit against interest due under the Wholesale Agreement in subsequent billing periods or applied to interest owed under other Finance Agreements, as determined by the Bank in its sole discretion. After Default, or upon the termination of the Wholesale Agreement, Applicable Interest Credits will cease to accrue and will cease to be applied, except as may be agreed by Bank in writing.

Ally Confidential

7. Upon Default, Bank may immediately apply all principal payments made pursuant to this Agreement to such principal advances made pursuant to the Wholesale Agreement as Bank may determine in its sole discretion.

8. The Obligor understands that the Credit Balance is a principal payment of an obligation under the Wholesale Agreement and is not a deposit or insured by the Federal Deposit Insurance Corporation.

9. This Agreement does not alter any obligation to pay Bank when and in the amounts required under any of the Finance Agreements.

10. Bank and Obligor may implement this Agreement by conducting business with the (non-exclusive) use of electronic, computer, digital, or other paperless means, including the good faith reliance on electronic mail, facsimile transmittal, telephonic, or other usual and regular forms of communication (by Bank or other commercial parties) with or without confirmation or authentication of the communication by receipt of an original signature, document, paper, or otherwise.

11. Bank may assign this Agreement and/or its rights under this Agreement in the event that Bank also assigns its right to be paid the amounts owed to it under its Wholesale Agreement. Bank may also assign this Agreement and/or its rights under this Agreement to one of its affiliates in the event that Bank ceases to provide ongoing wholesale floorplan financing to Obligor and such affiliate is providing or will provide such financing to Obligor. Otherwise, this Agreement must not be assigned by any party without the prior written consent of the other. In the event that Bank assigns this Agreement to Ally Financial ("AFI") in connection with an assignment of amounts owed by Obligor under the Wholesale Agreement or because Bank will not provide ongoing wholesale floorplan financing to Obligor and AFI provides or will provide such financing, Obligor agrees that any principal payments made pursuant to this Agreement will be held and used by AFI as principal reductions on any wholesale indebtedness assigned by Bank to AFI, any wholesale advances made by AFI prior to such assignment and any wholesale advances made by AFI after such assignment and that, effective as of the date of such assignment, this Agreement will be deemed to be amended such that wherever the words "Bank" or "Ally Bank" appear in this Agreement (other than in this paragraph 11), they will be replaced with "Ally Financial"

12. Any provision of this Agreement that is prohibited by law is ineffective to the extent of those prohibitions, but does not invalidate the remaining provisions of this Agreement.

13. Except as set forth herein, this Agreement may be changed only in a writing signed by both parties.

14. Any forbearance, delay or failure by Bank in exercising any of its rights or remedies does not constitute a waiver of such rights or remedies or of any existing or future default by Bank.

15. Subject to the limitations of paragraphs 2 and 3, any party may terminate this Agreement after giving ten days prior written notice to the others, provided, however that the Obligor may not terminate this Agreement if a Default then exists and no such termination shall affect the rights or remedies that Bank had immediately before the effective date of such termination.

16. This Agreement constitutes the entire agreement of the parties regarding its subject matter. The execution of this Agreement by Bank and Obligor replaces all previously executed agreements between them or between Ally Financial and Obligor of substantially similar nature and type, effective as of the date of this Agreement.

Ally Confidential

17.   This Agreement may be signed in counterparts, each of which is deemed an original, and all of which taken together constitute one and the same agreement.  The signatures of the parties, exchanged via fax or e-mail, shall constitute and be deemed original signatures for all purposes.

Signed February 13, 2023

Ally Bank

By:   _Kenneth D Geyer_          

Name:   _Kenneth D Geyer_

Title:   _Authorized Representative_

Off Lease Only LLC

By:   _Leland Wilson_          

Name:   Leland Wilson

Title:   CEO

For purposes of acknowledging its rights and obligations pursuant top Paragraph 11 above

Ally Financial

By:   _Kenneth D Geyer_          

Name:   _Kenneth D Geyer_

Title:   _Authorized Representative_